**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

|  |  |
|---|---|
| NORTH DAKOTA RETAIL ASSOCIATION & NORTH DAKOTA PETROLEUM MARKETERS ASSOCIATION, <br><br>         Plaintiffs, <br><br> v. <br><br> BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, <br><br>         Defendant. | Civil Action No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs North Dakota Retail Association and North Dakota Petroleum Marketers Association file this Complaint for Declaratory Relief against Defendant Board of Governors of the Federal Reserve System. For a decade, the Board has failed to properly follow Congress's instructions to ensure that debit-card processing fees are reasonable and proportional to the costs of debit-card transactions. Because the Board has not done what Congress said to cure this market failure, American consumers and merchants continue to suffer the same harms that prompted Congress to act in the first place. Enough is enough.

**INTRODUCTION**

1.     This case is about debit cards. More precisely, it's about the behind-the-scenes fees attached to every debit-card transaction—fees that generate billions of dollars in profits annually for banks that issue debit cards. It's about how those billions of dollars

in bank fees ultimately lead to higher costs for retailers and higher prices for consumers. And it's about how, in 2010, Congress told the Federal Reserve Board to fix that problem—and how the Board's solution to that problem is no fix at all. Rather, the Board's actions perpetuate by government fiat the same problem that prompted Congress's 2010 directive: A decade later, banks *still* reap billions of dollars in annual profits from debit-card fees at retailers' and consumers' expense, directly contrary to Congress's instruction.

2.      Americans' enthusiasm for debit cards predates the COVID-19 pandemic. At the beginning of 2020, debit cards were one of the most popular forms of payment. American consumers used debit cards in 35 percent of all noncash payment transactions. In fact, as summarized in the below table, data from biennial government reports show a staggering 82 percent increase in debit-card transactions since 2009:

| Number and dollar value of debit card transactions in U.S. | | |
|---|---|---|
| Year | Number of transactions | Dollar value of transactions |
| 2009 | 37,600,000,000 | $1,430,000,000,000 |
| 2011 | 46,700,000,000 | $1,820,000,000,000 |
| 2013 | 53,700,000,000 | $2,070,000,000,000 |
| 2015 | 60,600,000,000 | $2,310,000,000,000 |
| 2017 | 68,500,000,000 | $2,620,000,000,000 |

*See* Bd. of Governors of the Fed. Reserve Sys., *Regulation II (Debit Card Interchange Fees and Routing): Reports and Data Collections*, https://bit.ly/3705HaI.

3.      The COVID-19 pandemic has turbocharged consumers' shunning of cash payments for noncash alternatives. In 2020, cash withdrawals from ATMs declined a "staggering" 22 percent. R. Robin McDonald, *Pandemic Drives Dramatic Card Transaction Shifts*, Credit Union Times (Sept. 8, 2020), https://bit.ly/2W2Mq2x. Debit-card use, in

contrast, continues to spike; to take just one example, it "was up 19.6% for the week ending Aug. 9[, 2020] compared to the same week in 2019." *Id.* Experts see no signs that this trend will stop. On the contrary, they expect it to continue. *See id.*

4.      Indeed, "[t]he COVID-19 crisis is pushing people in the U.S. to increasingly choose debit cards over credit cards." Emily Bary, *Square Stands to Benefit from Growing Usage of Debit Cards, Analyst Says*, MarketWatch (Oct. 5, 2020), https://on.mktw.net/3nnzGiF. "Visa disclosed in early September that overall U.S. payment volume was up 7% in August, led by a 24% increase in debit [card] volume as credit [card] volume fell 8%." *Id.* Beyond that, "Mastercard saw U.S. debit [card] volumes exceed credit [card] volumes for the first time in the June quarter, while Visa saw its widest spread to date between the two payment types then." *Id.* Visa itself "estimates, based on past behaviors, that there could be a $100 billion annual shift to debit-card spending from credit-card spending over time." Emily Bary, *Visa Says COVID-19 Crisis Could Help Drive $100 Billion Annual Shift to Debit Cards Over Time*, Marketwatch (June 3, 2020), https://on.mktw.net/3u3xRuY.

5.      The surge in debit-card usage is an unstoppable trend with inescapable implications for America's merchants. Consumers now use debit cards for so many transactions that, as a practical matter, most merchants in most sectors must accept debit cards. As one commentator put it, "[r]etailers and restaurants cannot feasibly refuse Visa and Mastercard." Charlie Thaxton, *The Hidden Price of Cashless Retail*, Forbes (Apr. 3, 2019), https://bit.ly/3oWKchn. That makes the costs of accepting debit cards a necessary (and ever-larger) cost of doing business.

- 3 -

6.     That merchants must accept debit cards will prompt no objections from the banks that issue them. Nor will it draw protest from Visa or Mastercard, which operate the largest networks over which almost all debit-card transactions are processed. Banks that issue debit cards, commonly referred to as "issuers," receive a fee from merchants — known as an "interchange fee" — every time a customer uses a debit card to buy something. Ostensibly, this interchange fee compensates the issuers for their costs in the transaction. But those fees have become a lush profit center for issuers — contrary to Congress's express instructions in 2010.

7.     Back then, when responding to the Great Recession, Congress recognized how debit-card interchange fees had skyrocketed in the preceding decades. Those fees exploded because they are (1) set by card networks, like Visa and Mastercard; (2) paid *to* the issuers; but (3) paid *by* the merchants. So, in this broken market, networks have no incentive to compete with each other to offer lower interchange fees to merchants. Instead, the networks compete for the issuers' business by offering the highest interchange fees possible, and then pass those fees on to the merchants to pay. Merchants, in turn, remain captive to whatever interchange fees the networks set. As a result, debit-card interchange fees over Visa's network more than tripled between the early 1990s and 2010. In 2009 alone, merchants paid issuers $16.2 billion in debit-card interchange fees.

8.     Congress acknowledged the consequences of continued unfettered interchange-fee increases for both merchants and consumers. The increasing interchange fees would threaten merchants' continued profitability, lead to higher prices for consumers, or both. Consumers, in turn, would be stuck paying ever-higher prices, face

job losses from shuttered businesses, lose ready access to goods and services, or suffer some of all those consequences.

9.      Congress deemed those outcomes unacceptable. So, as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Congress amended the Electronic Fund Transfer Act to regulate the interchange fees that large issuers can receive for debit-card transactions. Those changes are known as the "Durbin Amendment," after their sponsor, Senator Richard Durbin. Those regulated interchange fees apply only to debit-card transactions with large issuers—those with $10 billion or more in assets. The Durbin Amendment reins in interchange fees for those issuers by limiting those fees to a level that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. §1693o-2(a)(2).

10.     Congress also directed the Federal Reserve Board to issue regulations that set a standard for assessing whether an interchange fee is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* §1693o-2(a)(3)(A). It then told the Board how to set that standard. In particular, Congress required "the Board" to "distinguish between" two types of costs. *Id.* §1693o-2(a)(4)(B). **First**, the Board "shall" consider the "incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement"—that is, the processing costs, sometimes called ACS costs—"of a particular electronic debit transaction." *Id.* §1693o-2(a)(4)(B)(i). **Second**, the Board "shall not" consider "other costs incurred by the issuer which are not specific to a particular electronic debit transaction." *Id.* §1693o-2(a)(4)(B)(ii).

11.     As the Durbin Amendment required, in 2010 the Board proposed a rule for setting reasonable and proportional debit-card interchange fees. The Board's proposed rule contained two alternative approaches, both of which hewed to Congress's careful delineation and looked (as instructed) only to costs associated with the "authorization, clearance, or settlement" ("ACS costs") of a particular debit-card transaction.

12.     But, sensing an end to untold billions of dollars in profits, covered issuers responded to the Board's 2010 proposed rulemaking by pushing the Board to consider a third, *nonstatutory* category of costs when setting the standard. In a dramatic departure from its proposed rule, the Board ultimately adopted in its final rule a variant of one of its proposed approaches—but based the final rule on that third category of nonstatutory costs. The upshot? The final rule's maximum interchange fee didn't just increase from the proposed rule's maximum interchange fee. It more than *doubled*.

13.     Worse yet, the final rule does not even tie the maximum interchange fee to a covered issuer's actual costs for a particular transaction. Congress, of course, instructed the Board to do just that—the Durbin Amendment requires the "amount of *any* interchange fee" to "be reasonable and proportional to *the* cost incurred by *the* issuer with respect to *the* transaction." *Id.* §1693o-2(a)(2) (emphasis added). But the final rule sets a one-size-fits-all fee, allowing *all* covered issuers to charge a fee of up to 21 cents for any debit-card transaction—no matter the issuer's actual costs to process it—*and* an ad valorem component of .05% of the transaction's value to compensate the issuers for fraud losses. 12 C.F.R. §235.3(b).

14.     Using the Board's own data, the 21-cent maximum allowable per-transaction fee in its final rule continues to provide a windfall for issuers that has existed since day one. For every year since 2009, covered issuers' average per-transaction ACS costs have been less than half of the final rule's maximum fee of 21 cents:

| Average per-transaction ACS costs for covered issuers (excluding fraud losses) | | | | |
|---|---|---|---|---|
| Year | Average ACS costs (per transaction), or what Congress effectively mandated | Maximum allowable interchange fee, or what the Final Rule allows | Average difference (per transaction), or amount that exceeds the mandate | Average profit for issuers (per transaction, as a %) |
| 2009 | 8¢ | 21¢ | 13¢ | 163% |
| 2011 | 5¢ | 21¢ | 16¢ | 320% |
| 2013 | 4.4¢ | 21¢ | 16.6¢ | 377% |
| 2015 | 4.2¢ | 21¢ | 16.8¢ | 400% |
| 2017 | 3.6¢ | 21¢ | 17.4¢ | 483% |

*See* Bd. of Governors of the Fed. Reserve Sys., *Regulation II (Debit Card Interchange Fees and Routing): Reports and Data Collections*, https://bit.ly/3705HaI.

15.     It is not hard to see why covered issuers pulled out every stop to get the Board to adopt the higher, one-size-fits-all standard in the final rule. In 2017, the final rule facilitated an average profit of 483% every time a consumer used a covered issuer's debit card. (Average profit of 17.4 cents per transaction divided by average cost of 3.6 cents per transaction = 483.3%.) Profit margins so stratospheric in other sectors might prompt antitrust or price-gouging investigations; here, they're protected by a regulatory fiat that contradicts the Durbin Amendment's plain text and purpose.

16.     Those differences between the average per-transaction ACS costs and the maximum allowable interchange fee in the Board's final rule confirm that the rule has been anything but reasonable and proportional since 2011. And it grows less reasonable

and proportional with every passing year. In fact, the Board correctly anticipated both that issuers' ACS costs would drop over time and that those declines would require it to "to reexamine and potentially reset the fee standard." 76 Fed. Reg. at 43,422. But after nearly a decade of consistent cost declines, the same fee persists.

17.     The North Dakota Retailers Association and North Dakota Petroleum Marketers Association thus have no choice but to file this suit challenging the Board's final rule, known as Regulation II (pronounced "eye-eye"). *See* Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,394 (July 20, 2011), as updated by Debit Card Interchange Fees and Routing, 80 Fed. Reg. 48,684, 48,684 (Aug. 14, 2015) ("Updated Rule").

18.     Regulation II must be vacated and set aside because it exceeds the Board's statutory authority in three ways. ***First***, the Board flouted Congress's decision to separate all costs into two categories: (a) incremental ACS costs, which the Board *must* consider; and (b) all other costs, which Board *must not* consider. The Board claimed authority to consider more than just incremental ACS costs in setting the standard, and used those nonstatutory costs to raise the recoverable fee in its final rule. ***Second***, even assuming the Board could consider nonstatutory costs when setting an interchange fee, it included costs that the Durbin Amendment allowed the Board to account for elsewhere. ***Third***, even if the Board were correct to consider all those costs, it set a single standard for all issuers when the Durbin Amendment plainly requires a case-by-case approach.

## PARTIES

19.    The North Dakota Retail Association is a nonprofit trade association with its headquarters in Bismarck, North Dakota. NDRA's mission is to provide a sustainable environment for legislative and regulatory advocacy, education, networking, and member services for its retail-industry members. NDRA represents and promotes the best interests of the retail industry for retailers across North Dakota. It does so by, among other things, monitoring legislative and regulatory activity at the state and national level to protect members against legislation or regulations that could erode businesses' profitability. NDRA also provides training and education to its members.

20.    The North Dakota Petroleum Marketers Association is a nonprofit trade association that has existed since the mid-1950s, when it was known as the North Dakota Petroleum Dealers and Jobbers. Today, NDPMA represents over 400 petroleum marketers and associate members, including service station dealers, convenience stores, and truck stops. Among other things, NDPMA provides training, advocacy, and education for its members about legal and regulatory aspects of the retail landscape—an essential part of ensuring that NDPMA's members, a majority of which are small businesses, can continue to boost North Dakota's economy by providing over 10,000 jobs for area residents.

21.    NDRA's and NDPMA's members include retailers whose customers purchase goods using debit cards from covered issuers. Those retailers pay interchange fees for covered debit-card transactions subject to Regulation II. And those fees harm the retailers by unlawfully decreasing the amount of money they collect for each covered

debit-card payment they accept. That's a classic pocketbook injury, readily establishing that members of NDRA and NDPMA have standing to challenge Regulation II.

22.     NDRA and NDPMA have associational standing to litigate this case on behalf of their members whose debit-card transactions are subject to Regulation II's unlawful interchange fees. NDRA's and NDPMA's members are injured by Regulation II's unlawful fees, and would have standing to challenge Regulation II in their own right. This lawsuit seeks to protect merchants' interests, NDRA's and NDPMA's very reason for being. And neither the claims asserted nor the relief requested requires individual participation by NDRA's or NDPMA's members. *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

23.     Defendant Board of Governors of the Federal Reserve System is an agency of the United States within the meaning of 5 U.S.C. §551(1). Its principal place of business is at 20th Street and Constitution Ave., NW, Washington, DC. The Board is the federal agency responsible for operating the Federal Reserve System and for promulgating rules and regulations for banking institutions, including Regulation II. The Board is sued in its official capacity only.

## JURISDICTION AND VENUE

24.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§1331, 2201–2202; 5 U.S.C. §§701–706.

25.     Venue is proper because NDRA and NDPMA reside in this district. 28 U.S.C. §1391(e)(1).

## STATUTE OF LIMITATIONS

26.     Claims under the Administrative Procedure Act are subject to a six-year statute of limitations. *See* 28 U.S.C. §2401(a) ("[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."). The claims here are filed within that limitations period.

27.     The Board issued Regulation II in July 2011. *See* Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,394 (July 20, 2011). That rule was challenged under the APA in the United States District Court for the District of Columbia. The district court concluded that Regulation II violated the APA and vacated it. *See NACS v. Bd. of Governors of Fed. Reserve Sys.*, 958 F. Supp. 85 (D.D.C. 2013) (Leon, J.).

28.     The D.C. Circuit reversed. *See NACS v. Bd. of Governors of Fed. Reserve Sys.*, 746 F.3d 474 (D.C. Cir. 2014). But it also concluded that the Board failed to justify important portions of the rule. *Id.* at 492-93. It thus remanded to the Board to address that deficiency, if possible. *Id.* at 493. On August 14, 2015, the Board reevaluated and stood by its rule with further justification to support it. *See* Updated Rule, 80 Fed. Reg. 48,684.

29.     This lawsuit is timely because it was filed within six years of the Board's issuing the Updated Rule.

30.     This lawsuit is also timely because some of NDRA's or NDPMA's members were formed or began accepting regulated debit cards within six years of the date this suit was filed. For example, the Corner Post is a truck stop and convenience store in Watford City, North Dakota, and is a member of NDRA/NDPMA. The Corner Post opened its doors for business in March 2018 and began accepting debit cards from

covered issuers that same month. *See* Decl. of B. Lund, attached as Ex. A. That was the point at which the Corner Post began to be "adversely affected or aggrieved" by Regulation II. *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 818-19 (6th Cir. 2015); *see also Sisseton-Wahpeton Oyate of Lake Traverse Reservation v. U.S. Corp of Eng'rs*, 888 F.3d 906, 917 (8th Cir. 2018. In other words, Regulation II first "invade[d] [the Corner Post's] legally protected interest" in lawful debit-card interchange fees less than six years before this suit was filed; and March 2018 is when the Corner Post's "right to redress that injury under the APA accrue[d]" for the purpose of the APA's statute of limitations. *Herr*, 803 F.3d at 818-19 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882–83 (1990)). The Corner Post's claim is thus timely under the APA, and NDRA and NDPMA have associational standing to bring claims on behalf of the Corner Post and all their similarly situated members.

## BACKGROUND

I.     **The Durbin Amendment and the Board's regulations.**

A.   **Debit-card interchange fees.**

31.     When consumers use a debit card to buy goods or services from a merchant, they trigger a reticulated behind-the-scenes payment process that gets their money to the merchant. That process consists of four key players: (1) payment card networks such as Visa and Mastercard ("networks"); (2) the banks that issue debit cards (known as "issuers"); (3) merchants that accept payment by debit card; and (4) the merchant's banks (known as "acquirers"). *See* 76 Fed. Reg. 43,395.

32.     Networks provide the infrastructure and software that route data for debit-card authorization, clearance, and settlement, and connect issuing banks with the

merchant's acquirers so merchants can accept debit cards as a form of payment. Visa and MasterCard own the networks that process the vast majority of debit-card transactions.

33.     Issuers provide debit cards to their customers. Those cards allow customers to run electronic debit transactions over the networks. Debit-card transactions may occur on the same type of electronic payment network that processes credit-card payments, though there are a number of debit-card networks that handle debit payments but do not handle credit-card payments. The main difference between a debit card and a credit card is that the debit card pays the merchant from existing funds in the customer's bank account instead of drawing on the customer's credit.

34.     Debit-card transactions involve several fees. This case is about the largest of those fees—the "interchange fee." The interchange fee is a fee that merchants pay, passed through by the acquirers. That fee is set by the networks and paid to the issuers to compensate the issuers for their involvement in debit-card transactions. *See* 76 Fed. Reg. 43,396. As Senator Durbin explained before Regulation II was put in place, "every time a sale is made with a Visa or MasterCard debit or credit card the person who makes the sale only receives 97 or 98 cents on the dollar because the card networks take an unregulated cut out of the transaction amount and share it with their issuing banks." *See* Letter from Senator Durbin to Jennifer J. Johnson, Secretary, Board of Governors of the Federal Reserve System, at 2 (Feb. 22, 2011), https://bit.ly/3jrg9wq ("Durbin Letter").

35.     This problem worsened when interchange fees exploded as debit cards became more popular in the 1990s and early 2000s. For example, interchange fees for PIN debit transactions grew 234 percent from 1998 to 2006. *See* Stephen Mott, Industry Facts

Concerning Debit Card Regulation Under Section 920, at 14 (Oct. 27, 2010), https://bit.ly/3fK7fYB.

36.    The reasons for that spike were no secret. First, networks' "market dominance allows" them "to largely dictate card fees to merchants." Thaxton, *supra*. Second, the networks set the interchange fee that issuers receive, and the networks want the issuing banks to issue as many cards as possible to drive up transaction volume and fees that the networks themselves can charge. As a result, the networks motivate issuers by promising them high interchange fees for every transaction. *See* Durbin Letter at 5. Competition among networks, then, is upside down. The networks compete to *raise* the fees they set rather than compete to *lower* them, as typical market actors do—and their market dominance leaves merchants with no feasible alternative.

37.    The consequences for merchants are predictably devastating. For many merchants, interchange fees are their second-highest operating cost after payroll. Since consumers expect merchants to accept debit cards, merchants have no leverage to negotiate with the networks or issuers to lower interchange fees. *See* 156 Cong. Rec. S5,802 (daily ed. July 14, 2010) (statement of Sen. Richard J. Durbin). And since the issuers benefit from the networks' pricing practices, issuers have no incentive to negotiate directly with merchants.

### B. Congress passed the Durbin Amendment to address the staggering increase in interchange fees.

38.    Congress adopted the Durbin Amendment in 2010 to provide relief for merchants—and ultimately for the consumers who shared the burden of debit interchange fees in the form of higher prices for goods and services, even if they didn't

pay those prices with a debit card—while ensuring issuers could keep collecting enough revenue to cover their costs. The statute applies to debit-card issuers with more than $10 billion in assets. 15 U.S.C. §1693o-2(a)(6)(A). Interchange fees for covered issuers must be "reasonable and proportional" to the issuer's "incremental costs" for processing its particular debit-card transactions. 15 U.S.C. §§1693o-2(a)(2), (a)(4)(B)(i). The Board must prescribe regulations to "establish standards for assessing whether" an interchange fee is reasonable and proportional to a transaction's incremental costs. *Id.* §1693o-2(a)(3)(A). After all, the statute's entire point is to limit "[t]he amount of any interchange transaction fee that an issuer may receive or charge" to an amount that "shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* §1693o-2(a)(2); *see also id.* §1693o-2(a)(3)(A) (providing that the Board's regulation should "establish standards for assessing whether the amount of any interchange transaction fee … is reasonable and proportional to the cost incurred by the issuer with respect to the transaction").

39.     When issuing the regulation to establish "reasonable interchange fees," the Board "shall … distinguish between … the *incremental* cost" and "*other* costs." *Id.* §1693o-2(a)(4)(B) (emphasis added). Eliminating all ambiguity, Congress defined both types of costs—and told the Board what role each should play in setting the interchange fee.

40.     First, the statute defines "incremental cost" as those costs "incurred by an issuer for the role of the issuer in the *authorization, clearance* or *settlement* of a particular debit transaction." *Id.* §1693o-2(a)(4)(B)(i) (emphasis added). Those are also known as

"ACS" costs. ACS costs "shall be considered" when the Board sets the standard for interchange fees. *Id*.

41.     Second, the statute defines "other costs" as those "incurred by an issuer which are not specific to a particular electronic debit transaction." *Id*. §1693o-2(a)(4)(B)(ii). Unlike ACS costs, "other" costs "shall not be considered" when the Board sets the standard for interchange fees. *Id*.

42.     The Durbin Amendment established that dichotomy—between must-consider ACS costs and must-not-consider "other" costs—to create a debit-card payments regime that resembles the checking system, where payment transactions are regulated and clear at par (that is, with no interchange fees at all). *See id.* §§1693o-2(a)(4)(A) (requiring the Board to consider the "functional similarity between (i) electronic debit transactions; and (ii) checking transactions that are required within the Federal Reserve bank system to clear at par"). Put another way, merchants pay *no* ACS costs for a *paper* check that debits a consumer's bank account—and Congress instructed the Board to make the debit-card system as "functional[ly] similar[]" to the paper-check system as possible.

43.     Even while imposing those limits on the Board's discretion, Congress recognized that fraudulent debit-card transactions impose costs that should be mitigated. For that reason, after the Board determines a "reasonable and proportional" interchange fee, the Durbin Amendment permits the Board to "adjust[]" that fee to account for fraud-prevention costs. But Congress specifically limited this adjustment to "costs incurred by

the issuer in *preventing* fraud." *Id.* §1693o-2(a)(5)(i) (emphasis added). That is the only "adjustment" Congress allows the Board to make to its established interchange fee.

### C. The Board's proposed rule followed the Durbin Amendment's instructions.

44.     The Board hewed to the Durbin Amendment's statutory text in its notice of proposed rulemaking. The proposed rule created an interchange fee that limited the costs that issuers could recover to "those associated with authorization, clearing and settlement of a transaction." 75 Fed. Reg. 81,734 (Dec. 28, 2010) ("Proposed Rule"). In fact, the proposed rule contemplated a fee cap based on "only those costs that are specifically mentioned for consideration in the statute." *Id.* at 81,734-35. The Board specifically invoked Congress's "mandate to consider the functional similarities between debit transactions and check transactions" to bolster its plan to limit allowable costs "*to those that the statute specifically allows to be considered*, and not" "expand[]" allowable costs "to include additional costs that a payor's bank in a check transaction would not recoup through fees from the payee's bank." *Id.* at 81,735 (emphasis added).

45.     As a result, the proposed rule excluded all "other costs of a particular transaction beyond authorization, clearing and settlement costs" from the standard for the interchange fee. *Id.* at 81,735. The Board specifically excluded network processing fees, as well as overhead and "fixed costs, even if incurred for activities related to authorization, clearance, and settlement," since those costs were not attributable to the ACS costs of any one transaction. *Id.* at 81,735, 81,760. The Board also deemed fraud losses, and the costs of fraud-prevention and reward programs, unallowable because they are not attributable to the variable ACS costs an issuer incurs.

46.     Proceeding from those background principles, in 2010 the Board outlined two potential standards in its proposed rule. Under "Alternative 1," the Board proposed an "Issuer-Specific" fee "up to a Cap, with a Safe Harbor." *Id.* at 81,736. That proposal, set at the median issuer's ACS costs, allowed an issuer to receive a per-transaction interchange fee up to a 7-cent safe harbor. *See id.* at 81,736-38. If an issuer's allowable costs per transaction exceeded 7 cents, the issuer could have proven those costs and received a higher per-transaction interchange fee to compensate, up to a 12-cent-per-transaction cap. *Id.* at 81,737-38.

47.     Under "Alternative 2," the Board proposed a universal 12-cent cap; all issuers could receive 12 cents per transaction without showing their actual costs per transaction. *See id.* at 81,738.

48.     The Board determined that either option would more than suffice to cover the transaction's ACS costs. *Id.* at 81,737-38. And the Board believed the proposal furthered "the statute's mandate to consider the functional similarities between debit transactions and check transactions." *Id.*

### D. The Board buckled under pressure from issuers and networks and reversed course in the final rule.

49.     The Board received over 11,500 comments in response to the NPRM. Many commenters supported the proposed rule, including some who pushed for even lower fees. Merchants and their trade groups overwhelmingly supported the proposed rule's Alternative 1. Issuers and networks, in contrast, were among the proposed rule's most outspoken critics opposing both alternatives. In response to those comments, the Board

yielded to pressure from the issuers and networks and issued a final rule on July 20, 2011, that differed drastically from its proposed rule.

50.     The final rule adopts "a variant of the approach proposed in Alternative 2" from the proposed rule. Regulation II, 76 Fed. Reg. at 43,422. Under Regulation II, "an issuer may not receive an interchange fee that exceeds the sum of a base component, corresponding to the per-transaction allowable costs of the issuer at the 80th percentile as reported on the Board's survey, and an ad valorem component, corresponding to the per-transaction fraud loss of the median issuer as reported on the Board's survey." *Id.*

51.     In adopting this variant, the Board first rejected its previous view that the Durbin Amendment split the universe of relevant costs into two categories, and made the costs of "authorization, clearing and settlement of a transaction" the only allowable costs it could consider when setting the interchange fee. In its revised view, the Board could consider any costs not *specifically excluded* by §1693o-2(a)(4)(B)(ii). *Id.* at 43,426-27. That cleared a path for the Board to conclude that a *third* category of relevant costs exists—specifically, costs "that are not encompassed in either the set of costs the Board must consider in Section 920(a)(4)(B)(i), or the set of costs the Board may not consider under Section 920(a)(4)(B)(ii)." *Id.* at 43,427. "These costs," the Board explained, "are those that are specific to a particular electronic debit transaction but that are not incremental costs related to the issuer's role in authorization, clearance, and settlement." *Id.*

52.     The Board claimed virtually unfettered discretion to add costs to this third category and consider them when setting the recoverable interchange fee:

> The Board does not find it necessary to determine whether costs are "incremental," fixed or variable, or incurred in connection with

> authorization, clearance, and settlement. Under the framework established by the statute, all costs related to a particular transaction may be considered, and some—the incremental costs incurred by the issuer for its role in the authorization, clearance, and settlement—must be considered.

*Id.* That let the Board base the interchange standard on any costs that could be justified as somehow "specific" to debit transactions.

53.     The Board then considered four types of costs that were not "incremental" ACS costs: (1) fixed ACS costs, such as "network connectivity, software, hardware, equipment, and associated labor"; (2) network processing fees incurred by the issuer; (3) transaction monitoring costs (*i.e.*, costs for monitoring transactions before authorization); and (4) fraud losses. *Id.* at 43,426, 43,429-31. In this revised view, the only costs that Regulation II excluded as "other costs incurred by an issuer which are not specific to a particular electronic debit transaction," 15 U.S.C. §1693o-2(a)(4)(B)(ii), were "costs of corporate overhead (such as senior executive compensation); establishing the account relationship; card production and delivery; marketing; research and development; and network membership fees," Regulation II, 76 Fed. Reg. at 43,404.

54.     Incorporating those four costs into its analysis, the Board set a uniform cap for the amount issuers could recover: 21 cents per transaction, with a 5 basis-point (.05%) fee per transaction to account for potential fraud losses. *Id.* at 43,422; 12 C.F.R. §235.3(b).

55.     After the D.C. Circuit held that the Board needed to further justify its decision to base the interchange fee in part on transaction-monitoring costs, *see NACS*, 746 F.3d at 492-93, the Board rested its decision on "[t]he same rationale" that it thought supported the rest of the final rule—"'any cost that *is* incurred in effecting any electronic debit transaction'" could be part of the standard. Updated Rule, 80 Fed. Reg. at 48,685.

II.    **Though the Board's own biennial reports show marked reductions in issuer-reported ACS costs since 2009, the Board still refuses to revise the interchange fee.**

56.    Since adopting Regulation II, the Board has known that it does not accomplish Congress's goal of establishing reasonable and proportional debit-card interchange fees. Time and again, merchants and retailers have met with the Board, raising concerns about (and providing evidence of) how Regulation II's fee cap far exceeds covered issuers' average ACS costs. *See, e.g.*, Meeting Between Federal Reserve Board Staff and Representatives of the Merchant Advisory Group (MAG), July 7, 2015, https://bit.ly/3r7Tb1l (noting discussion of "concerns regarding the increase in interchange fees for low-value debit card transactions since Regulation II took effect"); Meeting Between Federal Reserve Board Staff and Representatives of the National Retail Federation (NRF) et al., March 25, 2016, https://bit.ly/2KxSZYo (noting discussion of "concerns regarding the level of regulated interchange fees compared to issuer costs and the increase in interchange fees for low-value debit card transactions since Regulation II took effect"); Meeting Between Staff of the Federal Reserve Board and Representatives of the Retail Industry Leaders Association, Dec. 5, 2019, https://bit.ly/3mvg37r (noting discussion of "debit card transaction and fraud-prevention costs in connection with the interchange fee cap and fraud-prevention adjustment in Regulation II").

57.    Reports about skyrocketing interchange fees have even hit the popular press. In early 2019, for example, the Wall Street Journal reported that "[m]erchants paid an estimated $64 billion in Visa and Mastercard credit and debit interchange fees" in 2018, totals "up 12% from a year earlier and 77% from 2012." AnnaMaria Andriotis, *Purchases*

with Plastic Get Costlier for Merchants—and Consumers, Wall St. J. (Feb. 15, 2019), https://on.wsj.com/3r7ZKRx. Other accounts describe the specific stress that interchange fees place on small businesses, like the Harborside Harvest Market in North Hero, Vermont (population 600), where interchange fees are now the store's "fourth-highest operating expense, after labor, rent and utilities." Todd Keyworth, *U.S. Needs Swipe Fee Reform*, Burlington Free Press (Nov. 14, 2014), https://bit.ly/2K6spp6. To put that in perspective, "[t]he fees are always larger than" the store's "profits—last year twice as large." *Id.*; *see also* AnnaMaria Andriotis, *Another Challenge for Small Businesses: Higher Card Fees Could Be on the Way*, Wall St. J. (Apr. 9, 2020), https://on.wsj.com/3agu2ew (quoting CEO of the Hub Convenience Stores, "a small business comprising six gas stations, sa[ying] his company paid nearly $400,000 last year in credit- and debit-card fees, including interchange fees," making credit- and debit-card fees the company's third-largest line item behind only rent and payroll).

58.     But the Board need not look beyond its own data for proof that Regulation II has given issuers a decade-long, government-sanctioned windfall. The Durbin Amendment instructs the Board to collect and publish biennially information about costs that issuers incur and fees they receive. 15 U.S.C. §1693o-2(a)(3)(B). As directed, the Board has issued reports disclosing its findings for the years 2009, 2011, 2013, 2015, and 2017. *See* Federal Reserve, Regulation II (Debit Card Interchange Fees and Routing), Reports and Data Collections, https://bit.ly/2CWMT0d.

59.     Those reports confirm that Regulation II's cap was too high from the beginning. When Regulation II took effect in 2011, ACS costs for all covered issuers

averaged 5 cents per transaction. 2011 Report at 4. High-volume issuers—whose cards accounted for 94% of all covered debit-card transactions—had average ACS costs of 4.7 cents per transaction. *Id.* at 31-32. Put differently, the Board's 21-cent cap created an average windfall of 16.3 cents for 94% of all covered debit-card transactions in 2011. Mid-volume issuers accounted for 5.9% of covered debit transactions that year, and their ACS costs averaged about 12 cents per transaction. *Id.* That means those issuers received, on average, 9 cents more per transaction than it cost to perform those transactions. Taken together, these figures represent a massive boon for covered issuers in 99.9% of regulated transactions that directly contravenes the Durbin Amendment.

60.   Issuer ACS costs have only fallen since then. The Board's 2017 survey found that the average issuer ACS costs dropped to 3.6 cents per transaction. *See* 2017 Report at 23. High-volume issuers' share of all regulated debit transactions rose to 96.2%, and their average costs fell to 3.3 cents per transaction. *Id.* at 37-38. Regulation II thus created an average windfall of 17.7 cents for 96.2% of covered debit-card transactions in 2017. Mid-volume issuers made up 3.78% out of the remaining 4% of regulated transactions; their average costs remained steady at about 12 cents per transaction. *Id.*

61.   Because Regulation II allows covered issuers to charge interchange fees almost 6 times their actual ACS costs, covered issuers have continued to reap tens of billions of dollars in profits from interchange fees even after Congress moved to halt networks' harmful pricing practices.

III.    **Regulation II's interchange fee exceeds the Board's authority, is contrary to law, and is arbitrary and capricious.**

62.    Regulation II, as confirmed by the Updated Rule, must be vacated and set aside because it exceeds the Board's statutory authority, is contrary to law, or is arbitrary and capricious in at least three ways.

**A.  Congress gave the Board authority to consider only incremental ACS costs.**

63.    The Durbin Amendment instructed the Board to set a standard for interchange fees that is "reasonable and proportional to the *cost* incurred by the issuer with respect to the transaction." 15 U.S.C. §1693o-2(a)(3)(A) (emphasis added). Congress specified the set of baseline costs against which the Board must measure an interchange fee's reasonableness and proportionality; that measuring stick is the "*incremental* cost" of "authorization, clearance, or settlement of a particular electronic debit transaction." *Id.* §1693o-2(a)(4)(B)(i) (emphasis added). Beyond that, Congress explicitly prohibited the Board from considering any "other costs incurred by the issuer which are not specific to a particular electronic debit transaction." *Id.* §1693o-2(a)(4)(B)(ii). In other words, "incremental costs" are the *only* costs the Board can consider in setting interchange fees.

64.    Regulation II and the Updated Rule flout that plain language. After initially—and properly—considering only incremental ACS costs in its NPRM, *see* 75 Fed. Reg. at 81,755-56, Regulation II invents a third category of costs that even the Board admits "the statute is silent" on—*i.e.*, costs "specific to a particular transaction but that are not incremental costs related to the issuer's role in authorization, clearance, and settlement." 76 Fed. Reg. at 43,426. The Board then claims discretion to include (and exclude) particular costs from that third category in setting an allowable interchange fee.

Relying on those additional costs, the Board increased the allowable interchange fee from a maximum of 12 cents per transaction in the NPRM to 21 cents per transaction in the final rule, with another .05% of the transaction's value for fraud losses. And the Updated Rule doubles down on basing the regulated fee on nonstatutory transaction-monitoring costs. 80 Fed. Reg. at 48,685. That exceeds the Board's statutory authority and is arbitrary, capricious, or otherwise not in accordance with law.

**B. The Board exceeded its authority in considering the specific costs it relied on.**

65.     Even if the Durbin Amendment gave the Board authority to consider more than just incremental ACS costs, it still prohibits the Board from considering the four specific additional costs it invoked to support the rule: (1) fixed ACS costs, (2) fraud losses, (3) transaction monitoring costs, and (4) network processing fees. By expressly including each of those costs in Regulation II, the Board exceeded its statutory authority and acted arbitrarily, capriciously, and not in accordance with law.

66.     ***Fixed ACS Costs.*** Regulation II relied on fixed—rather than "incremental"—ACS costs, such as "network connectivity, software, hardware, equipment, and associated labor" costs, to support its 21-cent cap. Regulation II, 76 Fed. Reg. at 43,426, 43,429-31; Updated Rule, 80 Fed. Reg. at 48,685. But the Board cited no statutory support to justify that interpretation. Instead, the Board justified its approach by pointing to alleged difficulties in discerning each transaction's incremental ACS costs. Regulation II, 76 Fed. Reg. at 43,426-27. That's an excuse, not a reasoned explanation. And agencies violate the APA when they ignore difficult congressional mandates rather than solve them. *See Comcast Corp. v. FCC*, 579 F.3d 1, 7 (D.C. Cir. 2009) ("That a problem is

difficult may indicate a need to make some simplifying assumptions, but it does not justify ignoring altogether a variable so clearly relevant and likely to affect the calculation on" a statutorily mandated cap).

67.     The Board's focus on the alleged difficulties instead of the statutory language was intentional and impermissible. Even under the Board's expansive statutory reading that it contends allows for its third category of costs, the Durbin Amendment still prohibits the Board from considering "costs incurred by an issuer which are not *specific* to a *particular* electronic debit transaction." 15 U.S.C. §1693o-2(a)(4)(b)(ii) (emphasis added). And fixed costs, by definition, are not "specific" to any "particular" transaction. *See* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "fixed cost" as "[a] cost whose value does not fluctuate with changes in output or business activity"); *San Antonio v. United States*, 631 F.2d 831, 851 n.11 (D.C. Cir. 1980) ("By definition, fixed costs are not associated with any particular traffic."). So the Board exceeded its statutory authority, and acted arbitrarily and capriciously, by considering them.

68.     *Fraud losses*. Regulation II's inclusion of a 5-basis-point (0.05 percent) allowance for "fraud losses" likewise exceeded the Board's authority and was arbitrary, capricious, and not in accordance with law. 12 C.F.R. §235.3(b)(2); *see* Regulation II, 76 Fed. Reg. at 43,431 ("fraud losses are best assessed through an *ad valorem* component in the interchange fee standards"). The Durbin Amendment authorizes issuers to recoup only one specific kind of fraud-related costs—those related to "preventing fraud." 15 U.S.C. §1693o-2(a)(5)(A)(i). It provides that, *after* the Board calculates the interchange fee standard, "[t]he Board may allow for an *adjustment* to the fee amount … if such

adjustment is reasonably necessary to make allowance for costs incurred by the issuer in *preventing fraud*." *Id.* (emphasis added). And to obtain that "adjustment" for costs of "preventing fraud," issuers must first "compl[y] with the fraud-related standards" that the Durbin Amendment requires the Board to promulgate. *Id.* §§1693o2(a)(5)(A)(ii) & (5)(B). Those standards, the Durbin Amendment provides, "shall be designed to ensure that *any fraud-related* adjustment of the issuer is *limited* to" fraud prevention. *Id.* §1693o-2(a)(5)(A)(ii)(I) (emphasis added).

69.     None of this is news to the Board. It conducted a separate notice-and-comment proceeding for fraud-prevention costs, and allowed a 1-cent upward adjustment of the interchange fee for issuers that implement policies and procedures reasonably designed to prevent fraud. *See* 12 C.F.R. § 235.4. So by also accounting for "fraud losses" in the interchange fee, the Board flouted the Durbin Amendment's careful limitation that any "fraud related" recovery be "limited to" fraud prevention. 15 U.S.C. §1693o-2(a)(5)(A)(ii)(I). And the Updated Rule goes so far as to label "most costs of the authorization process" as "some type of fraud"-prevention costs. 80 Fed. Reg. at 48,685.

70.     Labeling authorization costs as fraud prevention, and including "fraud losses" in the interchange fee, also creates perverse outcomes. Congress authorized the adjustment to "*require* issuers to take effective steps to reduce the occurrence of, and costs from, fraud in relation to electronic debit transactions." 15 U.S.C. §1693o-2(a)(5)(ii)(II) (emphasis added). But Regulation II reduces issuers' incentives to implement fraud-prevention measures because it allows them to charge a 5 basis-point fee for *all* transactions to reimburse them for fraud-related losses—making fraud a profit center for

some issuers no matter if they implement adequate fraud-prevention protocols. This frustrates Congress's goal of encouraging fraud reduction.

71.     ***Transaction-monitoring costs***. The Board's reliance on transaction-monitoring costs exceeds its statutory authority and is arbitrary and capricious for the same reason. The Board agrees that monitoring costs are those "costs incurred by the issuer during the authorization process to *detect indications of fraud* or other anomalies." Updated Rule, 80 Fed. Reg. at 48,684 (emphasis added). And the Board has admitted that "[t]he most commonly reported fraud-prevention activity was *transaction monitoring*." Regulation II, 76 Fed. Reg. at 43,394 (emphasis added).

72.     But here again, Congress specifically authorized a separate "adjustment … to make allowance for costs incurred by the issuer in preventing fraud." *Id.* §1693o-2(a)(5)(A)(i). As a result, "fraud prevention costs" are not to "be considered as part of the incremental issuer costs upon which the reasonable and proportional fee amount is based." 156 Cong. Rec. S5902-01, 5925 (July 15, 2010) (Statement of Senator Durbin). By ignoring that directive, the Board increased the amount issuers can recover in an interchange fee, further discouraging issuers from adopting stringent fraud-prevention measures. Regulation II and the Updated Rule make issuers' fraud-prevention costs recoverable no matter if their fraud-prevention efforts satisfy the Board's standard for recovering the adjustment.

73.     ***Network processing fees.*** A network processing fee is the fee that networks (like Visa and Mastercard) charge issuing (cardholder) banks and acquiring (merchant) banks to process a debit card transaction. Proposed Rule, 75 Fed. Reg. at 81,735. The

Durbin Amendment did give the Board the authority to regulate those fees. But that authority was limited to issuing regulations necessary "to ensure that a network fee is not used to *directly or indirectly compensate* an issuer with respect to an electronic debit transaction." *Id.* §1693o-2(a)(8)(B)(i) (emphasis added). Rather than preventing issuers from using network fees as "direct[] or indirect[]" compensation, the Board did the opposite. It relied on those costs to *raise* the interchange fee and *increase* the compensation that issuers receive for "electronic debit transaction[s]." *Id.* §1693o-2(a)(2).

74.     The Durbin Amendment's definition of "network fee" confirms that the Board must exclude such fees from its calculations. A "network fee" is "any fee charged and received by a payment card network with respect to an electronic debit transaction, *other than an interchange transaction fee*." 15 U.S.C. §1693o-2(c)(10) (emphasis added). A "network fee" cannot be both *different from* an "interchange transaction fee" (as defined in subsection 2(c)(10)) *and* a *component of* an "interchange transaction fee" (as Regulation II proclaims). Congress treated network processing fees as a separate issue. The Board must do so too.

### C.  The Board cannot set a one-size-fits-all cap.

75.     Even if the Durbin Amendment lets the Board consider more than incremental ACS costs—and if those other permissible costs included the four types discussed above—Regulation II as confirmed by the Updated Rule still exceeds the Board's statutory authority and is arbitrary and capricious because it implements a one-size-fits-all approach for interchange fees.

76.     The Durbin Amendment provides that:

> The amount of any interchange transaction fee that an issuer may receive with respect to an electronic debit transaction shall be reasonable and proportional to *the* cost incurred by *the* issuer with respect to *the* transaction.

15 U.S.C. §1693o-2(a)(2) (emphasis added). The word "the" is one "of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'" *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000) (cleaned up); *see also Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1514 (2019) ("[T]he 'use of the definite article ... indicates that there is generally only one' person covered" (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004)). By using "the definite article 'the,'" Congress "particularize[d] the subject which it precedes," *Slater*, 231 F.3d at 5 (cleaned up), which means that Congress intended the words "cost" and "transaction" to be particularized for each issuer. In other words, the interchange fee that each issuer can recover must be tied to the specific costs that each issuer incurs for its own specific transactions. *See Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) ("[G]rammar and usage establish that 'the' is a function word indicating that a following noun or noun equivalent is definite or has been previously specified by context.") (cleaned up).

77.     The Durbin Amendment's other sections confirm this reading. The statute directs the Board to consider "the incremental cost by an issuer for the role of *the* issuer in the authorization, clearance, or settlement of a *particular* electronic debit transaction." 15 U.S.C. §1693o-2(a)(4)(B)(i) (emphasis added). Along with using (again) the definite article "the," this section requires the Board to tie the "cost" that issuers can recover to "particular" transactions. And "particular" means "[p]ertaining to a single definite thing or person, or set of things or persons, as distinguished from others," or "[b]elonging only

to a specified person or thing; restricted *to*." Shorter Oxford English Dictionary 2110 (6th ed. 2007).

78.     Section 1693o-2(a)(2) also requires that the interchange fee be "proportional" to the costs incurred. As the Board recognized, "the term 'proportional' requires a relationship between the interchange fee and the costs incurred." Regulation II, 76 Fed. Reg. at 43,423.

79.     Regulation II, as confirmed by the Updated Rule, breaks from both directives. Rather than issue a standard that is "particular" to each issuer and "proportional" to issuer-specific costs, Regulation II lets every issuer recover the same amount—21 cents plus .05% of each transaction—regardless of the costs the issuer incurs for each transaction. That exceeds the Board's statutory authority and is arbitrary, capricious, or otherwise not in accordance with law.

\* \* \*

80.     For these reasons, NDRA's and NDPMA's members are substantially harmed by the Board's unlawful implementation of the Durbin Amendment's interchange-fee cap. Regulation II, as confirmed by the Updated Rule, permits issuers to recover far more costs than the Durbin Amendment's plain language allows. It exceeds the Board's statutory authority. And it constitutes a construction of the Durbin Amendment that is arbitrary, capricious, or otherwise not in accordance with law.

CLAIMS FOR RELIEF

**COUNT I**
**Administrative Procedure Act**
**(Contrary to Law)**
**5 U.S.C. §706**

81.     Plaintiffs repeat and re-allege the allegations in paragraphs 1-80 as if set forth fully herein.

82.     Regulation II and the Updated Rule are final agency action. *See* 5 U.S.C. §704.

83.     Under the APA, a reviewing court must hold unlawful and set aside agency action that is "not in accordance with law" or is "in excess of statutory jurisdiction, authority or limitations, or short of statutory right." 5 U.S.C. §706(2)(A), (C). Regulation II as confirmed by the Updated Rule is contrary to law and exceeds the Board's statutory authority under the Durbin Amendment for at least three reasons.

84.     First, Congress directed the Board to ensure that any interchange fees an issuer receives for covered debit-card transactions are reasonable and proportional to a specific set of the issuer's transaction costs—its incremental ACS costs. And Congress specifically commanded that, when setting the interchange fee cap, "other costs … shall not be considered." 15 U.S.C. §1693o-2(a)(4)(B)(ii). But in Regulation II and the Updated Rule, the Board expressly considered costs *other than* incremental ACS costs. As a result, Regulation II and the Updated Rule are contrary to law and exceed the Board's statutory authority.

85.     Second, Regulation II and the Updated Rule also exceed the Board's authority and are contrary to law because the Board based them on four specific costs—

fixed ACS costs, fraud losses, transaction-monitoring costs, and network-processing fees—that Congress precluded the Board from considering, or directed the Board to consider through mechanisms other than interchange fees. Basing Regulation II on fixed ACS costs exceeds the Board's authority because fixed costs are not "specific to a particular electronic debit transaction." 15 U.S.C. §1693o-2(a)(4)(B)(ii). Including fraud losses and transaction-monitoring costs in interchange fees exceeds the Board's authority and is contrary to law because Congress required the Board to account for those costs, if at all, through other adjustments—ones for fraud *prevention*. *Id.* §§1693o-2(a)(5)(A)(i), 2(a)(5)(A)(ii)(I). And Congress expressly excluded network-processing fees from the definition of interchange fees, *id.* §1693o-2(c)(10), and directed the Board "to ensure that a network fee is not used to directly or indirectly compensate an issuer" for debit transactions, *id.* §1693o-2(a)(8)(B)(i). But the Board *incorporated* network-processing fees into its interchange-fee calculus, thereby ensuring that issuers *would* be compensated *directly* for network fees. Each of those decisions exceeded the Board's statutory authority and is contrary to law.

86.     Third, Congress instructed the Board to adopt a cap on covered debit-card interchange fees that "is reasonable and proportional to *the* cost incurred by *the* issuer with respect to *the* transaction." *Id.* §1693o-2(a)(3)(A) (emphasis added). By using the definite article "the" three separate times, Congress left no doubt: interchange fee caps must be specific to each issuer's specific incremental ACS costs. Yet the Board flouted that command, adopting instead a one-size-fits-all cap for all covered debit-card transactions. Because it operates on broad generalities, rather than on a specific issuer's

costs, Regulation II as confirmed by the Updated Rule exceeds the Board's statutory authority and is contrary to law.

## COUNT II
## Administrative Procedure Act
## (Arbitrary and Capricious)
## 5 U.S.C. §706

87.     Plaintiffs repeat and re-allege the allegations in paragraphs 1-86 as if set forth fully herein.

88.     The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. §706(2)(A).

89.     Regulation II, as confirmed by the Updated Rule, is arbitrary and capricious for several reasons, including but not limited to the following.

90.     First, the Board failed to consider important aspects of the problem that Congress passed the Durbin Amendment to solve. Congress designed the Durbin Amendment to yield interchange fees that are sufficient to cover issuers' incremental ACS costs but are still as "functional[ly] similar[]" as possible to "checking transactions," which "are required within the Federal Reserve bank system to clear at par." 15 U.S.C. §1693o-2(a)(4)(A)(ii). Congress's evident purpose was to make covered debit-card transactions look as much as possible like checking transactions—like the latter, the former should bear as few processing costs as possible. But the Board's rulemaking process proceeded in the opposite direction. The Board moved from a proposed cap of either 7 cents plus a safe harbor, or a flat 12-cent fee, to a final cap of 21 cents plus 0.05% *ad valorem*—a movement *away* from clearing transactions at par, not *toward* it. Whatever

"functional similarity" might mean (*id.* §1693o-2(a)(4)(A)), it cannot equate one (paper-check) system that clears transactions at par to another (electronic-check) system that creates billions of dollars in interchange fees annually. The Board did not adequately consider or explain how that jump in allowable costs from its proposed rule to its final rule followed Congress's instruction to consider the functional similarity of debit-card interchange fees and checking transactions. That failure makes Regulation II as confirmed by the Updated Rule arbitrary and capricious.

91.     Second, the Board set the interchange fee cap based on factors that Congress did "not intend[] it to consider." *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Those factors include the four examples of nonstatutory costs—fixed ACS costs, fraud losses, transaction-monitoring costs, and network processing fees—described above. *See supra* ¶¶ 65-74. Agency decision making based on prohibited factors is the very definition of arbitrary and capricious agency action.

92.     Third, the Board's reasoning behind Regulation II and the Updated Rule "runs counter to the evidence before the" Board. *State Farm*, 463 U.S. at 43. Though it had only one year of ACS data, the Board found that average issuer processing costs were 8 cents per transaction. 2009 Report at 9. And the Board expected that issuers' ACS costs would drop over time—so much so that those declines would require it to "to reexamine and potentially reset the fee standard." 76 Fed. Reg. at 43,422. The Board's assumption has borne out; in 2015, when it issued the Updated Rule, average ACS costs had fallen to 4.2 cents per transaction. 2015 Report at 4. By 2017, average ACS costs had fallen to just

3.6 cents per transaction. 2017 Report at 3. Despite having those data, the Board still set the interchange fee cap at 21 cents per transaction plus an 0.05% *ad valorem* charge for fraud losses, did not change it in the Updated Rule, and has kept it there since. But the Board never adequately explained how a cap so significantly greater than issuers' actual incremental ACS costs—and leading to billions of dollars of ever-increasing profits every year for issuers—follows Congress's command to make debit-card interchange fees "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. §1693o-2(a)(3)(A). That failure makes Regulation II, as confirmed by the Updated Rule, arbitrary and capricious.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs ask this Court to enter judgment in their favor and to provide the following relief:

(1) A declaratory judgment holding that the standard for reasonable and proportional interchange fees in Regulation II and confirmed by the Updated Rule (12 C.F.R. §235.3(b)) is contrary to law and exceeds the Board's statutory authority;

(2) A declaratory judgment holding that the standard for reasonable and proportional interchange fees in Regulation II and confirmed by the Updated Rule (12 C.F.R. §235.3(b)) is arbitrary and capricious under the APA;

(3) A declaratory judgment and permanent injunction finding the standard for reasonable and proportional interchange fees in Regulation II and confirmed by the Updated Rule (12 C.F.R. §235.3(b)) invalid and setting it aside;

(4) All other relief to which Plaintiffs are entitled, including attorney's fees and

costs.

Dated: April 29, 2021

Respectfully Submitted,

s/ *Scott K. Porsborg*

Scott K. Porsborg
SMITH PORSBORG SCHWEIGERT ARMSTRONG
MOLDENHAUER & SMITH
P.O. Box 460
122 East Broadway
Bismarck, ND 58502
(701) 258-0630
sporsborg@smithporsborg.com

Tyler R. Green (*pro hac vice* forthcoming)
Bryan Weir (*pro hac vice* forthcoming)
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423

Stephanie A. Martz (*pro hac vice* forthcoming)
NATIONAL RETAIL FEDERATION
1101 New York Avenue, NW
Suite 1200
Washington, DC 20005
(202) 626-8106

*Attorneys for Plaintiffs North*
*Dakota Retailers Association and North Dakota*
*Petroleum Marketers Association*