## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Corner Post, Inc., North Dakota Retail Association, and North Dakota Petroleum Marketers Association, | | |
| Plaintiff, | | Case No. 1:21-cv-00095 |
| vs. | | |
| Board of Governors of the Federal Reserve System, | | |
| Defendant. | | |

## ORDER GRANTING MOTION TO DISMISS

### INTRODUCTION

[¶ 1]    THIS MATTER comes before the Court on a Motion to Dismiss for Lack of Jurisdiction, Motion to Dismiss for Failure to State a Claim, and, alternatively, Motion to Change Venue filed by the Defendant, Board of Governors of the Federal Reserve System ("Board'"), on August 6, 2021. Doc. No. 20. The Plaintiffs filed a Response on September 17, 2021. Doc. No. 26. The Board filed a Reply on October 8, 2021. Doc. No. 27. For the Reasons set forth below, the Board's Motion to Dismiss is **GRANTED**. Because this case is dismissed for filing outside the statute of limitations and the Plaintiffs have failed to show good cause why the statute of limitations should be tolled, the Board's alternative Motion to Change Venue is **MOOT**.

[¶ 2]    The current Motions seek to dismiss the Amended Complaint filed on July 23, 2021 (Doc. No. 19). Prior to filing the Amended Complaint, the Board sought dismissal of the original Complaint on similar grounds. Doc. No. 17. In response to the initial Motion, the Plaintiffs filed

- 1 -

an Amended Complaint, adding the Corner Post, Inc., as a Plaintiff. Because the Amended Complaint supersedes the original Complaint, the Board's earlier Motion are **MOOT**.

## BACKGROUND[1]

[¶ 3]   This case is about the fees associated with debit card transactions. These fees generate billions of dollars in revenue for the banks that issue the debit cards because debit cards are one of the most popular forms of payment in the United States. In fact, thirty-five percent (35%) of all noncash payments made in the United States were made by debit card. Consumers' frequent use of noncash methods of payments, such as debit cards, forced retailers and restaurants to accept customers' use of Visa and Mastercard. Because of the fees associated with debit cards, costs associated with these transactions have increased, and the cost of the fees has been passed along to the consumer. These fees are known as "interchange fees," which will be discussed in greater detail later. The issuers of debit cards (i.e., banks) have profited greatly from these interchange fees.

[¶ 4]   The Corner Post, Inc., ("Corner Post") is a truck stop and convenience store in Watford City, North Dakota. It incorporated on June 26, 2017, but did not open for business until March 2018. Corner Post has been accepting debit cards for payments since it first opened its doors for business.

[¶ 5]   The North Dakota Retail Association ("NDRA") is a non-profit trade association headquartered in Bismarck, North Dakota. It exists to "provide a sustainable environment for legislative and regulatory advocacy, education, networking, and member services for its retail-industry members." Doc. No. 19 at ¶ 20. NDRA seeks to promote the best interest of the retail

---

[1] The Background largely from the Amended Complaint (Doc. No. 19) and is largely undisputed in terms of factual relevancy to the current Motions.

industry in North Dakota by keeping its eye on legislative and regulative actions aimed at business which could impact business profitability. Its members accept debit card transactions.

[¶ 6]    The North Dakota Petroleum Marketers Association ("NDPMA")[2] is a nonprofit trade association, tracing its roots back to the mid-1950s entity known as the North Dakota Petroleum Dealers and Jobbers. NDPMA has over 400 petroleum marketers and associate members, which include gas stations, convenience stores, and truck stops. NDPMA exists to train, advocate, and educate its members on the legal and regulatory aspects of retail. Its members accept debit card transactions.

[¶ 7]    The Board is the governing body of the Federal Reserve System. It is an "agency" by definition[3] based in Washington, D.C., where it operates the Federal Reserve System and promulgates rules and regulations for banks. It is responsible for issuing the regulation at the heart of this dispute—the so-called "Regulation II."

[¶ 8]    The crux of this case revolves around the interchange fees paid by merchants. When a consumer purchases goods or services from a merchant—like the Corner Post—and pays with a debit card, that transaction triggers a payment process that includes the merchants getting charged the interchange fee. As the Amended Complaint puts it, the payment process has four key players: (1) card networks like Visa and Mastercard ("Networks"); (2) the banks that issue the debits cards ("Issuers"); (3) merchants who accept debit card payments; and (4) the merchant's banks ("Acquirers").

[¶ 9]    The Networks provide the physical and digital framework for these transactions. They are the ones who provide the software responsible for routing the data for debit card authorization,

---

[2] The Court will refer to the NDRA and NDPMA collectively as the "Associational Defendants."
[3] See 5 U.S.C. § 551(1)

clearance, and settlement They also provide the connection between the issuers and acquirers to allow for merchants to accept the debit card payments.

[¶ 10]   Issuers provide customers debit cards. This allows customers to use debit transactions over the Network. Depending on the Network, debit cards can run on the same line as credit cards, although some Networks have separate lines for debit cards and credit cards.

[¶ 11]   When using debits cards, several fees are attached to each transaction. Interchange fees are the largest. Merchants pay the interchange fee, which has been passed through by the Acquirers. Networks set the fees. The fees are paid to the Issuers as compensation for their involvement in the debit transactions. Over time, the Networks began raising the prices to compete with one another. This allowed the Issuers to receive more significant fee payments and, thus, more money in their coffers. Merchants were left to pay.

[¶ 12]   This process began escalating in the 1990s when debit card use gained in popularity. Fee hikes continued to increase through the early 2000s[4] until Senator Richard J. Durbin proposed certain amendments to the Electronic Fund Transfer Act as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. These changes are known as the "Durbin Amendment," which authorizes the Board to prescribe regulations relating to "any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction." 15 U.S.C. § 1693o-2(a)(1).  Such interchange fees, however, must be "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2). Congress directed the Board to make certain considerations during the rulemaking process, specifically:

---

[4] In 2009 alone, merchants paid Issuers about $16.2 billion in debit card interchange fees. Doc. No. 1 at ¶ 7.

(4) **Considerations; consultation**

In prescribing regulations under paragraph (3)(A), the Board shall—

    (A) consider the functional similarly between—

        (i)      electronic debit transactions; and

        (ii)     checking transactions that are required within the Federal Reserve bank system to clear at par;

    (B) distinguish between—

        (i)      the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement[5] of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and

        (ii)     other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2); and

    (C) consult, as appropriate, with the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Director of the Office of Thrift Supervision, the National Credit Union Administration Board, the Administrator of the Small Business Administration, and the Director of the Bureau of Consumer Financial Protection.

15 U.S.C. § 1693o-2(a)(4) (footnote added).

[¶ 13] This Rule defined the final interchange fee standard and is commonly known as "Regulation II." Id. Regulation II "provides that an issuer may not receive or charge an interchange transaction fee in excess of the sum of a 21-cent base component and 5 basis points of the transaction's value (the ad valorem component)." 76 Fed. Reg. 43394-01, 43463. Issuer costs effecting a transaction, including (1) ACS costs, including network connectivity, software, hardware, equipment, and associated labor costs; (2) network processing fees; (3) transaction monitoring costs; and (4) fraud losses. Id. at 43404. After the proper notice and comment period, the Board published Regulation II on July 20, 2011. See 76 Fed. Reg. 43394-01 (2011).

---

[5] Authorization, clearance, or settlement costs are commonly referred to as ACS costs.

[¶ 14]  Certain business associations challenged Regulation II shortly after its publication. In NACS v. Board of Governors of Federal Reserve System, 958 F.Supp.2d 85 (D.D.C. 2013), the plaintiffs brought a facial challenge to the final rule at issue in this case nearly identical to the claims at issue here. The district court held the final rule violated the Durbin Amendment's plain language. Id. The Board appealed in that case and the Court of Appeals for the District of Columbia Circuit reversed the district court's finding the rule violated the statute. NACS v. Board of Governors of Federal Reserve System, 746, F.3d 474, 477 (D.C. Cir. 2014). The D.C. Circuit specifically held, "Applying traditional tools of statutory interpretation, we hold that the Board's rules generally rest on reasonable constructions of the statute." Id. However, the Circuit concluded remand was appropriate on "one minor issue—the Board's treatment of so-called transactions-monitoring costs—to the Board for further explanation." Id. The Circuit concluded the Board needed to provide further clarification explaining why it exercised its discretion in relation to the transactions-monitoring costs. Id. at 492-93. The D.C. Circuit expressly refused to vacate the final Rule, instead, allowing the Board to provide the needed clarification. Id. at 493.

[¶ 15]  The Board made the requisite clarification, including transactions-monitoring costs in the interchange fee standard ("Clarification"). See 80 Fed. Reg. 48684. The Clarification was published on August 14, 2015. Id.

[¶ 16]  On April 29, 2021, the Associational Plaintiffs in this case filed a Complaint against the Board. Doc. No. 1. The Complaint alleges two causes of action, challenging the interchange fee generally as well as the specific fees relating to (1) ACS costs, including network connectivity, software, hardware, equipment, and associated labor costs; (2) network processing fees; (3) transaction monitoring costs; and (4) fraud losses. Doc. No. 1 at pp. 32-37. The Complaint alleges violations of the Administrative Procedure Act in so far as the final Rule is (1) Contrary to Law

and (2) Arbitrary and Capricious. Id. On July 2, 2021, the Board filed a Motion to Dismiss. Doc. No. 17. In response, the Plaintiffs filed an Amended Complaint, adding the Corner Store as a Plaintiff. The causes of action alleged in the Amended Complaint are substantially the same as in the Complaint. See Doc. No. 19 at pp. 32-37. The present dispute requires the Court to determine whether the Clarification relating to the transactions-monitoring costs reset the clock for the statute of limitations on bringing challenges to the Rule. The Court concludes it does not. The Court further holds the Plaintiffs are not entitled to equitable tolling of the statute of limitations.

## DISCUSSION

### I.    Legal Standards

[¶ 17]  The Board challenges the subject matter jurisdiction of the Court to adjudicate the Amended Complaint pursuant to Rule 12(b)(1), Fed. R. Civ. P. The Board contends the Court lacks subject matter jurisdiction because the Plaintiffs' claims fall outside the statute of limitations. The burden of demonstrating subject matter jurisdiction is on the Plaintiffs. See Herden v. United States, 726 F.3d 1042, 1046 (8th Cir. 2013). The Court has an obligation to decide the jurisdictional issue and may not simply rule that there is or is not enough evidence to have a trial on the issues. Osborn v. United States, 918 F.2d 724, 730 (8th Cir. 1990). The Court may look outside the pleadings to determine whether jurisdiction exists, allow an evidentiary hearing, and receive evidence by any rational mode of inquiry. Buckler v. United States, 919 F.3d 1038, 1044 (8th Cir. 2019).

[¶ 18]  Alternatively, the Board contends the Plaintiffs have failed to state a claim because their claims fall outside the statute of limitations. Rule 12(b)(6) of the Federal Rules of Civil Procedure mandates the dismissal of a claim if there has been a failure to state a claim upon which relief can be granted.  In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A plaintiff must show that success on the merits is
more than a "sheer possibility." Id. A complaint is sufficient if its "factual content . . . allows the
court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.
The Court must accept all factual allegations as true, except for legal conclusions or "formulaic
recitation of the elements of a cause of action." Id. at 681. When a complaint establishes that a
cause of action is time-barred, "[a] court may dismiss a claim under Rule 12(b)(6) as barred by the
statute of limitations." Humphrey v. Eureka Gardens Public Facility Board, 891 F.3d 1079, 1081
(8th Cir. 2018).

[¶ 19]   The Parties agree the statute of limitations issue here is governed by 28 U.S.C. § 2401(a),
which provides, "every civil action commenced against the United States shall be barred unless
the complaint is filed within six years after the right of action first accrues."

## II.    August 14, 2015, Clarification

[¶ 20]   The first question the Court must answer is whether the publication of the August 14, 2015,
Clarification of the basis for the transaction-monitoring costs by the Board on remand from the
D.C. Circuit constituted the issuance of a new final rule that reset the statute of limitations to bring
facial challenges to Regulation II. The Board contends the D.C. Circuit did not vacate Regulation
II, but merely remanded for further clarification on a very narrow matter relating to the transaction-
monitoring costs. The Plaintiffs contend, despite the D.C. Circuit reaffirming the validity of
Regulation II, the NACS decision in effect rendered the entire rule legally invalid until the 2015
Clarification was published. Essentially, the Plaintiffs contend the statute of limitations to
challenge each provision of the rule at issue here was reset when the Board published the
Clarification in 2015 relating to the transaction-monitoring costs. According to the Plaintiffs, the

statute of limitations for the entire Rule was reset "because the NACS holding made the interchange-fee standard legally invalid until" the publication of the Clarification. The Court disagrees with their contention because the Clarification was not a final rule.

[¶ 21]   The Eighth Circuit has explained an agency's action is "final" if two conditions are met. "First, the action must mark the consummation of the agency's decisionmaking process." Sisseton-Wahpeton Oyate of Lake Traverse Reservation v. United States Corps of Engineers, 888 F.3d 906, 914-15 (8th Cir. 2018) (quotation marks and citation omitted). Tentative or interlocutory actions are categorically not "final." Id. "Second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Id. (quotation marks and citations omitted). Under the second condition, the agency action must be a definitive statement that determines "the rights and obligations of the parties." Id. Put differently, "[t]he agency action must determine parties' rights or obligations or compel legal consequences." Id. A resulting legal injury is necessary to establish this second condition: "[i]t may either compel affirmative action or prohibit otherwise lawful action." Id. "To constitute a final agency action, the agency's action must have inflicted an 'actual, concrete injury' upon the party seeking judicial review." Id. (quoting AT&T Co. v. EEOC, 270 F.3d 973, 975 (D.C. Cir. 2001)).

[¶ 22]   The Clarification at issue here does not meet the first condition of a "final" rule because it is not the final consummation of the Board's decisionmaking process. Sisseton-Wahpeton Oyate, 888 F.3d at 915. The NACS holding clearly shows the legal enforceability of the entire rule pending the publication of the minor clarification. In NACS, the D.C. Circuit considered challenges to the exact same fee provisions of the Rule at issue here. Compare NACS, 746 F.3d at 483-93 (discussing the interchange fee, "fixed" ACS costs, network processing fees and fraud losses fees, and remanding on the transaction-monitoring costs for further clarification) with Doc.

No. 19 at ¶¶74 – (challenging the interchange fee generally, fixed ACS costs, fraud losses, transaction-monitoring costs, and network processing fees). The D.C. Circuit upheld each of the challenged provisions with the minor remand relating to the transaction-monitoring costs for further clarification. NACS, 746 F.3d at 483-493. Contrary to the Plaintiff's contention that NACS invalidated the entire rule until the Clarification was issued, the NACS court expressly refused to vacate Regulation II pending clarification for numerous reasons:

> Because the interchange fee rule generally rests on a reasonable interpretation of the statute, because the Board may well be able to articulate a sufficient explanation for its treatment of fraud-prevention costs, and because vacatur of the rule would be disruptive—the merchants seek an even lower interchange fee cap, but vacating the Board's rule would lead to an entirely unregulated market, allowing the average interchange fee to once again reach or exceed 44 cents per transaction—we see no need to vacate.

Id. at 493. In all respects, even as it related to the transaction-monitoring costs, the Board left all of Regulation II in effect. Id.

[¶ 23]  As it related specifically to the transaction-monitoring costs, the D.C. Circuit concluded such costs "can reasonably qualify both as costs 'specific to a particular . . . transaction (section 920(a)(4)(B)) and as fraud-prevention costs (section 920(a)(5))." NACS, 746 F.3d at 492. This gives the Board discretion under either option to promulgate the transaction-monitoring costs. Id. But, at that point in the NACS litigation, the D.C. Circuit concluded the Board did not adequately explain why it exercised its discretion in that particular way. Id. The remand on this issue was to provide the Board the opportunity to "articulate a reasonable justification for determining that transaction-monitoring costs properly fall outside the fraud-prevention adjustment." Id. at 493.

[¶ 24]  The 2015 Clarification did nothing to change the substance of the underlying Rule. Because the Board's rules were based on a reasonable interpretation of the statute, the interchange fee, fixed ACS costs, fraud losses, transaction-monitoring costs, and network processing fees have remained

in effect as promulgated in 2011.  All of the challenged fees were promulgated in the 2011 Final Rule. See 76 Fed. Reg. 43394 ("The Board is publishing a final rule, Regulation II, Debit Card Interchange Fees and Routing."), 43404 (final rule includes the challenged fees). The August 2015 Clarification merely clarified the rationale for the transaction monitoring fees. See 80 Fed. Reg. 48684 ("The Board is explaining its treatment of transaction-monitoring costs in this Clarification."). This fee—along with all the challenged fees—has remained in effect since July 2011. See NACS, 746 F.3d at 492-93

[¶ 25]  Put simply, the 2015 Clarification fails to meet the first condition to constitute a final rule. The action does not constitute the consummation of the agency's decisionmaking process. The action that constituted the Board's final decision was published in July 2011. The Clarification in 2015 provided a minor explanation relating to a very narrow issue relating to the transaction-monitoring costs. This is buttressed by the fact that the D.C. Circuit refused to vacate the entire rule on remand. Instead, that court left the entire rule in effect.[6]

[¶ 26]  The Clarification also fails on the second condition because it does not determine the rights or obligations of the Plaintiffs. The rights and obligations of Plaintiffs were explained in detail in the Final Rule promulgated in 2011. The Clarification provides no additional rights or obligations. It merely provides clarification for the rationale behind the transaction-monitoring costs. The

---

[6] While the Board does not raise this issue, the claims raised by the Plaintiffs are essentially an impermissible collateral attack on Regulation II in an attempt to circumvent the statute of limitations. The Fifth Circuit has rejected these types of challenges to final agency actions. In El Paso Electric Co. v. FERC, 832 F.3d 495, 509 (5th Cir. 2016), the Fifth Circuit noted, "[t]o distinguish between collateral attacks and permissible challenges, we ask whether the FERC order the petition challenges was a clarification or a modification of a prior FERC order." The Fifth Circuit has declined to consider a collateral attack on a final FERC order. Id. (quoting City of Redding v. FERC, 693 F.3d 828, 837 (9th Cir. 2012)). The Court finds this reasoning persuasive. The Plaintiffs are essentially collaterally attacking the Final Rule arguing the Clarification provides a basis to skirt the statute of limitations. As discussed above, the 2015 Clarification is not a final rule and therefore does not reset the statute of limitations.

Clarification does not provide an additional rights or obligations to the Plaintiffs. It explains the agency's action and nothing more. It does not create a new fee. It does not expand the transaction-monitoring costs fee. It does not give the Plaintiffs any additional rights. It does not create any additional or new legally enforceable requirement or obligation. The Clarification does not inflict "an actual, concrete injury" on the Plaintiff. See Sisseton-Wahpeton Oyate, 888 F.3d at 915.  Any purported injury to the Plaintiffs based on the Rule occurred in 2011, not in 2015. See id. ("Generally, an agency does not inflict injury merely by expressing its view of the law." (citation and quotation marks omitted)).

[¶ 27]  Putting all of this together, the Court concludes the 2015 Clarification is not a final rule.

### III.    Statute of Limitations

[¶ 28]  Now that the Court determined the 2015 Clarification is not a final Rule, the Court now turns to when the right to challenge the Rule first accrued. Section 704 of the Administrative Procedures Act gives the Court authority to review "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Section 2401(a) of Title 28 of the United States Code provides a six-year statute of limitations for claims against the United States, stating "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." The Parties agree Section 2401(a) governs the present dispute. A right of action first accrues "on the date when all the events have occurred which fix the liability of the government and entitle the claimant to institute an action." Chandler v. U.S. Air Force, 255 F.3d 919, 921 (8th Cir. 2001). This mean, the right to challenge the agency action accrues when the Plaintiff "either knew, or in the exercise of reasonable diligence should have known that they had a claim." Loudner v. United States, 108 F.3d 896, 900 (8th Cir. 1997). Publication of a regulation in the Federal Register provides "legal notice of their content to all

affected thereby" and the statute of limitations begins to run on the publication date. See <u>Izaak</u>

<u>Walton League of America, Inc. v. Kimbell</u>, 558 F.3d 751, 761 (8th Cir. 2009) (quoted material);

<u>Hire Order Ltd. v. Marianos</u>, 698 F.3d 168, 170 (4th Cir. 2012) (limitations period begins to run

at time of rule publication when a facial challenge to the rule is brought).

[¶ 29]   The limitations period in this case began on July 20, 2011. Because the Clarification was

not a final agency action, the statute of limitations period does not reset. See <u>Chandler</u>, 255 F.3d

at 921 (time accrues when all events have occurred that fix liability with the United States). The

Clarification is not a final rule and the Plaintiffs have brought a facial challenge to the statute. With

the limitations period beginning on July 20, 2011, all facial challenges must have been brought

before July 20, 2017. This action was commenced on April 29, 2021. The claims asserted in the

Amended Complaint fall well outside the six-year statute of limitations.

[¶ 30]   As it relates to the Corner Post, who did not exist as a legal entity until June 26, 2017, when

it was incorporated, the conclusion is the same. The Plaintiffs argue the fact the Corner Post did

not exist as a legal entity until shortly before the statute of limitations ran resets the statute of

limitations to the time the Corner Post was incorporated. The Board contends the wealth of caselaw

contradicts the Plaintiffs' position and the incorporation date has no bearing on when the statute

of limitations runs. The Court agrees.

[¶ 31]   The limitations period under 28 U.S.C. § 2401(a) for bringing a facial challenge to an

agency action begins to run at the time of publication of the agency's action. <u>Hire Order Ltd.</u>, 698

F.3d at 170. The Board points to numerous cases where courts declined to modify the statute of

limitations accrual date to when a party is subject to the regulation.[7]

---

[7] Neither party provides reference to a case in the Eighth Circuit regarding the relationship between
the statute of limitations at 28 U.S.C. § 2401(a) and a party's incorporation date.

[¶ 32]   In <u>Hire Order</u>, the Fourth Circuit rejected a similar argument raised by the Plaintiffs, concluding such a claim "utterly fails." <u>Id.</u> <u>Hire Order</u> dealt with a challenge to federal firearms dealer regulations. <u>Id.</u> at 169. The plaintiffs argued their cause of action did not accrue until 2008, when they became federally licensed firearms dealers. <u>Id.</u> "The contention of Hire Order and Privott that their cause of action did not accrue until they became federally licensed firearms dealers in 2008 utterly fails." <u>Id.</u> at 170. When bringing a facial challenge, such as Plaintiffs here, the statute of limitations accrues at the time the agency publishes the final rule, not at the time a business is subject to the regulation. <u>See id.</u> In <u>Hire Order</u>, the Court concluded the statute of limitations began to run when the rule was published in 1969, not when the Plaintiffs became federally licensed firearms dealers. <u>Id.</u>

[¶ 33]   In <u>Shiny Rock Min. Corp. v. United States</u>, the plaintiff brought a challenge to Public Land Order 3502, which "withdrew from appropriation under the United States mining laws all lands lying within a certain area of forest road S80 in the Williamette National Forest." 906 F.2d 1362, 1363 (9th Cir. 1990). The agency's decision was effective on December 8, 1964. <u>Id.</u> Plaintiffs did not bring their challenge until 1981. <u>Id.</u> The Ninth Circuit declined "to accept the suggestion that standing to sue is a prerequisite to the running of the limitations period. To hold otherwise would render the limitation on challenges to agency orders we adopted . . . meaningless." <u>Id.</u> at 1365 (citing <u>Vincent Murphy Chevrolet Co. v. United States</u>, 766 F.2d 449, 452 (10th Cir. 1985) ("To hold that the twelve-year [quiet title act] statute of limitations did not begin to run until conditions began changing would give rise to an interpretation of the term 'claim' under § 2409a(f) which would extend the limitations period indefinitely."). The Ninth Circuit further held, "[t]he only injury required for the statutory period to commence was that incurred by all persons when, in 1964 and 1965, the amount of land available for mining claims was decreased." <u>Id.</u> at 1365-66.

- 14 -

Accordingly, the Ninth Circuit applied the general rule, "[o]nce notice of the land withdrawals was given by publication in the Federal Register, the six-year limitation period of 28 U.S.C. § 2401(a) was triggered, for at that time any interested party acquired a 'right to file a civil action in the courts against the United States.'" Id. at 1366 (quoting Crown Coat Front Co. v. United States, 386 U.S. 503, 511 (1967)).

[¶ 34]  The same analysis holds true here. The Plaintiffs in this case indisputably bring a facial challenge to Regulation II.[8] The time the statute of limitations began to run was at the time of final publication. It was not at the time the Corner Store incorporated and thus became subject to the Final Rule's requirements. See id. To permit the Corner Store to pursue its claims here would effectively render the six-year statute of limitations period meaningless. Congress chose to give a finality to the Rule by imposing the limitations period. 28 U.S.C. § 2401(a). Courts have rejected similar arguments to Plaintiffs' here because the limitations period begins at the time the Rule was published. See Hire Order, 698 F.3d 169-70; Shiny Rock, 906 F.2d at 1363-65. Congress has determined there is a time in which facial challenges to the rules and regulations of administrative agencies must cease. That time is six years after publication of the final rule. See 28 U.S.C. § 2401(a); see also Chandler, 255 F.3d at 921 (A right of action first accrues "on the date when all the events have occurred which fix the liability of the government and entitle the claimant to institute an action."). Under Plaintiffs' theory, anytime an individual wanted to bring a facial

---

[8] The D.C. Circuit has noted the statute of limitations "does not foreclose subsequent examination of a rule where properly brought before this court for review of further Commission action applying it." Functional Music, Inc. v. F.C.C., 274 F.2d 543, 546 (D.C. Cir. 1958).  Plaintiffs here contend Corner Post effectively brings an as-applied challenge to Regulation II. Doc. No. 26 at p. 28. The Plaintiffs, however, immediately concede the interchange fee is not a regulation the Board directly enforces—the Rule allows third-parties to collect fees. Id. In other words, Plaintiff's contention Corner Post's claim is "as-applied" is grounded on the facial attack to the Rule itself. This is circular reasoning. They claim it is an as-applied challenge because the Rule is invalid on its face. Plaintiffs have brought a facial challenge to the Rule.

challenge against an agency rule or regulation beyond the six-year statute of limitations, all a party would need to do is create a new entity that would be subject to the Rule. This plainly contravenes the purpose of the statute of limitations, which is to bring finality to the rule's application.

[¶ 35]  Accordingly, the statute of limitations began to run on July 20, 2011, and expired seven years later. See 28 U.S.C. § 2401(a). Because Plaintiffs filed their complaint more than three years after the statute of limitations ran, their claims are time-barred.

### IV.     Jurisdictional Nature of Section 2401(a) and Equitable Tolling

[¶ 36]  The Parties dispute whether 28 U.S.C. § 2401(a)'s statute of limitations is a jurisdictional bar to Plaintiffs' claims. If it is not a jurisdictional bar, then Plaintiffs' can request the Court to toll the six-year limitations period. The Court does not need to definitively resolve this issue because Plaintiffs have failed to establish the statute of limitations should be tolled.

[¶ 37] The Eighth Circuit has "long considered § 2401(a) a jurisdictional bar." Sisseton_Wahpeton Oyate, 888 F.3d at 917, n.4 (citing Konecny v. United States, 388 F.2d 59, 61-62 (8th Cir. 1967)).  In 2015, the United States Supreme Court found the statute of limitations for private civil actions in 28 U.S.C. § 2401(b) was not jurisdictional and, therefore, subject to equitable tolling. United States v. Kwai Fun Wong, 575 U.S. 402 (2015). Courts have since applied Kwai Fun Wong to Section 2401(a), concluding the statute of limitations is not jurisdictional. See Matushkina v. Nielsen, 877 F.3d 289, 292 n.1 (7th Cir. 2017). In Sisseton-Wahpeton Oyate, the Eighth Circuit declined to review its long-standing precedent in light of Kwai Fun Wong because the Plaintiffs there failed to establish it was entitled to equitable tolling. As the law of this Circuit currently stands, Section 2401(a) appears to be a jurisdictional bar, even though there may be good reason for the Circuit to reconsider that determination in light of Kwai Fun Wong. As it stands in the Eighth Circuit, however, Section 2401(a) appears to be a jurisdictional bar to Plaintiffs' claims.

[¶ 38]  But this Court ultimately does not need to decide this issue because the Plaintiffs have failed to establish they are entitled to equitably toll the statute of limitations. Statutes of limitations presumptively permit equitable tolling. Sisseton-Wahpeton Oyate, 888 F.3d at 917. This presumption can be rebutted by the defendants. Id. When permitted, however, "[a] plaintiff is entitled to equitable tolling only if he or she shows (1) that he [or she] has been pursuing his [or her] rights diligently, and (2) that some extraordinary circumstances stood in his [or her] way and prevented timely filing." Id. (citations and quotation marks omitted; alterations in original). In making this determination, courts ask "whether a reasonable person in the plaintiff's situation would be expected to know about the violation of their legal rights."

[¶ 39]  The Plaintiffs contend the Court should equitably toll the statute of limitations based on Corner Post's incorporation date in 2017. Plaintiffs contend Corner Post's lack of legal existence constitutes an extraordinary circumstance that stood in its way of filing a cause of action. Plaintiffs claim Corner Post diligently pursuant its rights because it joined a lawsuit three years after it was incorporated and started to accept regulated debit card payments. The Board argues the Plaintiffs have failed to establish they are entitled to equitable tolling because they fail to meet the two requirements to equitably toll the statute of limitations. The Court agrees with the Board.

[¶ 40]  Plaintiffs have not diligently pursued their rights. The Associational Plaintiffs have been in existence long before Regulation II's publication and could have filed suit years before it chose to do so. The Associational Plaintiffs were aware of Regulation II, evidenced by their participation in a comment letter in February 2011. See Letter from Retail Industry Representatives to Ben Bernanke, Chairman, Board of Governors of the Federal Reserve System, at https://www.federalreserve.gov/SECRS/2011/February/20110204/R-1404/R-1404_020311_6370

2_497677994095_1.pdf. The Associational Plaintiffs filed their original Complaint approximately four years after the Final Rule's publication, all while knowing the regulation existed. See id.; Doc. No. 1.  Plaintiffs have offered no explanation why the Associational Plaintiffs waited almost four years after the statute of limitations period ran. As for the Corner Post, Plaintiffs have likewise failed to provide any explanation why it waited three years to join in this lawsuit. It is apparent the only reason Corner Post joined the suit was as an attempt to save Plaintiffs' claims from the statute of limitations. Corner Post waited three years to assert its claims. Corner Post could have brought its claims much earlier and has not provided any justification for waiting three years, except that the Court should simply excuse the delay. The Plaintiffs have, therefore, failed to show they diligently pursued their rights as it relates to challenging Regulation II.

[¶ 41]  Plaintiffs also fail to establish extraordinary circumstances. Again, the Associational Plaintiffs have not provided any explanation why their circumstances are extraordinary. As discussed above, they were aware of the Rule and participated in its comment period. The Corner Post's lack of existence at the time the Final Rule was published is hardly extraordinary. Businesses come and businesses go—it is the nature of the marketplace in the United States. There is simply nothing extraordinary about a business coming into existence and being subject to an administrative regulation. Plaintiffs provide no other explanation for this delay that shows extraordinary circumstances exist. Plaintiffs have failed to show extraordinary circumstances justifying equitable tolling of the statute of limitations to allow this case to proceed on the merits.

## CONCLUSION

[¶ 42]  Section 28 U.S.C. § 2401(a) provides a six-year statute of limitations for challenging final agency actions. As discussed above, the time under the statute of limitations began to run in July

2011, when the Final Rule was published and expired six years later. Plaintiffs, however, waited approximately three years to file the instant case and have failed to show any justification for equitably tolling the statute of limitations.

[¶ 43]  Accordingly, the Board's Motion to Dismiss for Lack of Jurisdiction or, alternatively, for Failure to State a Claim are **GRANTED**. The Amended Complaint is, therefore, **DISMISSED**. Because the Plaintiffs claims fall outside the statute of limitations, the Board's Motion to Change Venue is **MOOT**. Defendants' earlier Motions to Dismiss or Change Venue are also **MOOT**.

[¶ 44]  **IT IS SO ORDERED**.

DATED March 11, 2022.

Daniel M. Traynor, District Judge
United States District Court