**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

CORNER POST, INC.,

          *Plaintiff,*

v.

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

          *Defendant.*

Case No. 1:21-cv-95-DMT-CRH

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM IN SUPPORT OF PLAINTIFF CORNER POST, INC.'S
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................ iii

Introduction ........................................................................................................................... 1

Background ............................................................................................................................. 3

      A.   In 2010, Congress passes the Durbin Amendment, directing the Board to issue a standard for debit-card fees that are reasonable and proportional to the issuer's incremental ACS costs. .................................................................. 3

           1.   Debit-card interchange fees. .............................................................. 3

           2.   The Durbin Amendment. ................................................................. 5

      B.   The Board initially proposes two alternatives with a 12-cent cap, but buckles under banks' pressure and adopts a 21-cent cap with a 0.05% *ad valorem* adjustment. ....................................................................................................... 7

           1.   The Proposed Rule. .......................................................................... 7

           2.   Regulation II. ................................................................................... 7

      C.   The D.C. district court vacates Regulation II, but the D.C. Circuit saves it on appeal by applying *Chevron* deference. ....................................................... 9

           1.   *NACS I* .............................................................................................. 9

           2.   *NACS II* ........................................................................................... 10

      D.   The Board issues the Updated Rule. ........................................................ 11

      E.   Corner Post and merchant associations sue. ......................................... 11

Argument ............................................................................................................................. 12

   I.   Regulation II is contrary to law. ...................................................................... 13

      A.   Regulation II contradicts the Durbin Amendment because it erroneously creates a third category of costs and claims the sweeping discretion to include any and all costs. .......................................................................................... 13

      B.   Regulation II is contrary to law because it includes prohibited costs in the fee standard. ..................................................................................................... 21

      C.   Regulation II is contrary to law because it sets a one-size-fits-all cap when the Durbin Amendment commands the Board to set an issuer-specific and transaction-specific fee standard. ............................................................. 27

   II.   Regulation II is arbitrary and capricious. ....................................................... 29

      A.   The Board failed to consider the functional similarity between debit-card transactions and checking transactions. .................................................. 30

      B.   The Board considered prohibited costs that Congress did not intend it to consider and failed to justify the costs it included. ................................. 32

C.    The Board failed to consider issuer-specific and transaction-specific costs, and instead considered hypothetical costs that would be incurred by a hypothetical issuer in a hypothetical transaction, to set a universal cap. ..............34

III.    Vacatur with a stay is the appropriate remedy.....................................................34

Conclusion .....................................................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*A.L. Pharma, Inc. v. Shalala,*
  62 F.3d 1484 (D.C. Cir. 1995)...................................................................................35

*Ala. Ass'n of Realtors v. HHS,*
  594 U.S. 758 (2012)................................................................................................19

*Allina Health Services v. Sebelius,*
  746 F.3d 1102 (D.C. Cir. 2014)...............................................................................34

*Am. Bus Ass'n v. Slater,*
  231 F.3d 1 (D.C. Cir. 2000).....................................................................................27

*Anacostia Riverkeeper, Inc. v. Jackson,*
  713 F. Supp. 2d 50 (D.D.C. 2010)...........................................................................35

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333 (2011)...........................................................................................18, 23

*Biden v. Nebraska,*
  143 S.Ct. 2355 (2023)..............................................................................................29

*Bostock v. Clayton County,*
  590 U.S. 644 (2020)..................................................................................................18

*Bridgeport Hospital v. Becerra,*
  108 F.4th 882 (D.C. Cir. 2024)................................................................................27

*Clarke v. CFTC,*
  74 F.4th 627 (5th Cir. 2023)...............................................................................30, 31

*Cochise Consultancy, Inc. v. United States ex rel. Hunt,*
  587 U.S. 262 (2019)..................................................................................................27

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
  144 S.Ct. 2440 (2024)..........................................................................................12, 34

*DHS v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020)......................................................................................................29

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
  575 U.S. 768, 774 (2015)..........................................................................................18

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016)..................................................................................................33

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120, 159 (2000) ................................................................................................19

*Firearms Regul. Accountability Coal., Inc. v. Garland*,
    112 F.4th 507 (8th Cir. 2024)........................................................... 30, 32, 33, 34

*Friends of the Earth, Inc. v. EPA*,
    446 F.3d 140 (D.C. Cir. 2006)...................................................................................35

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)...................................................................................................11

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020)...................................................................................................14

*Loper Bright Enters. v. Raimondo*,
    144 S.Ct. 2244 (2024)...................................................................................10, 13, 20

*Louisiana v. EPA*,
    90 F.4th 461 (5th Cir. 2024)............................................................................ 30, 31, 32

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989)...................................................................................................29

*Michigan v. EPA*,
    576 U.S. 743 (2015)...................................................................................................29

*Missouri v. Biden*,
    112 F.4th 531 (8th Cir. 2024)....................................................................................19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)...................................................................................................30

*N. Dakota Retail Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*,
    55 F.4th 634 (8th Cir. 2022)......................................................................................12

*NAACP v. Trump*,
    298 F. Supp. 3d 209 (D.D.C. 2018).........................................................................35

*NACS v. Bd. of Governors of Fed. Rsrv. Sys.*,
    746 F.3d 474 (D.C. Cir. 2014)........................................................... 4, 10, 11, 20, 21, 22

*NACS v. Bd. of Governors of the Fed. Rsrv. Sys.*,
    958 F. Supp. 2d 85 (D.D.C. 2013) ...............................................4, 9, 10, 14, 15, 22, 24, 35

*Nat'l Ass'n of Mfrs. v. DOD*,
    583 U.S. 109 (2018).............................................................................................. 28, 29

*Nat'l Shooting Sports Found., Inc. v. Jones*,
  716 F.3d 200 (D.C. Cir. 2013) .................................................................................30

*Nielsen v. Preap*,
  586 U.S. 392 (2019) ...............................................................................................27

*Pereira v. Sessions*,
  585 U.S. 198 (2018) ........................................................................................ 22, 28

*Qwest Corp. v. FCC*,
  258 F.3d 1191 (10th Cir. 2001) ........................................................................ 32, 33

*Rumsfeld v. Padilla*,
  542 U.S. 426 (2004) ...............................................................................................27

*San Antonio v. United States*,
  631 F.2d 831 (D.C. Cir. 1980) ...............................................................................21

*Solis v. Summit Contractors, Inc.*,
  558 F.3d 815 (8th Cir. 2009) .................................................................................23

*United Food & Com. Workers Union v. USDA*,
  532 F. Supp. 3d 741 (D. Minn. 2021) .....................................................................12

*United Steel v. Mine Safety & Health Admin*,
  925 F.3d 1279 (D.C. Cir. 2019) .............................................................................34

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
  985 F.3d 472 (5th Cir. 2021) .................................................................................29

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ...............................................................................................19

*Wages & White Lion Invs., LLC v. FDA*,
  16 F.4th 113 (5th Cir. 2021) ..................................................................................29

*Watt. v. GMAC Mortg. Corp.*,
  457 F.3d 781 (8th Cir. 2006) .................................................................................15

*West Virginia v. EPA*,
  597 U.S. 697, 721 (2022) ................................................................................. 19, 20

**Statutes**

15 U.S.C. §1693o-2.................................................1, 2, 5, 6, 8, 10, 11, 13, 14, 15, 16, 17, 18, 21, 22,
  .................................................................................... 23, 24, 25, 26, 27, 29, 30, 32, 33, 34

5 U.S.C. §706 ........................................................................................2, 12, 13, 19, 22, 29, 34

**Rules**

Fed. R. Civ. P. 56(a). ....................................................................................................12

**Regulations**

12 C.F.R. §235.3(b)(2) ....................................................................................................24

88 Fed. Reg. 78,100 (Nov. 14, 2023). ............................................................................11

Proposed Rule, 75 Fed. Reg. 81,722 (Dec. 28, 2010)...................................... 7, 8, 16, 24, 26

Regulation II, 76 Fed. Reg. 43,394 (July 20, 2011) ................. 3, 4, 5, 7, 8, 9, 16, 17, 18, 20, 21, 22, 24, ......................................................................................... 25, 26, 27, 28, 30, 31, 32, 33, 34

Updated Rule, 80 Fed. Reg. 48,684 (Aug. 14, 2015)........................................... 11, 21, 22, 31

**Other Authorities**

Antonin Scalia & Bryan Garner, *Reading Law* (2012)....................................... 15, 18, 28

Charlie Thaxton, *The Hidden Price of Cashless Retail*, Forbes (Apr. 3, 2019) ...............................3

Cost, *Black's Law Dictionary* (9th ed. 2009)........................................................................24

Federal Reserve Bank of St. Louis, *Real Gross Domestic Product* .........................................3

Fixed Cost, *Black's Law Dictionary* (9th ed. 2009) .........................................................21

Incur, *Black's Law Dictionary* (9th ed. 2009). ................................................................25

Loss, *Black's Law Dictionary* (9th ed. 2009)..................................................................24

Other, *Concise Oxford English Dictionary* (12th ed. 2011) ...........................................15

Other, *New Oxford Am. Dictionary* (3d ed. 2010)........................................................15

Particular, *New Oxford Am. Dictionary* (3d ed. 2010)..................................................28

Particular, *Shorter Oxford English Dictionary* (6th ed. 2007) ......................................28

**INTRODUCTION**

Americans love to use their debit cards. In 2009, consumers made 37.6 billion debit-card transactions involving $1.43 trillion in value. Because so many consumers use debit cards, American merchants face a practical reality: accepting debit-card payments is an absolute must. But accepting debit-card payments comes with significant costs for merchants. Before money moves from the consumer's bank account to the merchant's, a series of behind-the-scenes actions—called authorization, clearance, and settlement actions—must occur. And each card swipe involves not just a customer and a merchant but also the following actors: issuer (customer's bank); acquirer (merchant's bank); and network (companies like Visa and Mastercard) that provide the infrastructure for the transactions. Fees arise throughout that process, and the largest—called "interchange fees"—compensate the issuers for their role in the transaction. Those fees are first paid by the acquirer, but ultimately assessed to and paid by the merchant.

Before 2009, networks set the interchange fees as high as possible to compete for issuer-banks' business. The fees predictably skyrocketed as a result. In 2009, although the median cost to process a debit-card transaction was between 8 and 13 cents, the average fees were 44 cents per swipe, netting banks between 238% and 450% in profit on each transaction. Interchange fees totaled over $16 billion that year. While the interchange fees became an easy and reliable multi-billion-dollar profit center for big banks, merchants and consumers bore the cost in reduced profitability and higher prices.

Congress sought to fix this market failure by passing the Durbin Amendment to the Dodd-Frank Wall Street Reform Act. *See* 15 U.S.C. §1693o-2. The Durbin Amendment states that the interchange fee "shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* §1693o-2(a)(2). It then instructed the Federal Reserve Board to set that "reasonable and proportional" amount. *Id.* §1693o-2(a)(3)(A). Most relevant here, Congress told the Board to "distinguish between" two types of costs when setting the fee amount: (i) "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered"; and (ii) "other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be

considered." *Id.* §1693o-2(a)(4)(B)(i), (ii). The Board's initial proposed rule tracked that bifurcation and proposed two alternatives that each would impose a 12-cent fee cap per transaction. But the Board's final rule—dubbed Regulation II—*doubled* the fee cap after pressure from big banks. In doing so, the Board committed fundamental legal errors. Despite Congress's clear command to consider incremental ACS costs—and only those costs—in the fee standard, the Board refused even to define what costs are "the incremental cost" as a baseline for "distinguish[ing] between" allowable incremental ACS costs and prohibited "other costs." *Id.* Instead, the Board claimed it found a *third* bucket of costs not mentioned in the statute, claimed it has broad discretion to include any and all costs (including the supposed third bucket of costs expressly prohibited by statute), and relied on them to inflate the fee to 21 cents per transaction plus .05% of the transaction's value, regardless of how much each transaction actually cost the banks to process.

Corner Post challenges Regulation II under the Administrative Procedure Act. Under the APA, Regulation II is contrary to law and should be "set aside," 5 U.S.C. §706(2), because (1) the Board's inclusion of the third category of costs contradicts the Durbin Amendment's clear bifurcation of costs that the Board could and could not consider; (2) each of the costs the Board considered in that third category were otherwise prohibited by Congress; and (3) the Board set a one-size-fits-all cap when Congress commanded the Board to set an issuer-specific and transaction-specific fee standard. Regulation II is also arbitrary and capricious and should be set aside because the Board (4) failed to consider the functional similarity between checking and debit-card transactions; (5) considered prohibited costs that Congress didn't intend it to consider, failed to define key terms, and drew arbitrary lines around allowable and prohibited costs; and (6) failed to consider issuer-specific and transaction-specific costs in its fee calculations. The Court should vacate Regulation II and the Updated Rule—and stay its order for six months to allow the Board to revise Regulation II in a new rulemaking consistent with this Court's order.

## BACKGROUND

**A.    In 2010, Congress passes the Durbin Amendment, directing the Board to issue a standard for debit-card fees that are reasonable and proportional to the issuer's incremental ACS costs.**

### 1.    Debit-card interchange fees.

Debit cards are everywhere now. American consumers have increasingly turned to electronic payments, especially debit-card payments, to pay for goods and services. Ex. A, Regulation II, 76 Fed. Reg. 43,394, 43,395 (July 20, 2011). In 2009 alone, before the Durbin Amendment was enacted, consumers used debit cards in 37.6 billion transactions, involving $1.4 trillion dollars in transaction value.[1] To put that in context, the gross domestic product of the U.S. economy in 2009 was $14.5 trillion.[2] Given consumers' heavy preference for using debit cards over cash or checks, American merchants have no real choice but to accept debit cards as a form of payment: "Retailers and restaurants cannot feasibly refuse Visa and Mastercard." Charlie Thaxton, *The Hidden Price of Cashless Retail*, Forbes (Apr. 3, 2019), bit.ly/3oWKchn.

Every time customers use a debit card, the merchant pays behind-the-scenes fees to move money from the customer's bank account to the merchant's bank account. Regulation II, 76 Fed. Reg. at 43,396-97. That transaction involves four relevant players. First, the consumer who uses a debit card to pay for goods and services. Second, the issuers—the banks that issue the debit card (*i.e.*, the consumer's bank). *Id.* at 43,412. Third, the acquirers, which are the merchant's banks that receive money from issuers. *Id.* at 43,406. Fourth, the networks like Visa and Mastercard. *Id.* at 43,413-14. Networks provide the infrastructure, software, and services that facilitate debit-card transactions to move money from the customer's bank to the merchant's bank. *Id.* at 43,414.

A debit-card transaction between those players proceeds in three steps: authorization, clearance, and settlement. Authorization "begins when the cardholder swipes her debit card, which sends an electronic 'authorization request' to the acquirer conveying the cardholder's account information and the transaction's value." *NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 746 F.3d 474, 478

---

[1] Bd. of Governors of the Fed. Rsrv. Sys., *2009 Interchange Revenue, Covered Issuer Cost, and Covered Issuer and Merchant Fraud Loss Related to Debit Card Transactions* 6 (June 2011), bit.ly/3Z3kQCn.

[2] Fed. Rsrv. Bank of St. Louis, *Real Gross Domestic Product*, bit.ly/4fCmXUN.

(D.C. Cir. 2014) ("*NACS II*"). The issuer then determines "whether the cardholder has sufficient funds in her account to complete the transaction and whether the transaction appears fraudulent" and either approves or rejects the transaction. *Id.* Even if the issuer approves, the transaction still must be cleared and settled before any money changes hands. Clearance is "a formal request for payment sent from the merchant on the network to the issuer." *Id.* Settlement "involves the actual transfer of funds from the issuer to the acquirer," after which "the transaction has concluded." *Id.*

Fees arise throughout this process. Relevant here, issuers, through networks, charge acquirers an interchange fee to compensate for the issuers' role in processing the transaction. *Id.* at 479. Before 2010, the interchange-fee market was completely unregulated. Networks "had complete discretion to set the level of interchange and network processing fees." *Id.* That is, the interchange fee that the merchant (through its acquirer) pays the issuer to compensate the issuer for its role in the debit transaction was set not through negotiation between the merchant, its acquirer, and the issuer. Instead, it was set by the network. *See id.* Networks, in turn, set the interchange fees as high as they could to compete for banks' business. *See* Regulation II, 76 Fed. Reg. at 43,396-97, 43,441; *see also* Ex. B, Letter from Senator Durbin to Jennifer J. Johnson, Secretary, Board of Governors of the Federal Reserve System, at 2 (Feb. 22, 2011), bit.ly/3jrg9wq; *NACS v. Bd. of Governors of the Fed. Rsrv. Sys.*, 958 F. Supp. 2d 85, 90 (D.D.C. 2013) ("*NACS I*") ("Networks thus have an incentive to continuously raise merchants' interchange fees … as a way to attract issuers to the network.").[3]

Due to this market failure, interchange fees skyrocketed. Between 1998 and 2006—exactly when debit cards started becoming more popular—interchange fees ballooned by 234%. Ex. C, Stephen Mott, *Industry Facts Concerning Debit Card Regulation Under Section 920*, at 14 (Oct. 27, 2010), bit.ly/3fK7fYB. In 2009, the average interchange fee for all debit-card transactions reached as high as 44 cents per transaction. *See* Regulation II, 76 Fed. Reg. at 43,397. That year, interchange fees totaled $16.2 billion. *Id.* But the issuer's cost of facilitating the debit-card transaction was only a fraction of the interchange fees: In 2009, the median total processing cost were a mere 8 cents per transaction for

---

[3] All exhibits are from the administrative record and were filed with the U.S. District Court for the District of Columbia as a part of that record in *NACS I*.

PIN debit transactions and 13 cents for signature debit transactions, meaning issuers profited between 31 and 36 cents and reaped between 238% and 450% in profit *in every transaction. Id.* at 43,397 n.27. Interchange fees had become a multi-billion-dollar annual profit center for the banks.

The consequences for merchants and consumers were predictably devastating. Before the Durbin Amendment's enactment, "every time a sale [was] made with a Visa or MasterCard debit or credit card the person who makes the sale only receive[d] 97 or 98 cents on the dollar because the card networks [took] an unregulated cut out of the transaction amount and share it with their issuing banks." Ex. B, at 2. For many small businesses like Corner Post, those debit-card fees have been one of their biggest operating expenses—and that remains true today even with the Durbin Amendment and Regulation II on the books. Corner Post alone paid hundreds of thousands of dollars in debit-card fees between 2018 and 2021. Lund Decl. (Doc. 1-2) ¶¶3-4; FAC (Doc. 19) ¶64. Other merchants have suffered a similar fate. It was estimated that in 2010, debit-card interchange fees cost the convenience-store industry alone $8.9 billion in fees. *See* Ex. D, Comment of NACS, No. R-1404 (Debit Card Interchange Fees and Routing), at 1.

### 2. The Durbin Amendment.

Congress deemed those outcomes unacceptable. So, as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Congress amended the Electronic Fund Transfer Act to regulate the interchange fees that large issuers can receive for debit-card transactions. Those changes are known as the "Durbin Amendment," after their sponsor Senator Richard Durbin. The Durbin Amendment applies only to debit-card transactions with large issuer-banks—those with $10 billion or more in assets. The law limits interchange fees for those banks to a level that is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. §1693o-2(a)(2). Congress directed the Federal Reserve Board to issue regulations that set a standard for assessing whether an interchange fee is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* §1693o-2(a)(3)(A). It then told the Board how to set that standard. Congress specifically required the Board to "consider the functional similarity between—(i) electronic

debit transactions; and (ii) checking transactions that are required to … clear at par." *Id.* §1693o-2(a)(4)(A). In other words, there are no interchange fees for processing checks; and because debit cards act like a check, Congress wanted the costs to use debit cards to be as close to checks as possible.

Congress also required "the Board" to "distinguish between" two types of costs when determining what fee was "reasonable and proportional." *Id.* §1693o-2(a)(2), (4)(B). First, the Board "shall" consider "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction." *Id.* §1693o-2(a)(4)(B)(i). Second, the Board "shall not" consider "other costs incurred by the issuer which are not specific to a particular electronic debit transaction." *Id.* §1693o-2(a)(4)(B)(ii). Senator Durbin explained that the Durbin Amendment "makes clear that the cost to be considered by the Board in conducting its reasonable and proportional analysis is the incremental cost incurred by the issuer for its role in the authorization, clearance, or settlement of a particular electronic debit transaction, as opposed to other costs incurred by an issuer which are not specific to the authorization, clearance, or settlement of a particular electronic debit transaction." 156 Cong. Rec. S5925 (daily ed. July 15, 2010).

Congress also authorized the Board to adjust the interchange fee to account for fraud-prevention costs but only if "the issuer complies with the fraud-related standards established by the Board." *Id.* §1693o-2(a)(5)(A)(i), (ii). Thus, the Durbin Amendment incentivizes issuers to invest in fraud-prevention measures with a conditional fraud-prevention cost adjustment, rather than giving such an adjustment automatically to issuers. Senator Durbin explained that this adjustment "would occur after the base calculation of the reasonable and proportional interchange fee amount takes place, and fraud prevention costs would not be considered as part of the incremental issuer costs upon which the reasonable and proportional fee amount is based." 156 Cong. Rec. S5925. And "any fraud prevention cost adjustment would be made on an issuer-specific basis, as each issuer must individually demonstrate that it complies with the standards established by the Board." *Id.* Finally, Congress prohibited the use of "network fee[s]" to "directly or indirectly compensate [a bank]." *Id.* §1693o-2(a)(8)(B)(i).

6

**B.    The Board initially proposes two alternatives with a 12-cent cap, but buckles under banks' pressure and adopts a 21-cent cap with a 0.05% *ad valorem* adjustment.**

**1.    The Proposed Rule.**

As the Durbin Amendment required, the Board initiated a rulemaking in 2010 to set an interchange-fee standard that was reasonable and proportional to the cost of a debit-card transaction. *See* Ex. E, Proposed Rule, 75 Fed. Reg. 81,722 (Dec. 28, 2010). The Board's proposed rule hewed closely to the Durbin Amendment's statutory text. In fact, the Board included "only those costs that are specifically mentioned for consideration in the statute." 75 Fed. Reg. at 81,734-35. And the Board suggested excluding other fees from consideration—such as network processing fees, fraud losses, and fixed and overhead costs common to all transactions and not attributable to particular transactions. *Id.* at 81735-39, 81755, 81760.

The Proposed Rule outlined two possible ways to implement the "reasonable and proportional" standard, both of which capped the interchange fee at 12 cents per transaction. 75 Fed. Reg. at 81,736-38. Under "Alternative 1," the Board proposed an "Issuer-Specific" fee "up to a Cap, with a Safe Harbor." *Id.* at 81,736. That proposal allowed an issuer to receive a per-transaction interchange fee up to a 7-cent safe harbor. *Id.* at 81,736-38. If an issuer's allowable costs per transaction exceeded 7 cents, the issuer could prove those costs and receive a higher per-transaction interchange fee to compensate, up to a 12-cent-per-transaction cap. *Id.* at 81,737-38. Under "Alternative 2," the Board proposed a universal 12-cent cap; all issuers could receive 12 cents per transaction without showing their actual costs per transaction. *Id.* at 81,738. The Board determined that either option would more than suffice to cover any debit-card transaction's ACS costs. *Id.* at 81,737-38. And the Board believed the proposal furthered "the statute's mandate to consider the functional similarities between debit transactions and check transactions." *Id.* at 81,735.

**2.    Regulation II.**

The Board received over 11,500 comments in response to the Proposed Rule. *See* Regulation II, 76 Fed. Reg. at 43,394. Many commenters supported the proposed rule, including some who pushed for even lower fees. *Id.* at 43,420. Merchants and their trade groups "overwhelmingly

supported" the proposed rule's Alternative 1. *Id.* Issuers and networks, by contrast, were among the most outspoken critics opposing both alternatives. *Id.* In the end, the Board yielded to pressure from the issuers and networks and adopted a final rule that differed drastically from its Proposed Rule.

To start, the Board decided not to consider "only those costs that are specifically mentioned for consideration in the statute." Proposed Rule, 75 Fed. Reg. at 81,734-35. Instead, the Board said that "all costs *related to* a particular transaction may be considered." Regulation II, 76 Fed. Reg. at 43,427 (emphasis added). In its revised view, the Board thought that the Durbin Amendment was "ambiguous" and "silent," so it artificially, and without statutory authority, expanded the universe of allowable costs and narrowed the prohibited-cost category. *Id.* at 43,426. According to the Board, the Durbin Amendment created not two, but *three* categories of costs. First, it mandated the Board to consider "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction." 15 U.S.C. §1693o-2(a)(4)(B)(i). Second, it prohibited "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." *Id.* §1693o-2(a)(4)(B)(ii). But rather than stopping here, the Board claimed that it found a third, unwritten category: "[T]here exist costs that are not encompassed in either the set of costs the Board must consider in Section 920(a)(4)(B)(i), or the set of costs the Board may not consider under Section 920(a)(4)(B)(ii)." Regulation II, 76 Fed. Reg. at 43,427. "These costs, on which the statute is silent," the Board said, "are those that are specific to a particular electronic debit transaction but that are not incremental costs related to the issuer's role in authorization, clearance, and settlement." *Id.* That interpretive maneuver cleared a path for the Board to conclude that *any* costs "related to a particular transaction may be considered." *Id.*

Next, the Board claimed virtually unfettered discretion to add costs to this third category and consider them when setting the recoverable interchange fee:

> The Board does not find it necessary to determine whether costs are "incremental," fixed or variable, or incurred in connection with authorization, clearance, and settlement. Under the framework established by the statute, all costs related to a particular transaction may be considered, and some—the incremental costs incurred by the issuer for its role in the authorization, clearance, and settlement—must be considered.

*Id.* Under this new interpretative framework, the Board factored into the fee standard four types of costs previously excluded in the Proposed Rule: (1) fixed ACS costs, (2) transaction-monitoring costs, (3) network processing fees, and (4) a fraud-loss adjustment based on the value of the transaction. *Id.* at 43,429-31. Those four costs allowed the Board to inflate the final fee cap to 21 cents per transaction plus a 0.05% *ad valorem* (based on the value of the transaction) adjustment. *See id.* at 43,433-34. The final fee cap was more than double the Proposed Rule's 12-cent cap.

C.    **The D.C. district court vacates Regulation II, but the D.C. Circuit saves it on appeal by applying *Chevron* deference.**

1.    ***NACS I***

Soon after Regulation II became final, a group of merchants challenged it in the U.S. District Court for the District of Columbia. That court held that the Board "clearly disregarded Congress's statutory intent by inappropriately inflating all debit card transaction fees by billions of dollars." *NACS I*, 958 F. Supp. 2d at 86. The court observed with "*no* difficulty" that Congress "bifurcate[d] the entire universe of costs associated with interchange fees" and that the Board's including a third, nonstatutory category of costs in the fee standard was "irreconcilable with the statute." *Id.* at 100, 105. The Durbin Amendment's "plain text makes clear that the incremental ACS cost of a particular electronic debit transaction is the *only* cost the Board was expressly authorized to consider in its interchange transaction fee standard." *Id.* at 101. The Board's contrary argument—"that a third category of costs can be recovered under the interchange transaction fee standard"—is "utterly indefensible" and "irreconcilable with" the Durbin Amendment. *Id.* at 105-06. And the court held that "it is quite clear that the statute did not allow the Board to consider the additional fixed costs factored into the interchange fee standard—*i.e.*, (1) fixed ACS costs, (2) transaction monitoring costs, (3) an allowance for an issuer's fraud losses, and (4) network processing fees." *Id.* at 107.

As to the fixed ACS costs, the court held that the Durbin Amendment "instructed the Board to consider only *variable* ACS costs incurred for the issuer's role in processing a particular transaction." *Id.* "The legislative mandate to consider incremental ACS costs in setting the interchange standard is not a 'minimum,' as the Board argues ... but rather a *ceiling*." *Id.* As to the transaction-monitoring

costs, the court concluded that those were, in the Board's own description, "fraud-prevention" costs, which should have been adjusted separately under the conditional fraud-prevention cost adjustment, not included in the base-component calculation. *Id.* at 107-08. As to the fraud losses, the court held that the compensation for issuers for fraud losses are merely a "*consequence of ACS*" but not "ACS costs themselves" and should not have been included in the fee standard. *Id.* at 108. Finally, on the network-processing fees, the district court observed that the Durbin Amendment expressly defines "network fees" as any fee charged by a network "other than an interchange fee transaction fee." *Id.* at 109 (quoting 15 U.S.C. §1693o-2(c)(10)). And the Durbin Amendment contemplates the recovery of issuer costs incurred only "'for the role of the *issuer*,' not the *network*." *Id.* (quoting 15 U.S.C. §1693o-2(a)(4)(B)(i)). The court also observed that the Durbin Amendment prohibits using network fees to "compensate an issuer with respect to an electronic debit transaction." *Id.* (quoting 15 U.S.C. §1693o-2(a)(8)(B)(i)).

Because the fee standard under Regulation II was "fundamentally deficient," the only appropriate remedy was to vacate Regulation II. *Id.* at 114. But the court stayed its decision so the Board could fix the fee standard on remand. *Id.* at 115-16.

### 2.    *NACS II*

On appeal, however, the U.S. Court of Appeals for the D.C. Circuit reversed. *NACS II*, 746 F.3d at 496. The court applied the *Chevron* deference that existed at the time. *But see Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). Under *Chevron* step 1, the court examined whether a statute was clear. If it was, that was the end of the inquiry. *Id.* at 2254. If the statute was ambiguous, the court moved to *Chevron* step 2 to see if the agency's interpretation was reasonable. If it was, then the court was required to defer to the agency's interpretation. *Id.* In *NACS II*, rather than exhausting all tools of construction at *Chevron* step 1, the court jumped straight to *Chevron* step 2. 746 F.3d at 484 ("consistent with the Board's *Chevron* step two argument, we certainly see nothing in the statute's language compelling that result"). The D.C. Circuit concluded that the Board's consideration of the third, nonstatutory category of costs was permissible. *Id.* at 483, 489.

Though the court salvaged Regulation II's fee standard under *Chevron* step 2, it found the Board's explanations for including the transaction-monitoring costs lacking. *Id.* at 492. But rather than vacating the fee standard, the court remanded Regulation II back to the Board to further explain its reasons for including transaction-monitoring costs. *Id.* at 493.

**D.    The Board issues the Updated Rule.**

Responding to *NACS II*, the Board issued an Updated Rule in 2015 that doubled down on the "[t]he same rationale" for the cost determination the Board employed in Regulation II. Ex. F, Updated Rule, 80 Fed. Reg. 48,684, 48,685 (Aug. 14, 2015). Under that same interpretative framework, the Board included additional explanations for why it included the transaction-monitoring costs in the fee standard. *Id.* It said that "[t]ransactions-monitoring systems … assist in the authorization process by providing information needed by the issuer in deciding whether the issuer should authorize the transaction"; therefore, it was "any cost that is incurred in effecting any electronic debit transaction." *Id.*; *but see* 15 U.S.C. §1693o-2(a)(4)(B)(i)-(ii).[4]

**E.    Corner Post and merchant associations sue.**

In April 2021, North Dakota Retail Association and North Dakota Petroleum Marketers Association filed this APA suit on behalf of their members challenging Regulation II. *See generally* Compl. (Doc. 1). Because an association's standing to sue turns on its members' standing, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), the plaintiff associations identified Corner Post as a member harmed by Regulation II's unlawful fee standard, *see* Compl. ¶30; Lund Decl. ¶6 (declaration of Corner Post's owner). In July 2021, Corner Post formally joined as a named party through an amended complaint. *See* FAC ¶19.

---

[4] While this case was on appeal, the Board issued a notice of proposed rulemaking that proposed changes to parts of Regulation II. *See* 88 Fed. Reg. 78,100, 78,104 (Nov. 14, 2023). Though the notice of proposed rulemaking proposes to lower the amount of the fee cap, it expressly declines to revisit the unlawful types of allowable costs upon which the Board bases its cap, which is the part of Regulation II that Corner Post is challenging. *See id.* at 78,101, 78,104, 78,113 n.82. If the Board issues a regulation changing the other parts of Regulation II, then, those changes will have no effect on this case. Corner Post will update the Court if the Board issues those changes while this motion is pending.

Corner Post, Inc. is a truck stop and convenience store located in Watford City, North Dakota. It was incorporated on June 26, 2017 and opened for business in March 2018. Lund Decl. ¶2-3. Corner Post accepts debit-card payments from its customers, including debit cards issued by banks subject to Regulation II. *Id.* ¶4. Corner Post first started accepting debit-card payments from its customers when it opened. *Id.* ¶3. Corner Post's customers purchase goods using debit cards from covered issuers. *Id.* ¶3-4. Corner Post pays interchange fees for debit-card transactions subject to Regulation II's fee standard, as confirmed by the Updated Rule. *Id.* ¶4. Corner Post alleges that Regulation II's fee standard, as confirmed by the Updated Rule, is unlawful, arbitrary, and capricious. FAC ¶¶84-94; *see* 5 U.S.C. §706(2)(A), (C).

The Board moved to dismiss the First Amended Complaint as untimely. The Court granted that motion as to NDRA, NDPMA, and Corner Post, and the Eighth Circuit affirmed. *See* Doc. 28; *N.D. Retail Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*, 55 F.4th 634, 643 (8th Cir. 2022). The Supreme Court granted Corner Post's petition for a writ of certiorari and, after oral argument, reversed. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2460 (2024). On remand, the parties agreed to a briefing schedule to address Corner Post's claims on cross-motions for summary judgment. *See* Doc. 39. The Court entered that schedule shortly thereafter. *See* Doc. 41.

## ARGUMENT

A moving party is entitled to summary judgment if there's "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). APA cases are "usually … resolved on summary judgment because '[t]he entire case on review is a question of law.'" *United Food & Com. Workers Union v. USDA*, 532 F. Supp. 3d 741, 768 (D. Minn. 2021). Under the APA, this Court "shall" "hold unlawful and set aside agency action" if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if it is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A), (C).

The Board's fee standard set in Regulation II, and confirmed in the Updated Rule, is invalid for three reasons. ***First***, the fee standard is contrary to law and "in excess of statutory … authority"

because it factors in costs that the Durbin Amendment expressly forbids the Board to consider. *Id.* §706(2)(A), (C). **Second**, the fee standard is contrary to law and "in excess of statutory … authority" because it sets a one-size-fits-all fee cap even though the Durbin Amendment requires issuer-specific and transaction-specific fee calculations. *Id.* §706(2)(A), (C). **Third**, the fee standard is "arbitrary and capricious" because the Board: (1) failed to consider the functional similarity between checking and debit-card transactions; (2) considered prohibited costs that Congress didn't intend it to consider, failed to define key terms, and drew arbitrary lines around allowable and prohibited costs; and (3) failed to consider issuer-specific and transaction-specific costs in its fee calculations. *Id.* §706(2)(A). The fee standard should be invalidated for those reasons.

As for remedy, the Court should vacate Regulation II's fee standard, as confirmed by the Updated Rule. But this Court should stay its vacatur for six months while the Board engages in rulemaking to issue a valid fee standard consistent with this Court's order.

## I.    Regulation II is contrary to law.

Under the APA, this Court "shall" "hold unlawful and set aside agency action" if it is "not in accordance with law" or if it is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A), (C). The APA requires this Court to "decide all relevant questions of law." *Id.* §706. And this Court decides those questions of law without deferring to the Board's interpretation of the Durbin Amendment. *See Loper Bright*, 144 S.Ct. at 2273.

### A.    Regulation II contradicts the Durbin Amendment because it erroneously creates a third category of costs and claims the sweeping discretion to include any and all costs.

**1.** The Durbin Amendment unambiguously bifurcates the entire universe of interchange-fee costs into two categories: (1) allowable "incremental cost[s] incurred by the issuer" for its role "in the authorization, clearance, and settlement of a particular electronic debit transaction," and (2) prohibited "other costs which are not specific to a particular electronic debit transaction." 15 U.S.C. §1693o-2(a)(4)(B)(i)-(ii).

This Court "begins and ends with the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 676 (2020). The Durbin Amendment states: "The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. §1693o-2(a)(2). Congress, in turn, instructed the Board how to set a fee standard to assess whether a fee is "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* §1693o-2(a)(3)(A). In setting the fee standard, Congress cabined the Board's discretion by instructing it to "consider the functional similarity between—(i) electronic debit transactions; and (ii) checking transactions that are required to … clear at par." *Id.* §1693o-2(a)(4)(A). Congress further instructed the Board to "distinguish between" two types of costs. *Id.* §1693o-2(a)(4)(B). First, "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, *which shall be considered* under [*id.* §1693o-2(a)(2)]." *Id.* §1693o-2(a)(4)(B)(i) (emphasis added). Second, "other costs incurred by an issuer which are not specific to a particular electronic debit transaction, *which costs shall not be considered* under [*id.* §1693o-2(a)(2)]." *Id.* §1693o-2(a)(4)(B)(ii) (emphasis added).

Even a cursory glance at the statutory text shows that Congress bifurcated the universe of costs into two categories—allowable costs and prohibited costs. A careful reading only confirms that interpretation. To start, the Durbin Amendment requires the Board to "distinguish between" two types of costs. *Id.* §1693o-2(a)(4)(B). To "distinguish" means to "'separate into different categories' or to 'make a distinction.'" *NACS I*, 958 F. Supp. 2d at 100 & n.27 (first quoting *Webster's New Coll. Dictionary* (2008), then quoting *Black's Law Dictionary* (9th ed. 2009)). The statute thus requires the Board to "separate" the universe of costs "into different categories," *id.*, of (i) the costs that the Board "shall" consider and (ii) the costs that the Board "shall not" consider. 15 U.S.C. §1693o-2(a)(4)(B)(i)-(ii). The "strategic[] plac[ement]" of "shall" and "shall not"—immediately following the requirement to "distinguish between" the costs—confirms the bifurcation of all costs into only two categories. *NACS I*, 958 F. Supp. 3d at 101.

The statute also divides the costs into two categories by differentiating between "the incremental cost" (which is allowed) and "other costs" (which are prohibited). 15 U.S.C. §1693o-2(a)(4)(B)(i)-(ii). The only costs that the Board can "consider" in setting the fee standard are the "incremental" ACS costs incurred "for the role of the issuer in … a *particular* electronic debit transaction." *Id.* §1693o-2(a)(4)(B)(i) (emphasis added). The Durbin Amendment doesn't list any other allowable costs. "[T]he expression of one thing"—here, the incremental ACS costs—"excludes others not expressed." *Watt. v. GMAC Mortg. Corp.*, 457 F.3d 781, 783 (8th Cir. 2006); *see also* Antonin Scalia & Bryan Garner, *Reading Law* 107 (2012) ("[t]he expression of one thing implies the exclusion of others"). The Durbin Amendment thus excludes all other costs that are not the incremental ACS cost from the fee standard.

Furthermore, the "other costs" provision requires excluding all costs that are not the incremental ACS cost from the fee standard. 15 U.S.C. §1693o-2(a)(4)(B)(ii). The word "other" used in prohibited costs "subsume[s] *all* costs not explicitly addressed in the first, permissible category of costs." *NACS I*, 958 F. Supp. 2d at 101. "Other" means "being the remaining one or ones of two or more; different or distinct from that or those referred to or implied." *Id.* (quoting Other, *Webster's New Coll. Dictionary* (2007)); *see also* Other, *New Oxford Am. Dictionary* (3d ed. 2010) ("Used to refer to a person or thing that is different or distinct from one already mentioned or known about"; "Those remaining in a group; those not already mentioned"); Other, *Concise Oxford English Dictionary* (12th ed. 2011) ("Used to refer to a person or thing that is different from one already mentioned or known"). The Durbin Amendment allows the Board to consider only "the incremental cost," 15 U.S.C. §1693o-2(a)(4)(B)(i), so the statutory term "other costs," *id.* §1693o-2(a)(4)(B)(ii), naturally includes all "remaining" costs that are *not* the incremental cost and are "different from" the incremental ACS cost "referred to" as the only allowable costs, *NACS I*, 958 F. Supp. 2d at 101; *see also* Other, *New Oxford Am. Dictionary*, *supra*; Other, *Concise Oxford English Dictionary*, *supra*.

The Durbin Amendment thus unambiguously bifurcates the universe of costs. It directs the Board to include only "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction" and to exclude

"other costs which are not specific to a particular electronic debit transaction." 15 U.S.C. §1693o-2(a)(4)(B)(i)-(ii). Here, given the Durbin Amendment's clear command to "distinguish between" the two categories of costs, *id.* §1693o-2(a)(4)(B), what the Board should have done was (1) define what costs are "incremental" ACS costs as a baseline, (2) "consider[]" those costs—and only those costs—in the fee standard, *id.* §1693o-2(a)(4)(B)(i), and (3) exclude all "other costs" from the fee standard, *id.* §1693o-2(a)(4)(B)(ii). But as explained below, the Board refused even to define what costs are incremental ACS costs, claimed the discretion to consider any and all costs, and included prohibited costs—fixed ACS costs, transaction-monitoring costs, fraud-loss adjustments, and network-processing fees—in the fee standard.

**2.** Before it buckled under pressure from banks, the Board itself hewed to the correct interpretation of the Durbin Amendment. *See* FAC ¶¶46-47; Regulation II, 76 Fed. Reg. at 43,394, 43,403 (explaining that the Board received over 11,500 comments and describing banks' comments). The Board initially proposed that it would "include *only* those costs that are specifically mentioned for consideration in the statute," which were the incremental costs "associated with authorization, clearing, and settlement of a transaction." Proposed Rule, 75 Fed. Reg. at 81,734-35 (emphasis added). Under this first approach, the Board noted several possible definitions of the "incremental [ACS] cost" and proposed to define it as "the per-transaction value of costs that vary with the number of transactions (*i.e.*, average variable cost) within the reporting period." *Id.* at 81,735. The Board further proposed to exclude fixed costs, transaction-monitoring costs, fraud-loss adjustment, and network-processing fees from the fee standard. *Id.* at 81,735 (network-processing fees excluded); *id.* at 81,736 (fixed costs excluded); *id.* at 81,760 (fraud losses and fraud-prevention costs excluded).

But after the banks' pressure campaign, the Board adopted a starkly different approach in the final rule. The Board claimed it found a *third* category of costs that it could consider and included those costs in Regulation II's fee standard. *See* Regulation II, 76 Fed. Reg. at 43,426. The Board thought that "there exist costs that are not encompassed in either the set of costs the Board must consider under [15 U.S.C. §1693o-2](a)(4)(B)(i), or the set of costs the Board may not consider under [*id.* §1693o-2](a)(4)(B)(ii)." Regulation II, 76 Fed. Reg. at 43,426. According to the Board, these costs

16

are "those that are specific to a particular electronic debit transaction but that are not incremental costs related to the issuer's role in authorization, clearance, and settlement." *Id.* The Board observed that the Durbin Amendment was "silent" on these costs and didn't "prohibit their consideration." *Id.* And then the Board claimed a broad delegation of "discretion" to "consider" the purported third-category costs "to the extent necessary and appropriate to fulfill the purpose of the statute." *Id.* And though the Durbin Amendment expressly requires the Board to consider "the incremental [ACS] cost" and exclude "other costs," 15 U.S.C. §1693o-2 (a)(4)(B)(i)-(ii), the Board didn't even find it "necessary"—and didn't even try—to "determine whether costs are 'incremental,' fixed or variable, or incurred in connection with authorization, clearance, and settlement," 76 Fed. Reg. at 43,427. The Board asserted that "*all* costs related to a particular transaction may be considered." *Id.* (emphasis added).

**Table 1. The Durbin Amendment's bifurcation of costs**

| Allowable Costs | Prohibited Costs |
|---|---|
| "[T]he incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which shall be considered." 15 U.S.C. §1693o-2(a)(4)(B)(i). | "[O]ther costs incurred by an issuer which are not specific to a particular electronic debit transaction, which shall not be considered." 15 U.S.C. §1693o-2(a)(4)(B)(ii). |

**Table 2. Regulation II's categorization of costs**

| Mandatory Costs | Prohibited Costs | Costs Purportedly Left to the Board's discretion |
|---|---|---|
| "[T]he incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which shall be considered." 15 U.S.C. §1693o-2(a)(4)(B)(i). | "[O]ther costs incurred by an issuer which are not specific to a particular electronic debit transaction, which shall not be considered." 15 U.S.C. §1693o-2(a)(4)(B)(ii). | Costs that are supposedly "specific to a particular electronic debit transaction but that are not incremental costs related to the issuer's role in authorization, clearance, and settlement," which may be considered. Regulation II, 76 Fed. Reg. at 43,426. |

That reading runs counter to the Durbin Amendment's text and structure. *See supra* at 13-16. The Board's refusal to define what costs are "incremental [ACS] costs" as the benchmark for deciding which costs to include in or exclude from the fee standard, Regulation II, 76 Fed. Reg. at 43,427, ignores the Durbin Amendment's command to "distinguish between" the incremental ACS costs and

other costs, 15 U.S.C. §1693o-2(a)(4)(B)(i)-(ii); *see also supra* at 14. The Board's claim that there exists a *third* category of costs *not* covered by the Durbin Amendment's bifurcation of costs also contradicts the statute's text and structure. *See supra* at 16. The Durbin Amendment bifurcates the universe of transaction costs into allowable costs (incremental ACS costs) and all "other costs." *See supra* at 13-15; 15 U.S.C. §1693o-2(a)(4)(B)(i)-(ii). And the Board's assertion that the Durbin Amendment, through "silen[ce]," Regulation II, 76 Fed. Reg. at 43,426, gives it the discretion to include the supposed third-category costs—and inflate interchange fees by billions ever year—is similarly baseless. Even if such a category of costs exists (again, it does not), the Board should have "construe[d] [the Durbin Amendment's] silence" about such costs "as exactly that: silence," not a wholesale grant of sweeping authority to the Board. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015).

The Board's interpretation also runs counter to the Durbin Amendment's purpose, which is "evident in the text." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). The statute's purpose was to reduce the amount of an issue's interchange fee to a "reasonable and proportional" amount. 15 U.S.C. §1693o-2(a)(2). And the evident purpose to make covered debit-card transactions look as much as possible like checking transactions—like the latter, the former should bear as few processing costs as possible. That's why Congress required the Board to "consider the functional similarity" between the two. *Id.* §1693o-2(a)(4)(A). The historical context confirms the same. Congress was responding to the debit-card market failure that allowed the average fee to soar to 44 cents per transaction, resulting in a severe economic burden for merchants and consumers. Regulation II, 76 Fed. Reg. at 43,397. Here, allowing the Board to ignore the clear bifurcation of allowed and prohibited costs by claiming the discretion to consider *any and all* costs that aren't the incremental ACS costs would vitiate the Durbin Amendment's purpose of reducing the interchange fee and making debit transactions more like checking transactions. *See* 15 U.S.C. §1693o-2(a)(2); *id.* §1693o-2(a)(4)(A).

The legislative history points in the same direction. *See Bostock v. Clayton County*, 590 U.S. 644, 674-75 (2020) (drafter's understanding is "evidence" of the law's ordinary meaning); Scalia & Garner, *supra*, at 388 (legislative history can show that "a particular word or phrase is capable of bearing a particular meaning"). During a floor speech, Senator Durbin—the statute's principal author—

explained that "the cost to be considered by the Board in conducting its reasonable and proportional analysis is the incremental [ACS] cost …, as opposed to other costs incurred by an issuer which are not specific to the authorization, clearance, or settlement of a particular electronic debit transaction." 156 Cong. Rec. S5925 (daily ed. July 15, 2010) (emphasis added). Yet here, the Board flatly refused to even define "the incremental cost," claimed the discretion to consider any and all costs, and included the "other costs" that Congress expressly forbade it to consider.

These fundamental failures and departures from the Durbin Amendment render the fee standard under Regulation II and the Updated Rule contrary to law, in excess of the Board's "statutory" "authority" and "limitations," and *ultra vires*. 5 U.S.C. §706(2)(A), (C).

**3.** If any doubt remained, the major-questions doctrine should erase it. "Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be 'shaped, at least in some measure, by the nature of the question presented'—whether Congress in fact meant to confer the power the agency has asserted." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)). Cases involving "economic and political significance" give courts "a 'reason to hesitate before concluding that Congress' meant to confer such authority." *Id.* The major-questions doctrine thus holds that when an agency makes a "vast assertion of newfound power," the agency must offer "something more than a merely plausible textual basis for the agency action." *Missouri v. Biden*, 112 F.4th 531, 547 (8th Cir. 2024) (per curiam) (quoting *West Virginia*, 597 U.S. at 723). Courts "expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2012) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

This is a major-questions case. Debit-card transactions affect far more than "a significant portion of the American economy." *West Virginia*, 597 U.S. at 722; *accord Util. Air*, 573 U.S. at 324. There were "37.6 billion debit and prepaid card transactions in 2009, with an aggregate value of more than $1.4 trillion." *2009 Interchange Fee Revenue*, *supra* n.1, at 6. The interchange fees in 2009 totaled $16.2 billion. *Id.* at 7. Thus, the Board's decision to include or exclude certain types of costs necessarily determines the transfer of billions of dollars from merchants and consumers to issuers. This

undisputed "vast" "economic … significance" brings this case within the major-questions doctrine's ambit. *See, e.g.*, *King v. Burwell*, 576 U.S. 473, 485-86 (2015) (tax credits "involving billions of dollars in spending each year and affecting the price of health insurance for millions of people" was "a question of deep 'economic and political significance' that is central to [the] statutory scheme).

Because the fee standard implicates a major question, the Board must show that Congress "clearly" wanted to include the third category of costs upon which the Board based Regulation II's fee standard. *West Virginia*, 597 U.S. at 716. It cannot do so. The best that the Board could muster was its assertion that the Durbin Amendment was "silent" on how to treat those costs. Regulation II, 76 Fed. Reg. at 43,426. By definition, silence is not a clear statement; it's silence. *Abercrombie & Fitch*, 575 U.S. at 774. In major-questions doctrine cases, if "modest words," "vague terms," "subtle device[s]," and even a "plausible textual basis" don't cut it, *West Virginia*, 597 U.S. at 723, then silence doesn't cut it either. So even if the Board were right that the Durbin Amendment is silent on those costs, that silence does not give the Board the sweeping discretion to include "*any* cost that is incurred in the course of effecting an electronic debit transaction," Regulation II, 76 Fed. Reg. at 43,426 (emphasis added). Given the vast economic and political significance of the debit-card fee issue, it's "very unlikely," *West Virginia*, 597 U.S. at 723, that "Congress left to the [Board] discretion" to interpret the Durbin Amendment to create the third category of costs and "to consider" them in the fee standard, Regulation II, 76 Fed. Reg. at 43,426.

**4.** For its part, the D.C. Circuit in *NACS II* didn't even adopt the Board's reading of the statute as the best one. Indeed, the D.C. Circuit said that "[t]he Board may well have been able to interpret [the statute] as the merchants urge." *NACS II*, 746 F.3d at 484. But contrary to the district court, the D.C. Circuit "s[aw] nothing in the statute's language compelling that result." *Id.* Because the court concluded the law was "ambiguous," it thought that it had to defer to the Board's interpretation under *Chevron*. *Id.* at 484-89. But *Chevron* deference is no more. *See Loper Bright*, 144 S.Ct. at 2273 ("*Chevron* is overruled.") Now, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires…. [C]ourts need not and under the APA

may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* That holding forecloses here the Board's path to success in the D.C. Circuit.

**B.      Regulation II is contrary to law because it includes prohibited costs in the fee standard.**

Even if the Durbin Amendment gave the Board authority to consider more than just incremental costs, it still prohibits the Board from considering the four specific additional costs the Board included in its fee cap: (1) fixed ACS costs, (2) network-processing fees, (3) transaction-monitoring costs, and (4) fraud losses. Regulation II, 76 Fed. Reg. at 43,426, 43,429-31. Each of these costs contradicts the Durbin Amendment, is unlawful, and requires invaliding Regulation II.

**Fixed ACS costs.** The Board unlawfully included fixed—rather than "incremental"—ACS costs in the fee standard. Those fixed ACS costs include costs associated with "network connectivity; software, hardware, equipment, and associated labor" Regulation II, 76 Fed. Reg. at 43,404; *see also* Updated Rule, 80 Fed. Reg. at 48,685. The Durbin Amendment, however, permits only the consideration of "*incremental* cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a *particular* electronic debit transaction," and prohibits the Board from considering "other costs incurred by an issuer which are not *specific* to a *particular* electronic debit transaction." 15 U.S.C. §1693o-2(a)(4)(B)(i)-(ii) (emphasis added). Fixed costs, by definition, are not "specific" to any "particular" transaction. *See* Fixed Cost, *Black's Law Dictionary* (9th ed. 2009) ("A cost whose value does not fluctuate with changes in output or business activity; esp., overhead expenses such as rent, salaries, and depreciation."); *San Antonio v. United States*, 631 F.2d 831, 851 n.1 (D.C. Cir. 1980) ("By definition, fixed costs are not associated with any particular traffic."). It would be "a stretch if a shoe store claimed that the rent it pays its landlord is somehow 'specific' to a 'particular' shoe sale." *NACS II*, 746 F.3d at 489. That is the precise "stretch" the Board took with Regulation II. The banks' fixed costs associated with authorization, clearance, and settlement are not "specific" to a "particular" debit-card transaction and therefore cannot support Regulation II's fee standard. 15 U.S.C. §1693o-2(a)(4)(B)(ii).

21

Tellingly, *nowhere* in Regulation II did the Board provide a statutory basis for including the fixed ACS costs in the fee standard. "Instead of citing statutory text to justify this interpretation of the law, the Board simply noted that it is administratively difficult to discern a transaction's incremental ACS cost," *NACS I*, 958 F. Supp. 2d at 107, and asserted that because "no electronic debit transaction can occur without incurring these [fixed] costs," the fixed ACS costs should be included, Regulation II, 76 Fed. Reg. at 42,327. This is wrong. Even if the Board's right about the administrative difficulties, "practical considerations … do not justify departing from the statute's clear text." *Pereira v. Sessions*, 585 U.S. 198, 217 (2018). Here, Congress unambiguously prohibited the Board from considering costs "which are not specific to a particular electronic debit transaction." 15 U.S.C. §1693o-2(a)(4)(B)(ii). Because the Board included fixed ACS costs, which are not specific to a particular transaction, it acted "in excess of statutory jurisdiction, authority, [and] limitations." 5 U.S.C. §706(2)(C).

**Transaction-Monitoring Costs.** The Board also unlawfully included transaction-monitoring costs in the fee standard. *See* Regulation II, 76 Fed. Reg. at 43,430-31; Updated Rule, 80 Fed. Reg. at 48,685. According to the Board, those costs are those associated with "[t]ransactions-monitoring systems, such as neural networks and fraud-risk scoring systems" that "assist in the authorization process by providing information needed by the issuer in deciding whether the issuer should authorize the transaction before the issuer decides to approve or decline the transaction." Updated Rule, 80 Fed. Reg. at 48,685. In other words, these are "fraud-prevention activities that authenticate the cardholder and confirm whether a debit card is valid." *NACS I*, 958 F. Supp. 2d at 107. Transaction-monitoring costs, the Board has previously "acknowledged," are "the paradigmatic example of fraud-prevention costs." *NACS II*, 746 F.3d at 492. The Board itself has consistently treated transaction-monitoring costs as fraud-prevention costs. *See, e.g.*, Regulation II, 76 Fed. Reg. at 43,397 ("The most commonly reported fraud-prevention activity was transaction monitoring.").

The problem with allowing transaction-monitoring costs—*i.e.*, the "most common[ ]" fraud-prevention costs, *id.*—to be included in the fee standard is that the Durbin Amendment already accounts for fraud prevention elsewhere. It specifically calls for a separate "adjustment … to make allowance for costs incurred by the issuer in preventing fraud" to be made (i) *after* calculating the fee

standard *and* (ii) only if the issuer "complies with various fraud-related standards." 15 U.S.C. §1693o-2(a)(5)(A)(i)-(ii). It states that the Board "may allow for an adjustment to the fee amount received or charged by an issuer under paragraph (2)"—that is, the interchange fee—"if" two conditions are met. *Id.* §1693o-2(a)(5)(A). First, "such adjustment" must be "reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions involving the issuer." *Id.* §1693o-2(a)(5)(A)(i). Second, the issuer must "compl[y] with the fraud-related standards established by the Board." *Id.* §1693o-2(a)(5)(A)(ii). In other words, the Durbin Amendment contemplates that the base fee would be calculated without fraud-prevention costs such as transaction-monitoring costs. If fraud-preventions costs like transaction-monitoring costs are already part of the interchange fee "received or charged by an issuer," then an "adjustment" would not be necessary. Including transaction-monitoring costs in the fee standard *before* adjustment would render 15 U.S.C. §1693o-2(a)(5)(A)'s separate adjustment provision superfluous. *See Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 823-24 (8th Cir. 2009) (courts should avoid construction that would render another part of the statute superfluous).

In addition, the Durbin Amendment makes the fraud-prevention adjustment conditional on the issuers' "compli[ance] with fraud-related standards." 15 U.S.C. §1693o-2(a)(5)(A)(ii). The statutory text makes clear why issuers must comply with this conditional requirement to obtain the fraud-prevention adjustment. *See Concepcion*, 563 U.S. at 344. The whole point is to incentivize issuers to adopt stringent fraud-prevention measures. Indeed, the Board engaged in a separate rulemaking to provide for an additional one-cent adjustment—separate and apart from the base interchange-fee calculation—for issuers who comply with various fraud-prevention measures, including the adoption of "[m]ethods to identify and prevent fraudulent electronic debit transactions." 12 C.F.R. §235.4(b)(1). But the Board's reading—which already and automatically gives issuers fraud-prevention costs like transaction-monitoring costs—disincentivizes the issuers from adopting stringent fraud-prevention measures, thereby defeating the Durbin Amendment's textually demonstrable purpose.

The Durbin Amendment's legislative history further confirms that fraud-prevention costs like transaction-monitoring costs should not be factored in the base-component calculation. Senator

Durbin explained that "any fraud prevention adjustment to the fee amount would occur *after* the base calculation of the reasonable and proportional interchange fee amount takes place." 156 Cong. Rec. 5925 (emphasis added). It "would not be considered as part of the incremental issuer costs upon which the reasonable and proportional fee amount is based." *Id.* And the issuer would have to "individually demonstrate that it complies with the standards established by the Board." *Id.*

**Fraud Losses.** The Board likewise unlawfully included a fraud-loss adjustment. On top of the 21-cent base component, Regulation II further includes an allowance for "fraud losses" by a 5-basis-point (0.05) *ad valorem* component. *See* 12 C.F.R. §235.3(b)(2); Regulation II, 76 Fed. Reg. at 43,431. The Board defined fraud losses as those unrelated to nonsufficient funds and not recovered through chargebacks to merchants or customers. Regulation II, 76 Fed. Reg. at 43,431. As the Board described, "[t]he most common types of fraud … were counterfeit card fraud, lost and stolen card fraud, and card-not-present fraud." *Id.* The Board's including a fraud-loss adjustment in the fee standard is unlawful for three reasons.

First, fraud losses—though unfortunate—are not "costs" as used in the Durbin Amendment. The statute permits the Board to include only "the incremental *cost* incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction." 15 U.S.C. §1693o-2(a)(4)(B)(i) (emphasis added). Cost means "[t]he amount paid or charged for something; price or expenditure." Cost, *Black's Law Dictionary* (9th ed. 2009). Thus, the Durbin Amendment includes only the "amount paid or charged" for the issuer's role in the authorization, clearance, or settlement in a particular electronic debit transaction. Fraud losses don't fit that definition. Loss is "[a]n undesirable outcome of a risk; the disappearance or diminution of value, usu. in an unexpected or relatively unpredictable way." Loss, *Black's Law Dictionary* (9th ed. 2009). Issuers don't pay or get charged fraud losses for their role in the authorization, clearance, or settlement in a particular electronic debit transaction. The Board conceded this point. In the Proposed Rule, the Board explained that "[f]raud losses … are not includable as allowable costs." 75 Fed. Reg. at 81,760. And in Regulation II, even while including fraud losses, the Board acknowledged that fraud losses "are generally the *result* of the authorization, clearance, and settlement of an apparently valid

24

transaction that cardholder later identifies as fraudulent." Regulation II, 76 Fed. Reg. at 43,431. But "the *consequence* of ACS"—profits or fraud losses—are not "ACS costs themselves." *NACS I*, 958 F. Supp. 2d at 109.

Second, fraud losses are not "incremental cost[s] *incurred* by an issuer for the role" in "a particular electronic debit card transaction." 15 U.S.C. §1693o-2(a)(4)(B)(i) (emphasis added). Under Regulation II, merchants must pay 0.05% of a transaction's value to issuers for fraud losses regardless of whether a fraud loss occurred. To "incur" means to "suffer or bring on oneself." Incur, *Black's Law Dictionary* (9th ed. 2009). The Durbin Amendment uses it in the past tense—"incurred"—meaning that the fee being paid to the issuer must have been incurred. The Durbin Amendment does not say that the issuers should be paid fees for losses that *might be incurred* or *could be incurred*. Under Regulation II, however, fraud losses are entirely anticipatory payments from the merchants to the issuers for a fraud event that might never occur. Indeed, the Board described fraud losses as compensating for "potential" risk—not the actual cost incurred. *See* Regulation II, 76 Fed. Reg. at 43,431 ("For example, an issuer takes on a greater risk when approving a $100 transaction than a $5 transaction because the amount of the potential loss is greater.").

Third, including a fraud-loss adjustment in the interchange fee standard vitiates the Durbin Amendment's structure and statutory scheme. Congress chose to deal with fraud in debit-card transactions in a specific way—through a conditional fraud-prevention cost adjustment that incentivizes issuers to improve their fraud-*prevention* systems and compliance with "fraud-related standards." *See* 15 U.S.C. §1693o-2(a)(5)(A); *supra* at 22-23; 12 C.F.R. §235.4. Regulation II reduces issuers' incentives to implement fraud-prevention measures because it allows them to charge a 5 basis-point fee for *all* transactions to reimburse them for fraud-related losses. Perversely, this makes fraud a profit center for some issuers no matter if they implement adequate fraud-prevention protocols. Increasing the fee cap so that issuers can automatically recoup losses caused by fraud bears no resemblance, functionally or structurally, to the scheme Congress authorizes. Allowing issuers to simply recover their losses by passing the cost along frustrates Congress's goal of encouraging fraud reduction. *See* 15 U.S.C. §1693o-2(a)(5). And it frustrates Congress's goal of reducing the overall

interchange fee to an amount "reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* §1693o-2(a)(2).

**Network-Processing Fees.** The Board unlawfully included network-processing fees in the base fee component. *See* Regulation II, 76 Fed. Reg. at 43,430. A network-processing fee is the fee that the *networks* (like Visa and Mastercard) charge banks (both issuers and acquirers) to process a debit-card transaction. Proposed Rule, 75 Fed. Reg. at 81,735. Including the network-processing fees was unlawful for three reasons. First, the Durbin Amendment defines a "network fee" as "any fee charged and received by a payment card network with respect to an electronic debit transaction, *other than an interchange transaction fee*." 15 U.S.C. §1693o-2(c)(10) (emphasis added). A "network fee" cannot be both *different from* an "interchange transaction fee" and simultaneously be *a component of* an "interchange transaction fee."

Second, the Durbin Amendment expressly requires the Board to issue a rule "to ensure that … a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction." 15 U.S.C. §1693o-2(a)(8)(B)(i). Regulation II, however, allows "a network fee [to be] used to directly … compensate[s] an issuer with respect to an electronic debit transaction," *id.*, by including network-processing fees in the interchange-fee standard.

Third, a network-processing fee is not an "incremental cost incurred by an issuer for the role of the *issuer* in the authorization, clearance, or settlement of a particular electronic transaction." *Id.* §1693o-2(a)(4)(B)(i) (emphasis added). The network-processing fee is charged by the *networks* for their role in the transaction. To this point, the Board responds that the issuers must incur the network-processing fees to "effect[] electronic debit transactions," such that it is "incurred for the issuer's role in the authorization, clearance, and settlement." Regulation II, 76 Fed. Reg. at 43,430. But again, the Durbin Amendment prohibits including a "network fee" as a component of the interchange fee, *see* 15 U.S.C. §1693o-2(c)(10), and allowing a "network fee" to "compensate an issuer with respect to an electronic debit transaction," *id.* §1693o-2(a)(8)(B)(i).

26

**C.    Regulation II is contrary to law because it sets a one-size-fits-all cap when the Durbin Amendment commands the Board to set an issuer-specific and transaction-specific fee standard.**

Regulation II's fee standard is independently unlawful because it implements a one-size-fits-all approach for interchange fees. *See* Regulation II, 76 Fed. Reg. at 43,422-23. The Durbin Amendment provides that: "The amount of any interchange transaction fee that an issuer may receive with respect to an electronic debit transaction shall be reasonable and proportional to *the* cost incurred by *the* issuer with respect to *the* transaction." 15 U.S.C. §1693o-2(a)(2) (emphasis added). The word "the" is one "of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'" *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4-5 (D.C. Cir. 2000) (cleaned up). "[T]he 'use of the definite article … indicates that there is generally only one' person covered." *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 272 (2019) (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004)). And "[b]y using the definite article 'the' … Congress specified that each of these metrics has a single, definite, discernable value." *Bridgeport Hospital v. Becerra*, 108 F.4th 882, 887 (D.C. Cir. 2024); *see also Nielsen v. Preap*, 586 U.S. 392, 408 (2019) ("[G]rammar and usage establish that 'the' is a function word indicating that a following noun or noun equivalent is definite or has been previously specified by context." (cleaned up)). By using "the definite article 'the,'" Congress "particularize[d] the subject which it precedes," *Slater*, 231 F.3d at 5 (cleaned up), and intended the words "cost" and "transaction" to be particularized for each "issuer," *see* 15 U.S.C. §1693o-2(a)(2). In other words, the interchange fee that each issuer can recover must be tied to the *specific* costs that *each* issuer incurs for its own *specific* transactions. *See id.* The interchange fee thus must be issuer-specific and transaction-specific.

The Durbin Amendment's other sections confirm this reading. The statute directs the Board to consider "the incremental cost by an issuer for the role of *the* issuer in the authorization, clearance, or settlement of a *particular* electronic debit transaction." 15 U.S.C. §1693o-2(a)(4)(B)(i) (emphasis added). Along with using (again) the definite article "the," this section requires the Board to tie the "cost" that issuers can recover to "particular" transactions. And "particular" means "[p]ertaining to a single definite thing or person, or set of things or persons, as distinguished from others," or "[b]elonging only to a specified person or thing; restricted *to*." Particular, *Shorter Oxford English*

27

*Dictionary* (6th ed. 2007); *see also* Particular, *New Oxford Am. Dictionary* (3d ed. 2010) ("used to single out an individual member of a specified group or class"). Section 1693o-2(a)(2) also requires that the interchange fee be "proportional" to the costs incurred. As the Board itself recognized, "the term 'proportional' requires a relationship between the interchange fee and the costs incurred." Regulation II, 76 Fed. Reg. at 43,423. Regulation II breaks from both directives. Rather than issue a standard that is "particular" to each issuer and "proportional" to issuer-specific costs, Regulation II lets every issuer recover the same amount—21 cents plus .05% of each transaction—regardless of the costs the issuer incurs for each transaction.

The Board's justification for moving away from the issuer-specific and transaction-specific fee calculation is unpersuasive. *See* Regulation II, 76 Fed. Reg. at 43,422-24. The Board purported to justify the departure by asserting that the issuer-specific and transaction-specific fee calculation involves "tremendous complexity and administrative costs." *Id.* at 43,422. But "practical considerations … do not justify departing from the statute's clear text." *Pereira*, 585 U.S. at 217. Indeed, the Board itself initially contemplated an "issuer-specific measurements of costs fees" and would have required each issuer to "calculat[e] its allowable costs and receiv[e] an interchange fee that does not exceed its per-transaction allowable costs." Regulation II, 76 Fed. Reg. at 43,420-21; *cf.* Scalia & Garner, *supra*, at 388 ("legislative history can be consulted to refute attempted application of the absurdity doctrine" and to "establish that it is indeed thinkable that a particular word or phrase should mean precisely what it says").

To avoid the supposed "complexity" and "administrative costs," Regulation II, 76 Fed. Reg. at 43,422, the Board's solution was to rewrite the Durbin Amendment. The Board interpreted §1693o-2(a)(2)'s reference to "an issuer" and "an electronic debit transaction" to refer to not a specific and actual issuer and transaction, but to "a representative issuer" and a representative cost incurred by that representative issuer. *Id.* at 43,422. And the Board interpreted the statute's subsequent references to "the issuer" and "the transaction" to refer to that representative issuer and representative transaction, thereby justifying the use of an average-based, one-size-fits-all cap. *Id.* The problems with the Board's interpretation are obvious. A "representative issuer" and representative transaction, *id.*, are "not the

words that Congress wrote," *Nat'l Ass'n of Mfrs. v. DOD*, 583 U.S. 109, 123 (2018). Congress wrote "an issuer" and "an electronic debit card transaction." 15 U.S.C. §1693o-2(a)(2). The Board isn't "free to 'rewrite the statute' to [its] liking," *Nat'l Ass'n of Mfrs.*, 583 U.S. at 123-24, by adding the word "representative" in the Durbin Amendment, *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2368 (2023) (rejecting the government's attempt to "rewrite [the] statute from ground up"). In addition, the Board's interpretation—to tie the costs to a hypothetical issuer and a hypothetical transaction—reads the words "specific" and "particular" out of the Durbin Amendment. *See* 15 U.S.C. §1693o-2(a)(4)(B)(i) (allowing including "the incremental cost … in … a *particular* electronic debit transaction" (emphasis added)); *id.* §1693o-2(a)(4)(B)(ii) (prohibiting costs "which are not *specific* to a *particular* electronic debit transaction" (emphasis added)).

In short, the Durbin Amendment requires the interchange fee to be "reasonable and proportional to *the* cost incurred by *the* issuer with respect to *the* transaction." *Id.* §1693o-2(a)(2). It requires that the cost be specific to that incurred by an actual issuer and specific to a particular transaction, not based on what a hypothetical issuer would have incurred on average on hypothetical transactions. Accordingly, the Board's decision to adopt an across-the-board, average-based universal cap contradicts the Durbin Amendment.

## II.    Regulation II is arbitrary and capricious.

The APA requires agencies to engage in "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015). As a result, courts must aside an agency action if it is "arbitrary," "capricious," or "an abuse of discretion." 5 U.S.C. §706(2)(A). This review is "'searching and careful.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). And it has "serious bite." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021) (citing *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19-33 (2020)). Under this standard, an agency decision is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider," has "entirely failed to consider an important aspect of the problem," or has adopted a reading "so implausible that it could not be ascribed to a difference

in view or the product of agency expertise." *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 519 (8th Cir. 2024). As outlined below, the Board's fee standard under Regulation II is arbitrary and capricious for three reasons.

### A.    The Board failed to consider the functional similarity between debit-card transactions and checking transactions.

An agency's failure to "consider an important aspect of the problem" is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[B]are acknowledgement" of a concern or a problem "is no substitute for reasoned consideration." *Louisiana v. EPA*, 90 F.4th 461, 473 (5th Cir. 2024). Instead, the agency must give "adequate" and "reasonable" consideration to "an important aspect of [the] problem." *Id.* at 470, 473. A related concept requires the agency to "consider and explain its rejection of 'reasonably obvious'" or "'significant and viable'" alternatives. *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013). It is "the epitome of arbitrary and capricious action" if an agency fails to explain "why [it] rejected less draconian measures." *Clarke v. CFTC*, 74 F.4th 627, 641 (5th Cir. 2023).

Here, the Board failed to consider important aspects of the problem that Congress passed the Durbin Amendment to solve. Congress designed the Durbin Amendment to yield interchange fees that are sufficient to cover issuers' incremental ACS costs but are still as "functional[ly] similar[]" as possible to "checking transactions," which "are required within the Federal Reserve bank system to clear at par." 15 U.S.C. §1693o-2(a)(4)(A)(ii). The Board moved from a proposed cap of either an issuer-specific fee calculation up to 12 cents (with a 7-cent safe harbor) (Alternative 1), or a flat 12-cent fee (Alternative 2), to a final cap of 21 cents plus 0.05% *ad valorem*—a movement *away* from clearing transactions at par, not *toward* it. Whatever "functional similarity" might mean (*id.* §1693o-2(a)(4)(A)), it cannot equate one (checking) system that clears transactions at par to another (electronic-debit) system that creates billions of dollars in interchange fees annually.

To be sure, the Board includes a general description of the similarities and dissimilarities between debit and checking transactions in the background section of its rule *See* Regulation II, 76 Fed. Reg. at 43,398-401. Yet when it comes to the crucial analysis sections, the Board makes little to

no mention of the checking transactions. For instance, when the Board moved away from Alternative 1's issuer-specific fee calculation to the higher fee standard in its final form, it never mentions the comparison to checking transactions. *See id.* at 43,422-24. This failure was arbitrary and capricious because the move from Alternative 1 to the final higher fee standard was more "draconian" for merchants and thus required adequate consideration. *Clarke*, 74 F.4th at 641.

Although the Board's discussion of the cost considerations mentions that the Durbin Amendment requires the Board to consider "the 'functional similarity' between debit transactions and checking transactions," Regulation II, 76 Fed. Reg. at 43,424, that's about it; the Board "move[s] on," *Louisiana*, 90 F.4th at 473. The Board's discussion about including fixed ACS costs similarly fails to mention the functional similarity between debit and checking transactions. *See* Regulation II, 76 Fed. Reg. at 43,429-30. Checking transactions—like debit transactions—necessarily require "equipment, hardware, software, and associated labor." *Id.* at 43,430f. Yet, "a payor's bank in a check transaction (analogous to the issuer in a debit card transaction) would not recoup such costs from the payee's bank (analogous to the merchant acquirer in a debit card transaction)." *Id.* at 43,398; *see also id.* at 43,400 ("The presenting bank typically does not pay a fee to the payor's bank in order to receive settlement for the check."). The Board's decision to include fixed ACS costs fails to adequately and reasonably explain these similarities. *See Louisiana*, 90 F.4th at 470, 473.

The Board's decision to include transaction-monitoring costs similarly fails to consider the similarity to checking transactions. *See* Regulation II, 76 Fed. Reg. at 43,430-31; Updated Rule, 80 Fed. Reg. at 48,648-48,686. So does the Board's decision to include the fraud-loss adjustment. *See* Regulation II, 76 Fed. Reg. at 43,431. The only cost that the Board compares to checking transactions is network-processing fees. *See id.* at 43,430. But that discussion is wholly inadequate. Regulation II includes network-processing fees in the standard after observing that the including such fees would be "similar to traditional paper-check processing where the payee's bank (the corollary to the acquirer for the merchant) typically pays all of the processing costs, while the payor's bank (the corollary of the issuer in an electronic debit transaction) typically pays no processing fees." *Id.* But the Board also recognized that "in *electronic* check collection systems, *both* the payee's bank and the payor's bank

generally pay processing fees." *Id.* Yet despite this recognition, the Board didn't explain why the network-processing fees should still be included. Merely acknowledging a problem "is no substitute for reasoned consideration." *Louisiana*, 90 F.4th at 473.

In sum, the Board did not adequately consider Congress's instruction to consider the functional similarity of debit-card interchange fees and checking transactions. Regulation II's fee standard, as confirmed by the Updated Rule, is thus arbitrary and capricious.

> **B.**  **The Board considered prohibited costs that Congress did not intend it to consider and failed to justify the costs it included.**

The fee standard is arbitrary and capricious because the Board "relied on factors which Congress has not intended it to consider." *Firearms Regul. Accountability Coal.*, 112 F.4th at 519. As explained, *see supra* at 13-16, Congress required that the Board consider only the incremental ACS cost and exclude all other costs, *see also* 15 U.S.C. §1693o-2(a)(4)(B)(i)-(ii). Instead, the Board claimed the discretion to consider "*all* costs related to a particular transaction." Regulation II, 76 Fed. Reg. at 43,427 (emphasis added). And Congress did not authorize the costs it chose. *See supra* at 13-16.

The Board's decision to include those costs was arbitrary and capricious for an additional reason: it failed to "define adequately key terms" and proceeds to "replace[] a statutory command with some other standard." *Qwest Corp. v. FCC*, 258 F.3d 1191, 1201-02 (10th Cir. 2001). Simply "assert[ing] without explanation" that its adopted scheme is "sufficient" cannot withstand arbitrary-and-capricious review. *Id.* at 1201. Here, the Board claimed it did not have to define some of the most important terms that are in and relevant to interpreting the Durbin Amendment: costs. 15 U.S.C. §1693o-2(a)(4)(B)(i). The Board asserted that it was not "necessary to determine whether costs are 'incremental,' fixed or variable, or incurred in connection with authorization, clearance, and settlement." Regulation II, 76 Fed. Reg. at 43,427. This refusal was arbitrary and capricious. *Qwest Corp.*, 258 F.3d at 1201-02.

To that end, the Durbin Amendment turns on how costs are categorized. The statute requires the Board to "distinguish between" "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction" and

"other costs." 15 U.S.C. §1693o-2(a)(4)(B)(i)-(ii). The Board cannot possibly "distinguish between" these types of costs if it refuses to define (1) what the incremental costs are and (2) what costs are incurred in connection with authorization, clearance, and settlement as a baseline. Without these key baseline definitions, the Board proceeded to "replace[]" the Durbin Amendment's "command with some other standard." *Quest*, 258 F.3d at 1201-02. Specifically, the Board proceeded with its own standard that "all costs *related to* a particular transaction may be considered," Regulation II, 76 Fed. Reg. at 43,427, even though the Durbin Amendment expressly and intentionally permits only the incremental ACS costs to be considered, 15 U.S.C. §1693o-2(a)(4)(B)(i); *supra* at 13-16. And without adequate and sufficient definitions anchoring the Board's analysis, the Board drew arbitrary lines between what costs can be included and what costs must be excluded.

For instance, although the Board included fixed ACS costs, it excluded other fixed costs such as corporate overhead and compliance costs. *Compare* Regulation II, 76 Fed. Reg. at 43,404 (including "network connectivity; software, hardware, equipment, and associated labor")*, with id.* at 43,427 (excluding "corporate overhead" and "general debit card program costs, such as card production and delivery costs"). It's not clear why the excluded fixed costs—which the Board concedes are "related to debit card programs and transactions"—should be excluded if the Board can consider "all costs related to a particular transaction." *Id.* at 43,427. The same is true of the fraud-loss adjustment. The Board included the fraud-loss adjustment, asserting that such losses are "generally the result of the authorization, clearance, and settlement" of fraudulent transactions. *Id.* at 43,431. But so are the losses resulting from transactions involving "non-sufficient funds" that occur "when an issuer authorizes a transaction that overdraws the cardholder's account." *Id.* at 43,429. Both pose potential risk to issuers. Yet the Board arbitrarily included the fraud-loss adjustment but not the non-sufficient-fund adjustment. This kind of "internally inconsistent" line-drawing epitomizes arbitrary and capricious decisionmaking. *Firearm Regul. Accountability Coal.*, 112 F.4th at 524; *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("an '[u]nexplained inconsistency'" is the hallmark of arbitrary and capricious agency action). The Board's refusal to adopt key definitions "allow[ed]" it "to arrive at

whatever conclusion it wishes." *Id.* at 525. Both defects render Regulation II's fee standard arbitrary and capricious. *See Quest*, 258 F.3d at 1201-02.

> **C.    The Board failed to consider issuer-specific and transaction-specific costs, and instead considered hypothetical costs that would be incurred by a hypothetical issuer in a hypothetical transaction, to set a universal cap.**

As explained, the Durbin Amendment states that the interchange fee "that an issuer may receive with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. §1693o-2(a)(2). The Durbin Amendment thus requires issuer-specific and transaction-specific fee calculations and prohibits a universal cap untethered to issuer-specific and transaction-specific calculations. *See supra* at 26-27. At the very least, the Durbin Amendment does not contemplate the Board's considering the hypothetical, average-based costs incurred by a hypothetical issuer in a representative transaction. *See supra* at 27. But that is how the Board calculated its entire fee: on hypothetical issuers and transactions. *See supra* at 27; Regulation II, 76 Fed. Reg. at 43,422-24. In doing so, the Board "relied on factors which Congress has not intended it to consider." *Firearms Regul. Accountability Coal.*, 112 F.4th at 519. The fee standard is arbitrary and capricious for that reason.

## III.    Vacatur with a stay is the appropriate remedy.

The APA gives reviewing courts the power "to hold unlawful and set aside agency action[s]." 5 U.S.C. §706(2). This language "incorporated th[e] common and contemporaneous meaning of 'set aside,'" which meant to "'cancel, annul, revoke'"—in essence, "the vacatur of agency actions." *Corner Post*, 144 S. Ct. at 2462 (2024) (Kavanaugh, J., concurring). Not only is vacatur authorized by the APA, but "vacatur is the *normal* remedy." *Allina Health Services v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (emphasis added). Vacatur is also the appropriate and "ordinary" remedy when a rule is "*ultra vires* and unenforceable." *United Steel v. Mine Safety & Health Admin*, 925 F.3d 1279, 1287 (D.C. Cir. 2019). In addition, vacatur is *necessary* to provide Corner Post with any practical relief in this case. As Justice Kavanaugh noted in this case, "[t]he absence of vacatur would … create an asymmetry." *Corner Post*, 144 S. Ct. at 2464 (Kavanaugh, J., concurring). Without it, a regulated party, such as a bank, could

challenge the Board's regulations and receive relief, but Corner Post—a non-directly regulated party—could never receive relief even though the unlawful regulation caused its injury. *See id.* The Board itself conceded at oral argument before the Supreme Court that "the only way to provide [Corner Post] relief is vacatur." Tr. of Oral Arg. at 76, *Corner Post*, 144 S. Ct. 2440. Thus, vacatur of Regulation II and the Updated Rule is (1) authorized, (2) appropriate, and (3) necessary under the APA to grant Corner Post relief in this case. This Court should therefore vacate the Board's regulations.

The Court, however, can—and should—stay its vacatur to give the Board time to replace the invalid fee standard with a valid one. Courts regularly vacate final agency rules with stays so that the regulated area is not left without standards while the agency corrects its mistakes. *See, e.g.*, *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 148 (D.C. Cir. 2006); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995); *NAACP v. Trump*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018). Indeed, in *NACS I*, the district court did exactly that with Regulation II. It concluded that this "fundamentally deficient" regulation necessitated vacatur, but that "any disruptive effect of vacatur can be curtailed by a stay," which allowed the court to "prevent the Board from adopting similar regulations while at the same time avoid the disruption of vacating the entire regime." *NACS I*, 958 F. Supp. 2d. at 114-15.  This Court should follow the same path here and order vacatur with a temporary stay. If the Court vacates the fee standard without a stay, it would leave interchange fees entirely unregulated, returning to the pre-Durbin Amendment market where fees soared up to 44 cents per transaction. *See supra* at 4. "[N]either the Court, nor the parties" would want to see transaction fees "go without … limits" while the Board devises new regulations. *NACS I*, 959 F. Supp. 2d at 115 (quoting *Anacostia Riverkeeper, Inc. v. Jackson*, 713 F. Supp. 2d 50, 55 (D.D.C. 2010)). Thus, Corner Post respectfully asks this Court to vacate the current Regulation II fee standard and stay its vacatur order for a period of six months.

## CONCLUSION

The Court should grant Corner Post's motion for summary judgment, vacate the fee standard under Regulation II (as confirmed by the Updated Rule), and stay its order for six months while the Board engages in rulemaking consistent with this Court's order.

Dated: November 15, 2024                    Respectfully Submitted,

                                            /s/ *Tyler R. Green*
Scott K. Porsborg                           Tyler R. Green (pro hac vice)
SMITH PORSBORG SCHWEIGERT ARMSTRONG          CONSOVOY MCCARTHY PLLC
MOLDENHAUER & SMITH                         222 S. Main Street, 5th Floor
P.O. Box 460                                Salt Lake City, UT 84101
122 East Broadway                           (703) 243-9423
Bismarck, ND 58502                          tyler@consovoymccarthy.com
(701) 258-0630
sporsborg@smithporsborg.com                 Bryan Weir (pro hac vice)
                                            Frank H. Chang
                                            Cody Ray Milner
                                            CONSOVOY MCCARTHY PLLC
                                            1600 Wilson Blvd., Suite 700
                                            Arlington, VA 22209
                                            (703) 243-9423
                                            bryan@consovoymccarthy.com
                                            frank@consovoymccarthy.com
                                            cody@consovoymccarthy.com

                                            *Counsel for Plaintiff Corner Post, Inc.*


## CERTIFICATE OF SERVICE

I filed this brief on the Court's electronic filing system, which will email everyone requiring notice.

Dated: November 15, 2024                    /s/ *Tyler R. Green*