**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | |
|---|---|
| CORNER POST, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 1:21-cv-00095-DMT-CRH |
| v. ) | |
| ) | |
| BOARD OF GOVERNORS OF ) | |
| THE FEDERAL RESERVE SYSTEM, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 1

    A.    The Debit Card Industry and Interchange Fees ................................................ 1

    B.    Section 920 of EFTA ........................................................................................ 2

    C.    Regulation II ..................................................................................................... 3

        1.    The Board's December 2010 Notice of Proposed Rulemaking
            and July 2011 Final Rule ..................................................................... 3

        2.    The Board's November 2023 Notice of Proposed Rulemaking ........... 6

    D.    The First Challenge to the Final Rule and the D.C. Circuit's Decision ........... 7

    E.    Corner Post's Complaint ................................................................................. 10

ARGUMENT .......................................................................................................................... 12

I.    The Best Reading of the Durbin Amendment Is That It Gives the Board
    Substantial Discretion in Establishing Interchange Fee Standards ........................... 12

II.    The Board Properly Applied Section 920 of EFTA in Promulgating
    Interchange Fee Standards ....................................................................................... 15

    A.    The Board's Standards Give Meaning to All of the Terms of the Durbin
        Amendment ...................................................................................................... 16

    B.    In Establishing Interchange Fee Standards, the Board Correctly
        Interpreted Section 920(a)(4)(B) as Permitting Consideration of Costs
        That Are Not Prohibited by Section 920(a)(4)(B)(ii) ...................................... 17

        1.    Corner Post Ignores the Statute's Non-Interlocking Language ........... 17

        2.    Corner Post Ignores the "Which" Clause in Section
            920(a)(4)(B)(ii) .................................................................................. 19

C.      The Board Properly Included Four Specific Costs That are Not Prohibited by Section 920(a)(4)(B)(ii)..............................................................21

      1.      Fixed ACS Costs.........................................................................21

      2.      Transaction-Monitoring Costs....................................................22

      3.      Fraud Losses................................................................................24

      4.      Network Processing Fees............................................................26

D.      The Board's Decision to Adopt a Uniform Standard Applicable to All Issuers and Transactions Was Permissible.......................................................27

E.      The Board's Original and Longstanding Interpretation of the Durbin Amendment Is Entitled to Respect...................................................................31

III.    The Major Questions Doctrine Does Not Apply....................................................31

IV.     Corner Post Is Not Entitled to Vacatur on Procedural Grounds ...........................32

A.      The Board Adequately Considered Functional Similarities with Checking Transactions, as Directed by Congress ..........................................................32

B.      The Board Properly Explained How It Determined What Costs to Consider ........34

C.      Any Relief Relating to Corner Post's Procedural Claims Should Be Limited to Remand Without Vacatur ..............................................................35

CONCLUSION.............................................................................................................36

# TABLE OF AUTHORITIES

Page

**Cases**

*Alldredge Grain & Storage Co. v. ICC*,
    720 F.2d 480 (8th Cir. 1983) ............................................................ 14

*Arkansas Wildlife Federation v. U.S. Army Corps of Engineers*,
    431 F.3d 1096 (8th Cir. 2005) .......................................................... 30

*Barnhart v. Thomas*,
    540 U.S. 20 (2003) ............................................................................ 20

*Barr v. United States*,
    324 U.S. 83 (1945) ............................................................................ 29

*Batterton v. Francis*,
    432 U.S. 416 (1977) .......................................................................... 13

*Bokony v. U.S. Department of Defense*,
    2020 WL 2039560 (E.D. Ark. Apr. 28, 2020) ............................ 35, 36

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) .......................................................................... 12

*Coalition on Sensible Transportation, Inc. v. Dole*,
    826 F.2d 60 (D.C. Cir. 1987) ........................................................... 30

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
    603 U.S. 799 (2024) .......................................................................... 11

*Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*,
    9 F.4th 803 (8th Cir. 2021) ......................................................... 18, 24

*Duncan v. Walker*,
    533 U.S. 167 (2001) .......................................................................... 17

*Florida Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) .......................................................................... 35

*Georgetown University Hospital v. Sullivan*,
    934 F.2d 1280 (D.C. Cir. 1991) ....................................................... 29

*Hanley v. LeJeune*,
    2024 WL 4589856 (D. Minn. Oct. 28, 2024)................................................................. 13

*Heartland Regional Medical Center v. Sebelius*,
    566 F.3d 193 (D.C. Cir. 2009) ....................................................................... 36

*Houston Lighting & Power Co. v. United States*,
    606 F.2d 1131 (D.C. Cir. 1979).................................................................... 14

*Iowa Public Service Co. v. ICC*,
    643 F.2d 542 (8th Cir. 1981) ............................................................. 14, 15, 30

*Julius Goldman's Egg City v. United States*,
    697 F.2d 1051 (Fed. Cir. 1983) ....................................................................... 30

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024)................................................................ 12, 13, 14, 31, 32

*Lopez-Chavez v. Garland*,
    991 F.3d 960 (8th Cir. 2021) ....................................................................... 29

*Loughrin v. United States*,
    573 U.S. 351 (2014)........................................................................ 18, 19, 21

*Mandan, Hidatsa & Arikara Nation v. U.S. Department of the Interior*,
    95 F.4th 573 (8th Cir. 2024)....................................................................... 32

*Miles v. Apex Marine Corp.*,
    498 U.S. 19 (1990)................................................................................ 14

*NACS v. Board of Governors of the Federal Reserve System*,
    574 U.S. 1121 (2015)............................................................................. 8, 9

*NACS v. Board of Governors of the Federal Reserve System*,
    746 F.3d 474 (D.C. Cir. 2014) ........................................... 8, 9, 19, 20, 22, 35

*NACS v. Board of Governors of the Federal Reserve System*,
    958 F. Supp. 2d 85 (D.D.C. 2013) ................................................................... 8

*North Dakota Retail Association v. Board of Governors of the Federal Reserve System*,
    55 F.4th 634 (8th Cir. 2022)....................................................................... 11

*Owner-Operator Independent Drivers Association v. United Van Lines*,
    556 F.3d 690 (8th Cir. 2009) ....................................................................... 24

*Pharmaceutical Care Management Association v. Gerhart*,
    852 F.3d 722 (8th Cir. 2017) ................................................................. 16, 17

*Public Citizen v. U.S. Department of Justice*,
    491 U.S. 440 (1989) ............................................................................... 29

*Public Water Supply District No. 3 of Laclede County v. City of Lebanon*,
    605 F.3d 511 (8th Cir. 2010) ................................................................. 17, 21

*Russello v. United States*,
    464 U.S. 16 (1983) ................................................................................. 18, 19

*Schaffner v. Monsanto Corp.*,
    113 F.4th 364 (3d Cir. 2024) ................................................................. 12, 13

*Schweiker v. Gray Panthers*,
    453 U.S. 34 (1981) ................................................................................. 13

*Sports v. Top Rank, Inc.*,
    954 F.3d 1142 (8th Cir. 2020) ............................................................... 29, 31

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) ................................................................................. 17

*United States v. Pritchett*,
    470 F.2d 455 (D.C. Cir. 1972) ............................................................... 20

*United States v. Ron Pair Enterprises, Inc.*,
    489 U.S. 235 (1989) ............................................................................... 20, 24

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ............................................................................... 31

**Statutes**

1 U.S.C. § 1 ............................................................................................... 29

5 U.S.C. § 706 .......................................................................................... 10

28 U.S.C. § 2401(a) .................................................................................. 11

42 U.S.C. § 607(a) (1976) ........................................................................ 13

49 U.S.C. § 10701(a) (1982) ................................................................... 14

49 U.S.C. § 10701(e) (1982) ................................................................... 14

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203,
   124 Stat. 1376 .................................................................................................. 1, 2
   124 Stat. 1376, 2082 (codified at 15 U.S.C. § 1693b(e)(2)) ............................................ 15

Electronic Fund Transfer Act of 1978 (as amended),
   15 U.S.C. § 1693*o*-2 .................................................................................... *passim*

**Regulations**

12 C.F.R. Part 235, app. A § 235.6(a)(2)(i) (Commentary) .......................................... 27

12 C.F.R. § 235.3(b) ........................................................................................... 7

12 C.F.R. § 235.6(a) ........................................................................................... 27

12 C.F.R. § 235.6(b) ........................................................................................... 27

**Rules**

Fed. R. Civ. P. 12(b)(1), (b)(6) ............................................................................. 10

**Other Authorities**

75 Fed. Reg. 81,722 (Dec. 28, 2010) (NRPM) ....................................... 4, 14, 19, 28, 31

76 Fed. Reg. 43,394 (July 20, 2011) (Final Rule) ..................... 1, 2, 3, 4, 5, 6, 16, 17, 19
   ....................................................... 21, 22, 24, 25, 26, 27, 28, 33, 34, 35

77 Fed. Reg. 46,258 (Aug. 3, 2012) ........................................................................ 6

80 Fed. Reg. 48,684 (Aug. 14, 2015) (August 2015 Clarification) ................................... 9, 22, 23

88 Fed. Reg. 78,100 (Nov. 14, 2023) (2023 NPRM) ..................................................... 6

89 Fed. Reg. 5,438 (May 12, 2024) ........................................................................ 7

Antonin Scalia & Bryan A. Garner, *Reading Law:
   The Interpretation of Legal Texts* (2012) ....................................................... 17

H.W. Fowler, *A Dictionary of Modern English Usage* (2d ed. 1965) .......................................... 20

The Merriam Webster Dictionary (2009) ................................................................ 25, 29

Thomas W. Merrill, *Comment: The Demise of Deference and the Rise of Delegation to
   Interpret?*, 138 Harv. L. Rev. 227 (2024) ....................................................... 12

## INTRODUCTION

Corner Post challenges the regulation issued by the Board of Governors of the Federal Reserve System ("Board") in 2011 in accordance with the requirements of the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"). The Durbin Amendment directed the Board to establish standards for assessing whether the amount of any interchange fee that a debit card issuer may receive from a merchant is reasonable and proportional to the cost incurred by the issuer with respect to the debit card transaction, and the Board adopted its Regulation II in full compliance with Congress's requirements. For the reasons explained below, Regulation II was an appropriate exercise by the Board of the discretion granted to it under the Durbin Amendment, the rule is entirely consistent with the text and purpose of the statute, and Corner Post is not entitled to relief. The Board respectfully requests that summary judgment be entered in its favor.

## BACKGROUND

### A.    The Debit Card Industry and Interchange Fees

Debit cards enable consumers to directly access funds in their deposit or other asset accounts. *See Debit Card Interchange Fees and Routing, Final Rule*, 76 Fed. Reg. 43,394, 43,395 (July 20, 2011) ("Final Rule" or "Rule"). Debit cards evolved from a means of withdrawing funds and performing other banking activities at automated teller machines and became "one of the most popular forms of payment" in the United States. *See* Corner Post's ("Plaintiff's" or "Corner Post's") Amended Complaint for Declaratory and Injunctive Relief (Dkt. 19) ("Am. Compl.") ¶ 2; Final Rule, 76 Fed. Reg. at 43,395.

Various fees are involved when a consumer performs a debit card transaction. The largest of these, the interchange transaction fee (the "interchange fee"), is set by the network that

processes the debit card transaction (most commonly, Visa or Mastercard), and paid by the merchant's bank (the "acquirer") to the entity that issued the debit card (the "issuer") to compensate the issuer for its role in the transaction. 76 Fed. Reg. at 43,396. Prior to the Board's promulgation of the Final Rule in 2011, the amount of any interchange fee was unregulated, and networks reported that the average interchange fee for all debit card transactions was 44 cents per transaction, or 1.15 percent of the average transaction amount. 76 Fed. Reg. at 43,397.

### B.  Section 920 of EFTA

Section 1075 of the Dodd-Frank Act amended the Electronic Fund Transfer Act ("EFTA") by adding a new section 920, codified at 15 U.S.C. § 1693*o*-2 ("section 920" or the "Durbin Amendment"), regarding interchange fees for debit card transactions and other rules for payment card transactions. Among other things, section 920(a) gives the Board direction and authority to prescribe regulations establishing standards for assessing interchange fees for debit cards. Specifically, section 920(a)(2) provides that "[t]he amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction."[1] 15 U.S.C. § 1693*o*-2(a)(2). Section 920(a)(3)(A) requires the Board to prescribe regulations "to establish standards for assessing whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to

---

[1] The Durbin Amendment uses the phrase "electronic debit transaction" to refer to a debit card transaction. The statute defines "electronic debit transaction" as "a transaction in which a person uses a debit card." *Id.* § 1693*o*-2(c)(5). "[I]nterchange transaction fee" is defined as "any fee established, charged or received by a payment card network for the purpose of compensating an issuer for its involvement in an electronic debit transaction." 15 U.S.C. § 1693*o*-2(c)(8). An "issuer" is "any person who issues a debit card, or credit card, or the agent of such person with respect to such card." *Id.* § 1693*o*-2(c)(9).

the transaction." 15 U.S.C. § 1693*o*-2(a)(3)(A). The statute does not define the terms "reasonable" and "proportional" to cost.

In prescribing regulations under paragraph (3)(A), the statute states that the Board shall "(A) consider the functional similarity between – (i) electronic debit transactions; and (ii) checking transactions that are required within the Federal Reserve bank system to clear at par." 15 U.S.C. § 1693*o*-2(a)(4)(A). Section 920(a)(4)(B) further provides that, in promulgating regulations, the Board shall "distinguish between – (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement ["ACS"] of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2)." *Id.* § 1693*o*-2(a)(4)(B). The statute provides no other factors that the Board should take into account in establishing standards for assessing whether interchange fees are "reasonable" and "proportional" to issuer costs. Final Rule, 76 Fed. Reg. at 43,426; *see also id*. at 43,424. A separate provision of the statute, section 920(a)(5)(A), provides that "[t]he Board may allow for an adjustment to the fee amount" permitted by the Board's interchange fee standards if "reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions." *Id.* § 1693*o*-2(a)(5)(A)(i).

## C. Regulation II

### 1. The Board's December 2010 Notice of Proposed Rulemaking and July 2011 Final Rule

Shortly after the enactment of the Dodd-Frank Act, Board staff began meeting with parties interested in the interchange fee rulemaking, including representatives of merchants and retailers, card-issuing banks, networks, and others, to discuss the provisions of the Durbin

Amendment. In addition, the Board distributed surveys to debit card issuers, acquirers, and networks requesting information on, among other things, the costs associated with debit card transactions, in order to assist the Board in developing interchange fee standards. *See Debit Card Interchange Fees and Routing, Notice of Proposed Rulemaking*, 75 Fed. Reg. 81,722, 81,724–725 (Dec. 28, 2010) ("NPRM"); *see also* Am. Compl. ¶ 11.

On December 28, 2010, the Board published its Notice of Proposed Rulemaking requesting public comment on a proposed rule implementing the Durbin Amendment. *Id.* The Board received comments from more than 11,500 commenters, including issuers, payment card networks, merchants, consumers, consumer advocates, trade associations, and members of Congress. 76 Fed. Reg. at 43,394. The Board thoroughly reviewed all comments, along with statutory provisions, survey data, and other relevant information in promulgating the Final Rule. *Id.*

The Final Rule, published July 20, 2011, establishes standards for assessing whether the amount of any interchange fee is reasonable and proportional to the cost incurred by the issuer with respect to the transaction, as directed by Congress. 76 Fed. Reg. at 43,404. Specifically, the Final Rule permits each issuer to receive, for a transaction subject to the interchange fee standards, an interchange fee that does not exceed 21 cents (the "base component") plus 5 basis points multiplied by the value of the transaction (the "*ad valorem* component"), cutting roughly in half the pre-Rule level. *Id.* at 43,422.

In establishing the interchange fee standards, the Board determined, based on the language of the Durbin Amendment, that it could permissibly take into account costs in addition to incremental ACS costs (which the Board is required to consider under section 920(a)(4)(B)(i)), as long as those additional costs are specific to a particular debit card

4

transaction and not excluded from consideration by section 920(a)(4)(B)(ii). 76 Fed. Reg. at 43,426-427. As a result, the Final Rule's interchange fee standards are based on certain costs incurred by issuers in effecting a debit card transaction: both fixed and variable ACS costs (such as network connectivity, software, hardware, equipment, and associated labor), network processing fees, the costs of processing chargebacks and other non-routine transactions, transaction-monitoring costs, and issuer fraud losses. 76 Fed. Reg. at 43,429–431. Several other costs that issuers may incur in effecting a debit card transaction were excluded from consideration for the reasons described in the Final Rule. *Id*. at 43,404, 43,427–429. For example, the Board excluded corporate overhead (such as senior executive compensation), costs associated with establishing the account relationship, card production and delivery costs, marketing costs, research and development costs, and network membership fees, because these costs are not specific to particular debit card transactions. *Id.* at 43,404, 43,427–428.

The values of the base component and the *ad valorem* component in the Final Rule were determined using the data reported on the Board's 2010 survey of debit card issuers (concerning the cost associated with debit card transactions performed in 2009). These values reflect the costs incurred by a "representative issuer in a representative transaction," *id.* at 43,423, and, as such, the interchange fee standards apply uniformly to all issuers subject to the standards. The Board initially considered but rejected both an issuer-specific and a transaction-specific fee cap based on "the language and purpose of the statute and the practical results of various interpretations," including avoiding "a statutory requirement that is virtually impossible to implement" and that "would introduce tremendous complexity and administrative costs for issuers, networks,

acquirers, and merchants, as well as difficulty in monitoring and enforcing compliance." *Id*. at 43,422.[2]

When it established the interchange fee standards, the Board recognized that the issuer costs on which the standards are based may change over time. The Board stated that it would periodically conduct surveys to monitor these costs and would adjust the interchange fee standards based on reported costs if appropriate. *Id*. at 43,432. The Board has conducted surveys of debit card issuers on biennial basis since the Final Rule was adopted.

### 2. The Board's November 2023 Notice of Proposed Rulemaking

On November 14, 2023, the Board published a Notice of Proposed Rulemaking seeking comment on whether to update all three components of the interchange fee cap (*i.e.*, the base component, the *ad valorem* component, and the fraud-prevention adjustment) based on the then-latest cost data reported to the Board by debit card issuers. *See Debit Card Interchange Fees and Routing, Notice of Proposed Rulemaking*, 88 Fed. Reg. 78,100 (Nov. 14, 2023) ("2023 NPRM"). In addition, the 2023 NPRM proposed to codify an approach for "updating the three components of the interchange fee cap every other year going forward based on the latest data reported to the Board" by "directly linking the interchange fee cap to data" from the Board's biennial survey of debit card issuers. *Id*. at 78,101. Under the proposal, the base component would initially be lowered from 21 cents to 14.4 cents, the *ad valorem* component would be lowered from 5 to 4 basis points (multiplied by the value of the transaction), and the fraud-prevention adjustment

---

[2] In a separate interim final rule issued simultaneously with the Final Rule, the Board adopted a fraud-prevention adjustment of 1 cent per transaction for eligible issuers, consistent with section 920(a)(5) of EFTA. *See* 76 Fed. Reg. 43,478; *see also* 77 Fed. Reg. 46,258 (finalizing this interim final rule). The fraud-prevention adjustment is in addition to the amount permitted under the interchange fee standards (*i.e.*, the base component and *ad valorem* component). The base component, *ad valorem* component, and fraud-prevention adjustment are collectively referred to as the "interchange fee cap."

would increase from 1 cent to 1.3 cents for debit card transactions performed from the effective date through June 30, 2025. *Id.* The public comment period on the 2023 NPRM concluded May 12, 2024. *See* 89 Fed. Reg. 5438 (extending initial 3-month comment period).

### D.     The First Challenge to the Final Rule and the D.C. Circuit's Decision

Shortly after publication of the Final Rule in July 2011, a group of trade associations representing merchants, including the National Association of Convenience Stores ("NACS"), the National Retail Federation ("NRF"),[3] the Food Marketing Institution ("FMI"), and the National Restaurant Association ("NRA"), as well as two individual plaintiff merchants, sued the Board seeking a declaration that the Final Rule was arbitrary and capricious and exceeded the Board's statutory authority. *See NACS v. Bd. of Governors of the Fed. Res. Sys.*, No. 1:11-cv-02075 (D.D.C., filed Nov. 22, 2011) (the "NACS" litigation). Among other things, the first amended NACS Complaint—which largely parallels Corner Post's Amended Complaint—challenged the portion of the Final Rule establishing interchange fee standards. First Amended Complaint (Dkt. 18), filed March 2, 2012 ("NACS Compl."), ¶ 1. Like Corner Post here, the NACS plaintiffs claimed that in promulgating the interchange fee standards, the Board "vastly expand[ed] the categories of recoverable costs and thus the allowable debit interchange transaction fee" from the NPRM proposal, and that "the Final Rule exceeds the statutory authority delegated to the Board by the Durbin Amendment and is an unreasonable interpretation of that statute" that is "invalid under the Administrative Procedure Act ['APA']." NACS Compl. ¶ 5. The NACS plaintiffs sought a judgment "declaring that the portions of the Final Rule setting standards for reasonable and proportional interchange fees (12 C.F.R. § 235.3(b)) . . . are

---

[3] In-house counsel for the National Retail Federation appears as counsel for Corner Post in this case. *See* Dkt. 23 at 4.

arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law." NACS

Compl., Prayer for Relief.

On July 31, 2013, a judge of the U.S. District Court for the District of Columbia issued

an opinion and order finding that the interchange fee provisions of the Rule violated the APA.

*NACS v. Bd. of Governors of the Fed. Res. Sys.*, 958 F. Supp. 2d 85 (D.D.C. 2013). On appeal,

the D.C. Circuit reversed. *NACS v. Bd. of Governors of the Fed. Res. Sys.*, 746 F.3d 474, 477

(D.C. Cir. 2014), *cert. denied*, 574 U.S. 1121 (2015). The D.C. Circuit held that "section

920(a)(4)(B)(i) requires the Board to include 'incremental cost[s] incurred by an issuer for the

role of the issuer in the authorization, clearance, or settlement of a particular electronic debit

transaction,' and that section 920(a)(4)(B)(ii) prohibits the Board from including 'other costs

incurred by an issuer which are not specific to a particular electronic debit transaction.'" *Id.* at

483 (quoting 15 U.S.C. §§ 1693*o*-2(a)(4)(B)(i) and (ii)). The court observed that "[t]he Board

may well have been able to" preclude consideration of certain cost categories neither specifically

required to be considered nor specifically excluded from consideration, "as the merchants urge,"

but "we certainly see nothing in the statute's language compelling that result." *Id.* at 484. It

further held that the Board had appropriately determined, based on the statutory language, "that

the statute splits costs into three categories: (1) incremental ACS costs, which the Board must

allow issuers to recover; (2) costs specific to a particular transaction, other than incremental ACS

costs, which the Board may, but need not, allow issuers to recover; and (3) costs not specific to a

particular transaction, which the Board may not allow issuers to recover." *Id*. at 488.

The court next turned to a determination of whether the Board properly included "the

four specific types of costs the merchants challenge: 'fixed' ACS costs, network processing fees,

[issuer] fraud losses, and transactions-monitoring costs." *Id.* at 489. Those four categories are

identical to the costs Corner Post challenges here. *See* Am. Compl. ¶¶ 68, 88. The D.C. Circuit carefully considered each and determined that the statute permitted the Board to consider all four categories of costs. 746 F.3d at 489-92.

With regard to transaction-monitoring costs, the court "agree[d] with the Board that transactions-monitoring costs can reasonably qualify both as costs 'specific to a particular . . . transaction' (section 920(a)(4)(B)) [considered within the interchange fee standards] and as fraud-prevention costs (section 920(a)(5)) [considered within the fraud-prevention adjustment]." *Id*. at 492 (quoting section 920). However, the court held that while "the Board may well be able to articulate a reasonable justification for determining that transactions-monitoring costs properly fall outside the fraud-prevention adjustment" but within the interchange fee standards (and specifically the base component), "the Board has yet to do so." *Id.* at 493. Accordingly, without vacating the Final Rule, the court remanded to the Board for additional explanation of its inclusion of transactions-monitoring costs in the base component, rather than in the separate fraud prevention adjustment, and reversed the district court's grant of summary judgment to the NACS plaintiffs. *Id.* at 493, 496; *see also id.* at 477 ("we remand one minor issue—the Board's treatment of so-called transactions-monitoring costs—to the Board for further explanation").

The Supreme Court subsequently denied the NACS plaintiffs' certiorari petition. *NACS v. Bd. of Governors of the Fed. Res. Sys.*, 574 U.S. 1121 (2015). On August 14, 2015, the Board published a 3-page clarification of its rationale with respect to transactions-monitoring costs as required by the D.C. Circuit, but did not amend the Final Rule. *See Debit Card Interchange Fees and Routing, Clarification*, 80 Fed. Reg. 48,684 (Aug. 14, 2015) (the "August 2015 Clarification"). The NACS plaintiffs did not challenge the Board's August 2015 Clarification and consented to entry of judgment for the Board. *See* NACS Dkt. 53.

### E.    Corner Post's Complaint

The initial plaintiffs in this action, North Dakota Retail Association ("NDRA") and North Dakota Petroleum Marketers Association ("NDPMA"), filed their complaint on April 29, 2021. Following the Board's motion to dismiss for untimeliness, NDRA and NDPMA[4] filed an Amended Complaint on July 23, 2021, adding Corner Post, Inc., a truck stop and convenience store member of NDRA and NDPMA that was incorporated on June 26, 2017, and opened for business in March 2018. Am. Compl. ¶¶ 19, 32. The Amended Complaint seeks a declaration that the interchange fee standards in Regulation II were, from their inception, arbitrary, capricious, contrary to law, and beyond the Board's authority under section 920(a) of EFTA in violation of the APA, 5 U.S.C. § 706. Am. Compl. ¶¶ 84-95. Like the NACS plaintiffs, Corner Post contends that "Regulation II must be vacated and set aside because it exceeds the Board's statutory authority" under section 920 of EFTA in that the Board considered a third category of issuer costs—which the statute does not address—in addition to incremental ACS costs, which the statute requires the Board to consider. *Compare* Am. Compl. ¶¶ 18, 88, *with* NACS Compl. ¶ 5. Like the NACS plaintiffs, Corner Post seeks "[a] declaratory judgment holding that the standard for reasonable and proportional interchange fees in Regulation II" is arbitrary, capricious, contrary to law, and exceeds the Board's statutory authority. Am. Compl., Prayer for Relief; *accord* NACS Complaint, Prayer for Relief.

In its March 11, 2022 Opinion and Order, this Court granted the Board's motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) or, alternatively, for failure to state a claim under Fed. R. Civ. P. 12(b)(6), holding that plaintiffs' claims were time-barred. Dkt. 28

---

[4] NDRA and NDPMA did not participate in Supreme Court proceedings in this action. On remand, the Board and Corner Post agreed that they should be terminated from the case. *See* Dkt. 39 ¶ 5.

at 1, 7-8, 19.[5] The Court held, as the parties agreed, that 28 U.S.C. § 2401(a) provided the applicable six-year statute of limitations for challenging final agency action under the APA. *Id.* at 8, 18-19. The Court concluded that plaintiffs' claims first accrued in July 2011, when the Rule was published in the Federal Register, and thus were time-barred because this action was filed more than six years after the right of action first accrued. *Id*. at 12-13, 15-16. Plaintiffs filed a notice of appeal. Dkt. 30. By opinion and order of December 14, 2022, the Eighth Circuit affirmed, holding that "when plaintiffs bring a facial challenge to a final agency action, the right of action accrues, and the limitations period begins to run, upon publication of the regulation." *North Dakota Retail Ass'n v. Bd. of Governors of the Fed. Res. Sys.*, 55 F.4th 634, 641 (8th Cir. 2022).

On April 13, 2023, Corner Post filed a petition for writ of certiorari to the U.S. Supreme Court, which was granted on September 29, 2023. By opinion dated July 1, 2024, the Supreme Court reversed, holding that an APA claim does not accrue for purposes of 28 U.S.C. § 2401(a)'s six-year statute of limitations until the plaintiff is injured by final agency action. *Corner Post, Inc. v. Bd. of Governors of the Fed. Res. Sys*., 603 U.S. 799, 825 (2024). The Court held that, "[b]ecause Corner Post filed suit within six years of its injury, § 2401(a) did not bar its challenge to Regulation II." *Id*. By order of August 21, 2024, the Eighth Circuit vacated its opinion and remanded to this Court for further proceedings.

---

[5] Because the Court dismissed the Amended Complaint, it held that the Board's motion, in the alternative, to transfer venue to the District of Columbia, where the prior *NACS* case was decided, and where convenience and the interests of justice favored transfer, was moot. Dkt. 28 at 1.

## ARGUMENT

I.   **The Best Reading of the Durbin Amendment Is That It Gives the Board Substantial Discretion in Establishing Interchange Fee Standards**

Although *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), rejected the general presumption in *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), that statutory ambiguity indicates a congressional intent to delegate interpretive authority to an agency, 603 U.S. at 398, it held that Congress can still "delegate[] discretionary authority to an agency," and that a "statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id.* at 394. In such instances, rather than engaging in purely plenary review, courts must "fix the boundaries of the delegated authority and ensure the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* at 395 (cleaned up); *see also* Thomas W. Merrill, *Comment: The Demise of Deference and the Rise of Delegation to Interpret?*, 138 Harv. L. Rev. 227, 228–29 (2024) ("*Loper Bright* said courts must always exercise independent judgment [but] makes clear that independent judgment includes . . . the canon that asks [whether] the statute in question confers discretion on the agency to adopt a reasonable interpretation of the question at issue."). The Durbin Amendment indicates in several ways that it broadly delegates such discretion to the Board, and the enacting Congress expressly stated that it anticipated that the Board's exercise of this discretion would receive deferential review.

*First*, the very first words of the Durbin Amendment authorize the Board to "prescribe regulations . . . , regarding any interchange transaction fee that an issuer may receive or charge . . . , to implement this subsection (including related definitions), and to prevent circumvention or evasion . . . ." 15 U.S.C. § 1693*o*-2(a)(1). This language expresses an intent to "empower the agency to 'fill up the details' of [the] statutory scheme." *Schaffner v. Monsanto Corp.*, 113 F.4th 364, 382 (3d Cir. 2024), *pet'n for panel reh'g & reh'g en banc denied*, No. 22-3075 (3d Cir.

Sept. 24, 2024) (quoting *Loper Bright*, 603 U.S. at 395) (construing a statute authorizing an agency "to prescribe regulations to carry out the provisions" of the statute). Such statutes are one of the categories the *Loper Bright* Court gave as examples of delegations to an agency affording deferential review. 603 U.S. at 395; *accord, e.g.*, *Hanley v. LeJeune*, 2024 WL 4589856, at *4 (D. Minn. Oct. 28, 2024) ("The *Loper* decision does not affect statutes that 'expressly delegate to an agency the authority to . . . fill up the details of a statutory scheme.'" (citation omitted)).

*Second*, the Durbin Amendment expressly instructs the Board "to establish standards for assessing whether the amount of any interchange transaction fee . . . is reasonable and proportional to the cost incurred by the issuer . . . ." 15 U.S.C. § 1693*o*-2(a)(3)(A). Had Congress intended a single, fixed meaning of "standards," "reasonable," and "proportional" to control, without any discretion by the Board, a command for the Board to "establish standards" for purposes of "assessing" whether fees are "reasonable and proportional" would make little sense.

Notably, in a pre-*Chevron* decision, *Batterton v. Francis*, 432 U.S. 416 (1977), which *Loper Bright* cited as an example of a scenario involving delegation of discretion to an agency, the Court held that similar language instructing an agency to adopt "standards" to implement a statutory provision effected a broad delegation. *Batterton*, which applied a law basing eligibility for public benefits on "unemployment (as determined in accordance with *standards prescribed by the Secretary*)," 42 U.S.C. § 607(a) (1976) (emphasis added), held that when Congress

> delegated . . . power to prescribe standards for determining what constitutes "unemployment" [it] entrust[ed] to the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term. . . . The regulation at issue . . . is therefore entitled to more than mere deference or weight. It can be set aside only if the Secretary exceeded his statutory authority or if [it] is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

*Batterton.* 432 U.S. at 425–26 (citations omitted); *see also Schweiker v. Gray Panthers*, 453 U.S. 34, 43 (1981) (describing the delegation at issue in *Batterton* as "exceptionally broad").

*Third*, other pre-*Chevron* precedents, which *Loper Bright* did not purport to overrule and with which Congress is presumed to have been familiar, *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990), indicate that Congress delegates substantial discretion to an agency—subject to deferential review—when it authorizes it to implement a statutory mandate for "reasonable" rates. *Compare, e.g.*, 49 U.S.C. § 10701(a) (1982) ("A rate . . . provided by a carrier . . . must be reasonable."); *id.* § 10704(a)(1) (1982) (requiring the Interstate Commerce Commission ["ICC"] to assess compliance with § 10701(a)), *with Alldredge Grain & Storage Co. v. ICC*, 720 F.2d 480, 482–83 (8th Cir. 1983) ("Judicial review of decisions by the [ICC] in rate cases necessarily has a limited scope . . . . 'The stuff of the process is . . . the resultant of factors that must be valued as well as weighed.'" (citation omitted)); *Iowa Pub. Serv. Co. v. ICC*, 643 F.2d 542, 546 (8th Cir. 1981) ("Courts traditionally have applied a deferential standard in reviewing rate determinations by an agency."); *Houston Lighting & Power Co. v. United States*, 606 F.2d 1131, 1145, 1148 (D.C. Cir. 1979) ("determinations of the reasonableness of rates are primarily the province of the agency charged with that assessment"); *cf. Loper Bright*, 603 U.S. at 394 (terms such as "reasonable" can indicate a congressional intent to "leave[] agencies with flexibility").[6]

Thus, for example, a court resolving a challenge to an agency's approval of a proposed rate deferred not only to the agency's factual findings, but also to its decision of what *factors* to consider as relevant to a reasonable rate, as long as the statute did not bar consideration of these factors. *Houston Lighting*, 606 F.2d at 1147–48 (holding that a decision to apply what the agency discerned as the underlying public policy motivating a statute when determining an allowable rate "represents a permissible exercise of the [ICC's] ratemaking discretion"); *id.* at 1148

---

[6] As the Board noted during the rulemaking, the Durbin Amendment differs in certain respects from such rate-making statutes that, *inter alia*, require consideration of additional factors. *See* 75 Fed. Reg. at 81,733 n.44; 49 U.S.C. § 10701(e) (1982) (requiring allowance for "profit").

(upholding an ICC decision "no[t] forbidden by the Act" on what methodology fairly reflected costs). Similarly, the Eighth Circuit held that the ICC's use of various proxies and methodologies to approximate certain costs and advance certain policies was a permissible exercise of discretion. *Iowa Pub. Serv. Co. v. ICC*, 643 F.2d 542, 547 (8th Cir. 1981) (upholding, *inter alia*, the use of a statutory tax rate, which the ICC expected to create an incentive for greater capital spending, as a "reasonable substitute" for a carrier's actual tax costs when setting a permissible rate). Like the statutes at issue in *Batterton* and these cases, the Durbin Amendment delegates broad discretionary authority to the Board to promulgate "standards for assessing whether" interchange fees are "reasonable and proportional," thereby implicating deferential review.

*Lastly*, the enacting Congress expressly stated that it viewed the Durbin Amendment as granting discretion to the Board warranting deferential review of any associated Board rules. The Dodd-Frank Act specifically provided that "[n]o provision of this title may be construed as altering, limiting, or otherwise affecting the deference that a court affords to . . . the Board in making determinations regarding the meaning or interpretation of section 920." Dodd-Frank Act § 1084(3), 124 Stat. 1376, 2082 (codified at 15 U.S.C. § 1693b(e)(2)). This provision confirms that, when it enacted the Durbin Amendment, Congress understood that it was granting the Board discretionary authority to give "meaning" to the terms in section 920, and that the Board's resulting rules would receive deferential judicial review.

## II.    The Board Properly Applied Section 920 of EFTA in Promulgating Interchange Fee Standards

In the Final Rule, the Board established standards for assessing whether the amount of any interchange fee is reasonable and proportional to the cost incurred by the issuer with respect to the transaction, as mandated by Congress, which reduced interchange fees by approximately half compared to their pre-Rule levels. In so doing, the Board properly: (1) considered issuers'

incremental ACS costs, as directed by Congress in section 920(a)(4)(B)(i); and (2) excluded "other costs incurred by an issuer which are not specific to a particular electronic debit transaction" in accordance with section 920(a)(4)(B)(ii). The Board noted that the statute, while prohibiting consideration of costs not specific to a particular electronic debit transaction, did not bar consideration of costs "that are specific to a particular electronic debit transaction but that are not incremental [ACS costs]," 76 Fed. Reg. at 43,426, and properly exercised its discretion to consider four specific categories of costs—fixed ACS costs, transaction-monitoring costs, network processing fees, and issuer fraud losses—which it concluded, after detailed analysis, are specific to particular transactions and therefore may be included in the interchange fee standard. The Board also permissibly adopted a single industry-wide standard that avoids absurd results, and its consistent view of the statute since its enactment is entitled to respect.

### A.    The Board's Standards Give Meaning to All of the Terms of the Durbin Amendment

EFTA section 920(a)(2) broadly instructs that "[t]he amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693*o*-2(a)(2). And in mandating in section 920(a)(3)(A) that the Board prescribe regulations "to establish standards for assessing" interchange fees, Congress refers back to section 920(a)(2)'s directive that fees be "reasonable" and "proportional" to issuers' costs. *See* 15 U.S.C. § 1693*o*-2(a)(3)(A). The Board's Rule gives meaning to these terms: it considers only costs that are required or permitted to be considered, and creates a standard that distinguishes a reasonable interchange fee from an unreasonable one, which is set by reference to issuers' costs—thereby ensuring that interchange fees are proportional to those costs. 76 Fed. Reg. at 43,423; *Pharm. Care Mgmt. Ass'n v. Gerhart*, 852 F.3d 722, 728 (8th Cir.

2017) ("we must construe a statute 'so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant'" (internal quotations omitted)); *Pub. Water Supply District No. 3 of Laclede County v. City of Lebanon*, 605 F.3d 511, 517 (8th Cir. 2010) ("the 'well-established principle[] of statutory interpretation . . . require[s] statutes to be construed in a manner that gives effect to all of their provisions'" (internal quotations omitted)).

By contrast, Corner Post focuses almost exclusively on the required and prohibited cost categories in section 920(a)(4)(B). *See* Memorandum in Support of Plaintiff Corner Post, Inc.'s Motion for Summary Judgment (Dkt. 51) ("CP Br.") at 13-20. It views the Board's task as mechanically sifting costs into one of these two categories. *Id.* at 13 ("The Durbin Amendment unambiguously bifurcates the entire universe of interchange-fee costs into two categories"). But, as discussed below, the Board appropriately concluded that the statute's "requirement that one set of costs be considered and another set of costs be excluded suggests that Congress" permitted consideration, within the bounds of the statute, of costs that fall into neither category. 76 Fed. Reg. at 43,426. And Corner Post's approach fails to give separate significance to the overall mandate of reasonableness and proportionality to costs in sections 920(a)(2) and (a)(3)(A), and thus reads these important provisions out of the statute in contravention of well-settled tenets of statutory construction. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("we are 'reluctant to treat statutory terms as surplusage in any setting'" (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001))); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176 (2012) ("[C]ourts avoid a reading that renders some words altogether redundant.").

**B.    In Establishing Interchange Fee Standards, the Board Correctly Interpreted Section 920(a)(4)(B) as Permitting Consideration of Costs That Are Not Prohibited by Section 920(a)(4)(B)(ii)**

**1.    Corner Post Ignores the Statute's Non-Interlocking Language:** Section 920(a)(4)(B)(i) requires the Board to consider "the incremental cost incurred by the issuer for the

role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction." 15 U.S.C. § 1693*o*-2(a)(4)(B)(i). But the counterpart provision, identifying costs "which . . . shall not be considered," employs different language: "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." *Id.* § 1693*o*-2(a)(4)(B)(ii). Under ordinary rules of statutory construction, Congress's use of different words in the prohibited costs clause is presumed to mean that Congress intended a different meaning than in the preceding clause. *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (inclusion of particular language in one section but not another raises a presumption that Congress "intended a difference in meaning"); *Russello v. United States,* 464 U.S. 16, 23 (1983) (if "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely" (cleaned up)); *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 9 F.4th 803, 807 (8th Cir. 2021) (same).

Had Congress meant that the *only* costs that could be considered in determining what is "reasonable" and "proportional" are incremental ACS costs identified in section 920(a)(4)(B)(i), as Corner Post argues, CP Br. at 15-16, there are numerous ways it could have said so. It could have written section 920(a)(4)(B)(ii) as simply excluding "all other costs"; it could have written section 920(a)(4)(B)(i) to say "consider *only*" incremental ACS costs incurred" for authorization, clearance, or settlement, and eliminated section 920(a)(4)(B)(ii) altogether; it could have provided in sections 920(a)(2) and (a)(3)(A) that issuers were limited to costs that were "reasonable and proportional to the incremental cost incurred by the issuer in authorization, clearance, or settlement of a transaction"; or it could have used interlocking language by stating that the Board must consider incremental ACS costs but may not consider any cost that is not incremental ACS, to name just a few obvious possibilities. Congress chose none of these options,

however, and instead described the costs the Board *may not* consider using different language

than that used to describe costs the Board *must* consider. In so doing, under ordinary principles

of statutory construction, Congress did not limit the Board to considering only incremental ACS

costs, but permitted the Board to consider any other costs specific to a particular transaction so

long as that cost is not prohibited by section 920(a)(4)(B)(i) because it is not specific to a

particular transaction. *See Loughrin*, 573 U.S. at 358; *Russello*, 464 U.S. at 23.[7]

Here, the Board acted within the confines of the statute by considering certain non-

prohibited costs, in addition to required incremental ACS costs. 76 Fed. Reg. at 43,426. One

example of this kind of cost is ACS costs that may not be viewed as incremental ACS costs (*i.e.*,

fixed ACS costs), depending on the time horizon used to determine whether a cost is

"incremental." *Id.* at 43,427 ("[W]hether a cost incurred by an issuer for authorization, clearance,

and settlement of transactions is thought of as 'fixed' or 'variable' depends on the relevant time

horizon and [transaction] volume range."); *accord NACS*, 746 F.3d at 484. Congress neither

required nor prohibited the inclusion of these costs, and therefore the Board was not barred from

considering them when exercising the discretion delegated to it by the Durbin Amendment.

2.      **Corner Post Ignores the "Which" Clause in Section 920(a)(4)(B)(ii)**:

Corner Post's claim that the Board can only consider incremental ACS costs, CP Br. at 15-16,

should be rejected for a second reason. In arguing that section 920(a)(4)(B)(ii) "requires

excluding all costs that are not . . . incremental ACS cost[s] from the fee standard," CP Br. at 15,

---

[7] Contrary to Corner Post's claim that the Board initially "hewed to [Corner Post's] interpretation of the Durbin Amendment," CP Br. at 16, the Board consistently recognized that the Durbin Amendment's cost provisions do not cover the entire universe of issuer costs. *See* NPRM, 75 Fed. Reg. at 81,734, 81,735 (requesting comment on "whether [to] allow recovery through interchange fees of other costs"); Final Rule, 76 Fed. Reg. at 43,426 ("the requirement that one set of costs be considered and another set of costs be excluded suggests that Congress left to the implementing agency discretion to consider costs that fall into neither category").

Corner Post ignores that 920(a)(4)(B)(ii) does not forbid the Board from considering *all* costs that are not incremental ACS costs, but rather precludes consideration of "other costs incurred by an issuer *which are not specific to a particular electronic debit transaction*." 15 U.S.C. § 1693*o*-2(a)(4)(B)(ii). Congress's use of the phrase "which are not specific to a particular electronic debit transaction" in section 920(a)(4)(B)(ii) restricts the meaning of "other costs incurred by the issuer" to only non-transaction-specific costs, and not to all costs other than incremental ACS costs.

Under ordinary principles of statutory construction, the phrase "other costs which are not specific to a particular electronic debit transaction," § 1693*o*-2(a)(4)(B)(ii), is not equivalent to "other costs." Had Congress intended "which are not specific to a particular electronic debit transaction" merely to describe—but not restrict—other costs, it would have set the "which" clause off with a comma or parentheses. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003) (in the statutory phrase "any other kind of substantial gainful work which exists in the national economy," the "which" phrase qualifies "substantial gainful work"); *NACS*, 746 F.3d at 487 ("[i]n this instance, the absence of commas matters far more than Congress's use of the word 'which' rather than 'that'"); *United States v. Pritchett*, 470 F.2d 455, 459 (D.C. Cir. 1972) (interpreting a statutory phrase not set off by commas as modifying the immediately preceding phrase); H.W. Fowler, *A Dictionary of Modern English Usage* 698 (2d ed. 1965) ("A comma preceding *which* shows that the *which*-clause is nondefining, and the absence of such a comma shows that it is defining."). Where a "reading is . . . mandated by the grammatical structure of the statute," as in the case of section 920(a)(4)(B)(ii), it is the duty of the court to give effect to the statute as written. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).

Moreover, Corner Post's "reading" of the section 920(a)(4)(B)(ii) "which" clause must be rejected under another important principle of statutory construction. Because it renders the phrase "which are not specific to a particular electronic debit transaction" surplusage, it cannot stand. *Loughrin*, 573 U.S. at 358; *Pub. Water Supply*, 605 F.3d at 518.

### C.  The Board Properly Included Four Specific Costs That are Not Prohibited by Section 920(a)(4)(B)(ii)

Contrary to Corner Post's arguments, CP Br. at 21-26, the Board properly included four specific cost items in establishing interchange fee standards. As shown below and in the Final Rule, all four—fixed ACS costs, transaction-monitoring costs, issuer fraud losses, and network processing fees—are specific to particular electronic debit transactions and therefore not prohibited by section 920(a)(4)(B)(ii).

1.  **Fixed ACS Costs:** In establishing interchange fee standards, the Board properly considered—and included—ACS costs incurred by an issuer in effecting a transaction, including both fixed and variable ACS costs. *See* 76 Fed. Reg. at 43,404, 43,429. Corner Post argues that the term "incremental" in section 920(a)(4)(B)(i) bars the Board from considering "[f]ixed costs," which, "by definition, are not 'specific' to any 'particular' transaction." CP Br. at 21. This interpretation is wrong. Rather, the Board correctly concluded that fixed ACS costs are specific to a particular debit card transaction because, without these costs, no transaction could occur. *Id.* at 43,427 (noting that "no electronic debit transaction can occur without incurring [ACS] costs, making them costs specific to each and every electronic debit transaction").

In addition, as the Board explained, the concepts of fixed versus variable costs are exceedingly difficult to conclusively delineate in practice for a variety of reasons, including "the relevant time horizon and volume range" of the costs, the fact that "issuers' cost-accounting systems are not generally set up to differentiate between fixed and variable costs," and differing

21

cost accounting systems used when an issuer outsources debit card operations. 76 Fed. Reg. at 43,427. Accordingly, as the D.C. Circuit recognized in *NACS*, throughout the rulemaking process the merchants themselves "never argued that issuers should be allowed to recover only costs incurred as a result of processing individual, isolated transactions," and "any distinction between fixed and variable costs would prove artificial and unworkable." 746 F.3d at 489-90. As the Board correctly concluded, "[b]y considering all costs [including both fixed and variable ACS costs] for which it had data other than prohibited costs, the Board has complied with the statutory mandate not to consider costs identified in Section 920(a)(4)(B)(ii), has fulfilled the statutory mandate requiring consideration of the costs identified in Section 920(a)(4)(B)(i), and has chosen to consider other costs specific to particular electronic debit transactions to the extent consistent with the purpose of the statute." 76 Fed. Reg. at 43,427.

2.    **Transaction-Monitoring Costs:** Second, as described in the Final Rule, the Board properly included transaction-monitoring costs in the interchange fee standards. While the Board had not initially proposed including these costs, numerous commenters "recommended including costs of such fraud-prevention activities . . . because the pre-authorization fraud-prevention activities are integral to transaction authorization." *Id*. at 43,430. Specifically, the issuer, as part of its decision whether to authorize a transaction, confirms that a debit card is valid and authenticates the cardholder before authorizing the transaction. *Id*. at 43,430-431. As part of this process, the issuer may use transaction-monitoring programs such as neural network and fraud-risk scoring systems to assist in the authorization process by providing information to the issuer before it decides to approve or decline the transaction. *Id.*; August 2015 Clarification, 80 Fed. Reg. at 48,685. While these transaction-monitoring activities inherently include a fraud-prevention component, they are also part and parcel of the authorization process. *See* August

2015 Clarification, 80 Fed. Reg. at 48,685 ("Transactions-monitoring systems, such as neural networks and fraud-risk scoring systems, assist in the authorization process by providing information needed by the issuer in deciding whether the issuer should authorize the transaction before the issuer decides to approve or decline the transaction. . . . [T]ransactions-monitoring is integral to an issuer's decision to authorize a specific transaction.").

Corner Post fails to recognize this, arguing instead that transaction-monitoring costs are only "fraud-prevention activities . . . account[ed] for . . . elsewhere" in section 920(a)(5)(A). CP Br. at 22. But the Board appropriately concluded that it was permissible to include transaction-monitoring costs in the interchange fee standards, rather than only in the separate fraud-prevention adjustment, because the language of section 920(a)(5)(A) differs significantly from section 920(a)(4)(B), indicating that these provisions refer to different (although potentially overlapping) categories of costs. Specifically, the costs considered in section 920(a)(5)(A)(i) are those for preventing fraud "in relation to electronic debit transactions involving that issuer," rather than the costs "specific to a particular electronic debit transaction" referenced in section 920(a)(4)(B). *Compare* 15 U.S.C. § 1693*o*-2(a)(5)(A)(i), *with id.* § 1693*o*-2(a)(4)(B).

As the Board explained in the August 2015 Clarification, in contrast to transaction-monitoring costs, which are inextricably linked to the authorization of specific electronic debit transactions and included in the interchange fee standard, "fraud-prevention costs that the Board used to calculate the separate fraud-prevention adjustment authorized under section 920(a)(5) were not necessary to effect a particular transaction and were not part of the authorization, clearing, or settlement process, and thus a particular electronic debit transaction could occur without the issuer incurring these costs." 80 Fed. Reg. at 48,685. Indeed, Congress's omission of the word "particular" and its use of the more general phrase "in relation to," along with its use of

the plural "transactions" in section 920(a)(5)(A)(i), indicates that the fraud-prevention

adjustment may take into account an issuer's fraud prevention costs *over a broad spectrum of*

*transactions* not linked to a particular transaction. *Designworks*, 9 F.4th at 807 ("it is generally

presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion"

of particular language in different parts of a statute (internal quotation omitted)).

Thus, contrary to Corner Post's argument, CP Br. at 22-24, by its plain terms, section

920(a)(5)(A) does not bar the Board from considering transaction-monitoring costs that are

integral to the authorization process and specific to a particular transaction. Nor can legislative

history trump this plain language of the statute, as Corner Post incorrectly suggests, CP Br. at 23-

24. *See Owner-Operator Indep. Drivers Ass'n v. United Van Lines*, 556 F.3d 690, 693 (8th Cir.

2009) ("if 'the statute's language is plain, the sole function of the courts is to enforce it according

to its terms,' without reference to its legislative history" (quoting *Ron Pair*, 489 U.S. at 241)).

**3.    Fraud Losses:** As the Board explained in the Final Rule, fraud losses may

properly be included in the interchange fee standard because they are "specific to a particular

transaction" given that they are "generally the result of the authorization, clearance, and

settlement of an apparently valid transaction that the cardholder later identifies as fraudulent,"

most commonly because of counterfeit card fraud, lost and stolen card fraud, or card-not-present

fraud. 76 Fed. Reg. at 43,431. In other words, fraud losses are quintessentially specific to a

particular transaction because the issuer would not have incurred the fraud loss but for its

authorization, clearance, and settlement of that particular transaction. Having determined that

fraud losses are specific to a particular transaction, and therefore permissible to include in the

interchange fee standards, the Board determined that permitting issuers to recover "at least some

fraud losses through interchange fees is reasonable given that the source of fraud could be any

24

participant in an electronic debit transaction and that the exact source of fraud often is unknown." *Id.* The Board also appropriately determined that, because the "cost of a fraud loss varies with the amount of the transaction," the allowance for fraud losses is "best assessed through an *ad valorem* component." *Id.*

Corner Post argues that, even assuming the Durbin Amendment permits the Board to include certain non-prohibited costs, the inclusion of a portion of fraud losses in the interchange fee standard was "unlawful" because (1) "fraud losses—although unfortunate—are not costs," CP Br. at 24; (2) they are not "incurred," *id.* at 25; and (3) fraud in debit card transactions is dealt with in section 920(a)(5)(A), *id*. at 25-26. None of these arguments withstand scrutiny.

First, contrary to Corner Post's claim that "costs" are limited to "'the amount paid or charged for something,'" CP Br. at 24 (citing dictionary), the dictionary *also* defines costs as a "loss or penalty involved in gaining something." *The Merriam Webster Dictionary* 90 (2009). And fraud losses fall readily within the fee standard because they are typically borne by the issuer as a result of its "role" in authorizing a transaction that turns out to be fraudulent. 76 Fed. Reg. at 43,431.

Corner Post next argues that fraud losses are not costs "incurred" by a debit card issuer because an interchange fee (including the fraud loss component) is charged for a transaction regardless of whether the transaction turns out to be fraudulent, and (even in the event of a fraudulent transaction) before the issuer actually bears any fraud loss. CP Br. at 25 (describing the inclusion of fraud losses in the fee standards as "anticipatory payments . . . to the issuer for a fraud event that might never occur"). But interchange fee rates are established by a network in advance of any transaction, well before the cost of a particular transaction is known (if such a cost can be determined at all), and the full cost of a transaction is not necessarily borne by the

issuer at the time the interchange fee is charged. Further, to the extent Corner Post suggests the Board may not look backward at the cost of past transactions in establishing fee standards for future transactions, such an argument is at odds with the language and structure of the Durbin Amendment. *See* 15 U.S.C. §1693*o*–2(a)(3)(A) (requiring the Board to establish interchange fee standards that relate fees to issuer costs); *id.* § 1693*o*–2(a)(3)(B) (authorizing the Board to collect cost data from issuers "as may be necessary" to, *inter alia*, establish interchange fee standards).

Finally, Corner Post is wrong to argue that fraud in debit card transactions is "deal[t] with" in section 920(a)(5)(A), CP Br. at 25, because that section concerns fraud *prevention* rather than *losses* resulting from a fraudulent transaction. 15 U.S.C. § 1693*o*–2(a)(5)(A)(i).

**4.    Network Processing Fees:** The Board properly included in the interchange fee standard network processing fees, which are fees paid by an issuer to a network (such as per-transaction "switch fees"). 76 Fed. Reg. at 43,430. It reasoned that these fees are "both specific to a particular transaction and incurred for the issuer's role in authorization, clearance, and settlement." *Id*. These fees vary with the number of transactions processed and no transaction can authorize, clear, or settle without them. *Id.* Moreover, network processing fees, although paid by issuers to networks, are incurred "for the role of the issuer" in ACS. 15 U.S.C. § 1693*o*-2(a)(4)(B)(i). Issuers play a role in receiving authorization requests from networks, communicating approval or denial back to the networks, and receiving settlement information from the network. 76 Fed. Reg. at 43,396. This would not be possible if an issuer did not participate in the network, a necessary condition of which is that it pay network processing fees.

Corner Post wrongly argues that network processing fees are not incurred *by the issuer* for its role in the ACS process. CP Br. at 26. As explained above, this is incorrect. Moreover, Corner Post misinterprets a provision prohibiting circumvention or evasion of section 920(a). *Id*.

Specifically, Corner Post mistakenly argues that inclusion of network processing fees in the interchange fee standards runs afoul of section 920(a)(8), which allows the Board to prescribe rules to ensure "a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction [or to] circumvent or evade" regulations under section 920. 15 U.S.C. § 1693*o*-2(a)(8)(B). But this language says nothing at all about which costs the Board may consider in establishing interchange fee standards. Moreover, the Board implemented section 920(a)(8) elsewhere in the Final Rule by prohibiting "net compensation" to an issuer through the use of network fees, *see* 12 C.F.R. § 235.6(b), and "circumvent[ion] or eva[sion] [of] the interchange transaction fee restrictions . . . ." *Id.* § 235.6(a).[8]

### D.    The Board's Decision to Adopt a Uniform Standard Applicable to All Issuers and Transactions Was Permissible

Corner Post incorrectly contends that the Durbin Amendment's requirement that "an interchange fee shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction," 15 U.S.C. §1693o-2(a)(2), requires an interchange fee standard involving different fee levels for different issuers "tied to the *specific* costs that *each* issuer incurs for its own *specific* transactions" (*i.e.* an issuer-specific standard). CP Br. at 27. To the extent Corner Post is arguing that a permissible interchange fee standard must be calculated for each issuer based on the costs of all of that issuer's collective "*transactions*," as its brief appears to suggest, *id.*,[9] and as nearly all commenters opposing an industry-wide approach had argued,

---

[8] An example of such "circumvention or evasion" is a situation where a network lowers network processing fees paid by issuers by 50 percent while raising similar fees charged to merchants or acquirers by the same amount. *See* 12 C.F.R. Part 235, app. A § 235.6(a)(2)(i) (Commentary).

[9] Corner Post also appears to endorse what it characterizes as the "issuer-specific and transaction-specific" standard the Board originally proposed, which would have allowed an issuer to "receiv[e] an interchange fee that does not exceed its per-transaction allowable costs," CP Br. at 28 (quoting 76 Fed. Reg. at 43,421). But this figure would have been computed, for "a

76 Fed. Reg. at 43,422, 43,423, it appears to recognize that the statutory language does not compel an interchange fee standard involving different fee levels for individual transactions (*i.e.*, a transaction-specific standard). And if the statute does not require a transaction-by-transaction approach, there is no principled reason to read it as requiring an issuer-by-issuer approach.

In fact, as the Board explained, if "the issuer" referred to a specific issuer rather than a representative issuer, it would follow that "the transaction" in the same phrase refers to a specific rather than a representative transaction, which would lead to a transaction-specific standard that would be "virtually impossible" to implement. *Id.* at 43,422. *Inter alia*, some transaction-specific cost data is not available at the time the transaction (and associated interchange fee) is processed. *Id.* And due to the tens of billions of debit card transactions each year and "an exceedingly complex matrix of interchange fees," extensive information exchanges between issuers and networks would be required to determine individual transaction costs, adding substantial costs to be passed on to merchants and impeding enforcement. *Id*. These concerns prompted even commenters objecting to an industry-wide approach to argue for an issuer-specific rather than a transaction-specific standard. *Id.* at 43,423. And if the statute's reference to "the transaction" and "a transaction" must therefore indicate a representative transaction, it follows that "the parallel use of the same construction in referencing 'an issuer' and 'the issuer' in the same sentence supports the interpretation of those references as references to a representative issuer of debit cards." *Id.* Thus, the absurdity canon counsels against reading Congress's use of "the" to compel the result Corner Post urges, which would be virtually impossible to implement and undermine

_____

calendar year," using the issuer's "average variable cost" across all transactions "for that year," 76 Fed. Reg. at 43,420, thereby aggregating costs across transactions. This approach also incorporated a safe harbor rate and a maximum permissible fee rate, both of which were based on industry-wide data. 75 Fed. Reg. at 81,737–38. Thus, Corner Post implicitly concedes that the Durbin Amendment permits the Board to establish interchange fee standards that are, at least in part, uniformly applicable and based on industry-wide data.

the statute's purpose of controlling costs charged to merchants. *See Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 454 (1989) (statutory constructions leading to absurd results or undermining the purposes of a statute are disfavored); *Lopez-Chavez v. Garland*, 991 F.3d 960, 967 n.8 (8th Cir. 2021) (statute must be construed to avoid absurd or futile results).

Moreover, contrary to Corner Post's suggestion, CP Br. at 27, the statute's reference to "the transaction" and "the issuer" does not compel treating each transaction as a discrete unit of measure, particularly where doing so would create this absurd result. A definite article can indicate "any one typical of or standing for the entire class named." *The Merriam Webster Dictionary* 414 (2009); *accord* 1 U.S.C. § 1 (establishing a rebuttable presumption that use of the singular also refers to the plural); *Georgetown U. Hosp. v. Sullivan*, 934 F.2d 1280, 1284 n.4 (D.C. Cir. 1991) (citing *Barr v. United States*, 324 U.S. 83, 90–92 (1945)) (rejecting a similar argument based on use of "the" as "overly formalistic and inconsistent with Supreme Court case law"). Corner Post's further reliance on the Durbin Amendment's references to "a particular electronic debit transaction" in its cost provisions, CP Br. at 29, is especially misplaced because the identified passages use the indefinite article "a/an," which "is often used to mean 'any'. . . and applied to more than one individual object . . . ." *Sports v. Top Rank, Inc.*, 954 F.3d 1142, 1147–48 (8th Cir. 2020). Consequently, construing the statute's language concerning "the" (or "an") issuer and "the" (or "a") "transaction" as indicating a representative issuer and transaction is both possible and necessary to avoid a construction that would be "impossible to implement."

Finally, the Durbin Amendment's delegation of authority gave the Board discretion in how to approximate a "reasonable and proportional" fee. Such determinations necessarily require

making various fact-bound, line-drawing judgments about how to allocate and estimate costs.[10] Courts have recognized, both in pre-*Chevron* cases and in later cases that did not purport to apply *Chevron* deference, that congressional delegations to an agency that necessitate line-drawing necessarily imply substantial discretion to determine a workable method to engage in this fact-bound exercise. *See, e.g.*, *Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs,* 431 F.3d 1096, 1103-04 (8th Cir. 2005) (deferring to the agency's determination of what information was sufficiently "significant" to be taken into account; because the statute necessitates "an almost endless series of judgment calls[,] . . . [t]he line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts" (quoting *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C.Cir.1987))); *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1055 (Fed. Cir. 1983) ("[L]ine-drawing . . . is precisely the task [that] administrative agencies . . . are peculiarly suited to perform effectively; and . . . courts refuse to disturb such determinations [if based on] indicia [that] seem rational and appropriate [and thus] within the scope of discretion granted . . . by the statute." (citation omitted)). Notably, in *Iowa Public Service Co.*, the Eighth Circuit refused to "second guess" the ICC's decision, in the ratemaking context, to use a common statutory tax rate rather than a carrier's actual tax expenditures to approximate these costs. 643 F.2d at 547. Consequently, even if the methodology adopted by the Final Rule were not compelled by the canon of absurdity, the Board properly exercised its discretion in approximating the costs for a representative issuer and transaction based on data available to it.

---

[10] For example, the Durbin Amendment permitted the Board to allow an adjustment for the amount permitted under the interchange fee standards to make allowance for costs incurred by issuers to prevent fraud, 15 U.S.C. § 1693o-2(a)(5)(A)(i), which, *inter alia*, requires determining an appropriate time period for relevant data relating to fraud-prevention costs.

### E.    The Board's Original and Longstanding Interpretation of the Durbin Amendment Is Entitled to Respect

Apart from recognizing that congressional delegations to agencies assign to courts the role of fixing the boundaries within which the agency may exercise discretion and ensuring the agency acted within those bounds, 603 U.S. at 395, *Loper Bright* also reaffirmed prior precedents holding that a responsible agency's statutory interpretation adopted "roughly contemporaneously with the statute's enactment" is entitled to "very great respect," particularly where it has "remained consistent over time." *Id.* at 385-86 (citations omitted). Here, from the beginning, the Board construed the Durbin Amendment as giving it substantial discretion to consider "costs that are specific to a particular transaction other than incremental costs," NPRM, 75 Fed. Reg. at 81,734-735, and to adopt a uniform fee standard based on industry-wide data. *Id.* at 81,726-727. Moreover, the interchange fee standards were adopted within a year of the statute's enactment, and have remained in effect without significant amendment ever since. The Board's construction of the statute is therefore entitled to "very great respect." *Loper Bright*, 603 U.S. at 386.[11]

## III.    The Major Questions Doctrine Does Not Apply

Corner Post, which contends that the Board has underenforced the Durbin Amendment by establishing interchange fee standards that do not sufficiently lower fees from their otherwise-prevailing rates, also makes the remarkable assertion that the major questions doctrine compels its desired result. But the circumstances that trigger that doctrine are not present here. The major questions doctrine views with skepticism "'unheralded'" agency assertions of "regulatory power over 'a significant portion of the American economy,'" *West Virginia v. EPA*, 597 U.S. 697, 721 (2022), particularly when an agency attempts to address subject matter that it does not ordinarily

---

[11] For all of the reasons given in the preceding sections, the Final Rule amply fits within the bounds of the authority delegated to the Board, was a reasonable exercise of that discretion, and was neither arbitrary nor capricious.

regulate. *See Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*, 95 F.4th 573, 580 (8th Cir. 2024) ("[S]kepticism may be merited when there is a mismatch between an agency's challenged action and its congressionally assigned mission and expertise." (citation omitted)).

Here, in contrast, Corner Post seeks to *compel* the Board to assert *greater* "regulatory power." And the rule at issue is not the result of some sudden agency "claim to discover . . . an unheralded [or] newfound power" in statutory language that "had rarely been used in the preceding decades." *West Virginia*, 597 U.S. at 721. Instead, the Rule is the very regulation the Board first adopted to implement the Durbin Amendment's mandate shortly after its enactment. And the subject matter at issue—regulation of the fees that debit card issuers receive—is one that Congress expressly assigned to the Board to regulate and, as explained above, an area in which Congress specifically delegated discretionary authority to the Board. Consequently, the major questions doctrine in no way supports the argument that the Board is underregulating debit card interchange fees, and its invocation lays bare the weakness of Corner Post's other arguments.

## IV.   Corner Post Is Not Entitled to Vacatur on Procedural Grounds

Corner Post contends that the Board acted arbitrarily and capriciously by purportedly failing to consider similarities to checking transactions or explaining how it chose which costs to consider. CP Br. at 30-32. As a substantive matter, the Board *did* consider relevant similarities to checking transactions, and *did* provide a reasoned explanation for its decision on what costs to consider. And should the Court find that the Rule's preamble failed to address a necessary topic, the appropriate remedy would be to remand for an explanation without vacating the rule.

### A.   The Board Adequately Considered Functional Similarities with Checking Transactions, as Directed by Congress

Contrary to Corner Post's claim that the Board did not adequately consider the functional similarity between debit card and checking transactions, CP Br. at 30-32; *see also id.* at 14, 18,

the Board carefully considered similarities across, and differences between, debit card and checking transactions where appropriate, as Congress directed. In particular, in establishing interchange fee standards, the Board considered, as required by section 920(a)(4)(A),[12] the "functional similarity" with "checking transactions that are required within the Federal Reserve system to clear at par." 76 Fed. Reg. at 43,398-401. It appropriately concluded that it may consider not only similarities, but also differences, because similarities "can be understood only by considering the differences between them as well." *Id*. at 43,401.

In fact, it would be impossible to fully equate checking and debit transactions with regard to every single cost because certain fees apply only to debit transactions, such as interbank fees. 76 Fed. Reg. 43,400. Congress's direction that the Board consider functional similarities did not mean to make debit transactions equivalent to checking transactions in all respects, and there was no requirement that debit transactions clear at par, as checking transactions do. Congress also plainly understood that there were significant differences between debit and check, because it permitted issuers to receive an interchange fee that is "reasonable and proportional" to their cost incurred in the transaction, a reimbursement that is not part of the check clearance system.

Contrary to Corner Post's claim that the Board failed to consider an important aspect of the problem, the Board considered such similarities and differences, along with section 920(a)(4)(B) cost considerations, in deciding whether to include or exclude specific items of cost from the reasonable and proportional standard. *See, e.g*., 76 Fed. Reg. at 43,428 (excluding costs of debit card production and delivery, marketing, R&D and compliance because, among other reasons, "analogous costs incurred by a payor's bank for its check service are not reimbursed by

---

[12] The section provides: "In prescribing regulations under paragraph (3)(A), the Board shall – (A) consider the functional similarity between – (i) electronic debit transactions; and (ii) checking transactions that are required within the Federal Reserve bank system to clear at par."

the payee's bank"); *id.* at 43,429 (excluding customer inquiry costs in part because "[p]ayor's

banks . . . do not receive reimbursement for these costs from the payee's bank"); *id.* at 43,430

(including network processing fees because, *inter alia,* "such an arrangement would be similar to

traditional paper-check processing"). Thus, the Board fully complied with the requirements in

section 920(a)(4)(A) that it consider the functional similarity to checking transactions.

### B.    The Board Properly Explained How It Determined What Costs to Consider

Corner Post contends that the Board acted arbitrarily and capriciously because it "refused

. . . to define what costs are 'the incremental [ACS] cost," failed to explain how it determined

which fixed costs to exclude, and arbitrarily decided to include fraud losses in the interchange

fee standards despite excluding losses resulting from non-sufficient fund transactions. CP Br. at

19, 33. These arguments miss the mark. The Board did not need to distinguish incremental ACS

costs from non-incremental ACS costs because it determined that the Durbin Amendment

permitted consideration of a third category of costs in addition to incremental ACS costs,

therefore rendering it unnecessary to separately break out those ACS costs that were

"incremental." Contrary to Corner Post's assertions, the Board did explain the criterion it used to

determine which overhead costs to exclude; it excluded those costs that were "incurred by an

issuer for its general business operations [that] are shared across all product lines of the issuer

and are not specific to a particular electronic debit transaction." 76 Fed. Reg. 43,427–428. And

the Board explained that it excluded certain costs relating to transactions involving insufficient

funds because, in contrast to transactions resulting in fraud losses, an issuer knowingly chooses

to enter into insufficient fund transactions, and will typically impose fees to compensate it for

associated risks. *Id.* at 43,429. Consequently, the Board's explanation was neither arbitrary nor

capricious.

### C.    Any Relief Relating to Corner Post's Procedural Claims Should Be Limited to Remand Without Vacatur

Corner Post asks the Court to vacate the Rule while staying its order "while the Board devises a new rule," CP Br. at 35, but in the event Corner Post could prevail on purely procedural grounds, the appropriate course would be to remand without vacatur. "If the record . . . does not support the agency action, the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course . . . is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also NACS*, 746 F.3d at 493. "Though it seems to be an open question in the Eighth Circuit, the weight of authority holds that remand without vacating the agency decision is permitted by the Administrative Procedure Act and is a matter of the Court's equitable discretion." *Bokony v. U.S. Dep't of Def.*, 2020 WL 2039560, at *1 (E.D. Ark. Apr. 28, 2020). Because the Board could remedy any of the purported procedural flaws that Corner Post raises without "devis[ing] a new rule," simply by issuing a supplemental statement as it did after the *NACS* ruling, remand without vacatur would avoid a waste of resources from an unnecessary rulemaking. *See Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) (explaining that remand without vacatur is warranted "[w]hen an agency may be able readily to cure a defect in its explanation of a decision" and the "disruptive effect of vacatur" is high). In contrast, Corner Post cannot claim prejudice from leaving the rule in place pending such action, as it asks the Court to leave the rule undisturbed pending a new rulemaking, which would presumably take longer. Therefore, should the Court identify any procedural concerns, it should remand for any necessary corrective action without vacating the Rule.

## CONCLUSION

For the foregoing reasons, the Court should deny Corner Post's motion for summary

judgment and grant summary judgment for the Board.

Dated: January 10, 2024

Respectfully submitted,

 /s/  Joshua P. Chadwick
Joshua P. Chadwick
    Assistant General Counsel
Yvonne F. Mizusawa
Yonatan Gelblum
Monika Moore
    Senior Counsels
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
joshua.p.chadwick@frb.gov
(202) 263-4835

*Attorneys for the Board of Governors of the Federal
Reserve System*