# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
### WESTERN DIVISION

| | |
|---|---|
| CORNER POST, INC., | Case No. 1:21-cv-95-DMT-CRH |
| Plaintiff, | |
| v. | |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, | |
| Defendant. | |

## BRIEF OF AMICI CURIAE THE BANK POLICY INSTITUTE AND THE CLEARING HOUSE ASSOCIATION L.L.C. IN SUPPORT OF DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

INTEREST OF AMICI CURIAE .......................................................................................... 1

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................... 4

    A.    The Electronic Debit Card Payment System ................................................. 4

    B.    The Durbin Amendment ................................................................................ 6

    C.    Regulation II ................................................................................................... 7

    D.    Litigation Challenging The 2011 Final Rule ............................................... 13

ARGUMENT ........................................................................................................................ 15

I.    The Statute Requires The Board To Prescribe Regulations For An Interchange
Fee That Is Reasonable And Proportional To An Issuer's Transaction-Related
Costs.................................................................................................................................. 16

    A.    Interchange Fees Must Allow Issuers To Recover Costs Beyond
        Incremental ACS Costs Plus A Reasonable Rate Of Return ....................... 16

    B.    Plaintiff Misconstrues Statutory Language Directing The Board To
        Consider Certain Factors............................................................................... 20

    C.    Capping Interchange Fees Below Issuers' Costs Would Raise Serious
        Constitutional Concerns................................................................................ 25

II.    The Durbin Amendment Authorizes The Board To Consider Each Of The Costs
Plaintiff Challenges.......................................................................................................... 27

    A.    The Board Correctly Considered What Plaintiff Calls "Fixed" ACS Costs .......... 27

    B.    The Board Correctly Considered Transaction-Monitoring Costs ......................... 29

    C.    The Board Correctly Considered The Costs Of Fraud Losses ............................. 31

    D.    The Board Correctly Considered The Costs Of Network Processing Fees .......... 32

III.    The Durbin Amendment Does Not Require The Board To Tailor Interchange Fee
Caps To Specific Costs Of Specific Issuers.................................................................... 34

IV.    Plaintiff's Challenge, If Successful, Would Harm Issuers And Consumers, While
Providing Merchants A Financial Windfall..................................................................... 37

CONCLUSION ..................................................................................................................... 39

CERTIFICATE OF SERVICE ............................................................................................. 41

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Abramski v. United States*, 573 U.S. 169 (2014) ..........................................................20

*Aetna Casualty & Surety Co. v. Commissioner of Insurance*, 263 N.E.2d 698
(Mass. 1970) ...........................................................................................................26

*Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) ..............................................25

*American Bus Ass'n v. Slater*, 231 F.3d 1 (D.C. Cir. 2000) ..........................................34

*American Paper Institute v. American Electric Power Service Corp.*, 461 U.S. 402
(1983) .....................................................................................................................37

*Bath Iron Works Corp. v. Director, Office of Workers' Compensation Programs*,
506 U.S. 153 (1993) ...............................................................................................24

*Brooks-Scanlon Co. v. Railroad Commission*, 251 U.S. 396 (1920) .............................27

*Calfarm Insurance Co. v. Deukmejian*, 771 P.2d 1247 (Cal. 1989) ..............................26

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ............................................................24

*Coregis Insurance Co. v. American Health Foundation, Inc.*, 241 F.3d 123 (2d
Cir. 2001) ...............................................................................................................17

*Corner Post, Inc. v. Board of Governors of Federal Reserve System*, 603 U.S. 799
(2024) .....................................................................................................................14

*Duquesne Light Co. v. Barasch*, 488 U.S. 299 (1989) ..................................................25

*ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945 (D.C. Cir. 2007) (per curiam) .............20

*FPC v. Hope Natural Gas Co.*, 320 U.S. 591 (1944) ....................................................26

*Gallardo ex rel. Vassallo v. Marstiller*, 596 U.S. 420 (2022) ......................................18

*Guaranty National Insurance Co. v. Gates*, 916 F.2d 508 (9th Cir. 1990) ..................26

*In re Permian Basin Area Rate Cases*, 390 U.S. 747 (1968).................................20, 25

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ................................14, 16

*Marx v. General Revenue Corp.*, 568 U.S. 371 (2013) ..........................................18, 30

*Michigan Bell Telephone Co. v. Engler*, 257 F.3d 587 (6th Cir. 2001)...................26, 27

*Missouri v. Biden*, 112 F.4th 531 (8th Cir. 2024) (per curiam) ....................................25

*Moshea v. NTSB*, 570 F.3d 349 (D.C. Cir. 2009) ........................................................17

*NACS v. Board of Governors of Federal Reserve System*, 574 U.S. 1121 (2015)
    (mem.)..........................................................................................................................14

*NACS v. Board of Governors of Federal Reserve System*, 746 F.3d 474 (D.C. Cir.
    2014) ................................................................6, 13, 14, 17, 22, 24, 28, 32, 33, 34

*NACS v. Board of Governors of Federal Reserve System*, 958 F. Supp. 2d 85
    (D.D.C. 2013) ..............................................................................................................13

*Nielsen v. Preap*, 586 U.S. 392 (2019) ........................................................................34

*NLRB v. Noel Canning*, 573 U.S. 513 (2014) ..............................................................34

*Pulsifer v. United States*, 601 U.S. 124 (2024) ............................................................18

*Rumsfeld v. Padilla*, 542 U.S. 426 (2004) ....................................................................34

*Sackett v. EPA*, 598 U.S. 651 (2023) ............................................................................25

*Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31 (D.C. Cir. 2015)...............21

*TCF National Bank v. Bernanke*, 643 F.3d 1158 (8th Cir. 2011)......................14, 15, 26

*United States v. E.T.H.*, 833 F.3d 931 (8th Cir. 2016)..................................................36

*United States v. Sorto-Munoz*, 2023 WL 4424126 (D.S.D. Jan. 13, 2023) ..................24

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ......................................................................25

## STATUTES, RULES, AND REGULATIONS

7 U.S.C.
    § 211..............................................................................................................................20
    § 940f ............................................................................................................................19

15 U.S.C.
    § 717c...........................................................................................................................20
    § 1693*o*-2 ....................................1, 2, 3, 6, 7, 15, 16, 17, 18, 19, 20, 21, 22, 23, 30, 34, 36

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010,
    Pub. L. No. 111-203, 124 Stat. 1376 ...........................................................................6

Debit Card Interchange Fees and Routing, 75 Fed. Reg. 81,722 (Dec. 28, 2010) .........7

Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,394 (July 20, 2011) ......................................1, 4, 7, 8, 9, 10, 11, 12, 21, 26, 27, 28, 29, 31, 32, 33, 35, 36

Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,478 (July 20, 2011) ..........................8

Debit Card Interchange Fees and Routing, 80 Fed. Reg. 48,684 (Aug. 14, 2015) ................................................................................11, 12, 13, 30, 31

Debit Card Interchange Fees and Routing, 88 Fed. Reg. 78,100 (Nov. 14, 2023) .................26, 37

## OTHER AUTHORITIES

Board of Governors of the Federal Reserve System, *Federal Reserve Payment Study: 2022 Triennial Initial Data Release*, https://tinyurl.com/yckd3f6j (last updated Nov. 13, 2024) ..........................................................................4, 5

Chakravorti, Bhaskar, *The Hidden Costs of Cash*, Harv. Bus. Rev. (June 26, 2014), https://tinyurl.com/2s3w5x48 ......................................................5

*Checks Processed by the Federal Reserve in 2021: Report of the Check Sample Survey*, Federal Reserve Bank of Atlanta (Apr. 25, 2023), https://tinyurl.com/4r9snkd2 ......................................................................6

Federal Deposit Insurance Corporation, *2017 FDIC National Survey of Unbanked and Underbanked Households* at 23 (Oct. 2018), https://tinyurl.com/3jxdeneb. .............................................................38

Natasha Sarin, *Making Consumer Finance Work*, 119 Colum. L. Rev. 1519, 1542 (2019), https://tinyurl.com/4neyjaep.......................................................39

The Clearing House et al., Comment Letter Regarding Proposed Rule on Debit Card Interchange Fees, Docket No. R-1404 (Feb. 22, 2011), https://tinyurl.com/ydd8n2pp ....................................................................7

The Clearing House, *et al.*, Comment Letter Regarding Docket No. R-1818, RIN 7100-AG67, Debit Card Interchange Fees and Routing at 37-41 (May 10, 2024), https://tinyurl.com/8fwkfvhr.............................................37, 38, 39

Vladimir Mukharlyamov & Natasha Sarin, *The Impact of the Durbin Amendment on Banks, Merchants, and Consumers*, 2046 All Faculty Scholarship 1, 36 (2019), https://tinyurl.com/4k2avkcn.....................................................39

*Webster's Third New International Dictionary* (2002) ......................................17, 19

**INTEREST OF AMICI CURIAE**[1]

The Bank Policy Institute ("BPI") and The Clearing House Association L.L.C. ("TCH") represent a substantial coalition of major nationwide banks. BPI and TCH (collectively, "the Associations") are organizations headquartered in Washington, D.C. and New York, New York respectively. BPI is a nonpartisan public policy, research, and advocacy group that represents the policy interests of the nation's leading banks. TCH is the nation's oldest banking association and represents the interests of its members by developing and promoting policies to support a safe, sound, and competitive banking system that serves customers, communities, and economic growth. The Associations' members have a direct interest in this case, which concerns Regulation II, a regulation promulgated over a decade ago by the Board of Governors of the Federal Reserve System ("the Board") to regulate interchange fees received by debit-card issuing banks. The Associations' members include issuers of debit cards who receive debit card interchange fees and who are subject to Regulation II, and bank holding companies whose banks are such issuers. These issuers have collectively invested (and continue to invest) billions of dollars to develop and maintain an efficient, convenient, and secure debit card payments system.

**INTRODUCTION**

For more than a decade, the nation's debit card payment system has operated under Regulation II, a 2011 Final Rule that the Board promulgated pursuant to a statute commonly referred to as the Durbin Amendment. *See* 15 U.S.C. § 1693*o*-2. Regulation II caps interchange fees that debit card issuers may receive for their role in electronic debit transactions ("Interchange Fee Cap"). As the Associations have consistently asserted, Regulation II has never been perfect.

---

[1] Amici curiae file this brief pursuant to the Court's February 13, 2025 order. Dkt. 64 at 12. No party's counsel authored this brief in whole or in part, and no person—other than amici or their counsel—contributed money that was intended to fund preparing or submitting this brief.

It improperly fails to account for numerous costs issuers incur in enabling electronic debit transactions. The Board also expressly declined to account for issuers' ability to earn a reasonable return for providing this vital payment option, contrary to the statute. And the Board admits its Interchange Fee Cap prevents many issuers from recovering even the subset of costs that the Board relied on in promulgating the regulation. But Regulation II has been the law since 2011. Shortly after the Board issued the Final Rule, merchant trade groups sued to block the regulation, raising nearly identical challenges to those presented here. The D.C. Circuit rejected those challenges, and in the more than a decade since that decision, vast segments of the American economy have made investments in reliance on this regulation. Now Plaintiff Corner Post, Inc. seeks to upend this settled state of affairs.

Corner Post's view of the statute, however, cannot be squared with its text or structure. The Durbin Amendment sets forth a straightforward framework, starting with a single overarching mandate: interchange fees "shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693*o*-2(a)(2). The statute repeats this mandate in its next provision, directing the Board to establish "standards for assessing" whether an interchange fee "is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* § 1693*o*-2(a)(3)(A). Neither of these provisions says *anything* suggesting the Board should limit interchange fees to a subset of transaction-related costs, as Plaintiff would have it. Furthermore, the statute's use of "reasonable and proportional to" (not "equal to" or "limited to") is unmistakable evidence of Congress's intent that interchange fees permit issuers to recover a reasonable return in addition to costs.

After these two provisions, the Durbin Amendment requires the Board to "consider" certain things when promulgating the required regulations. The topics for *consideration* include the

"functional similarity" between checks and electronic debit transactions and the "incremental cost" associated with "authorization, clearance, or settlement" of debit transactions ("incremental ACS costs"). 15 U.S.C. § 1693*o*-2(a)(4)(A), (B)(i). The same paragraph also directs the Board not to "consider" another category of costs: "other costs incurred by an issuer which are not specific to a particular electronic debit transaction." *Id.* § 1693*o*-2(a)(4)(B)(ii). Those are the *only* costs the statute prohibits the Board from considering—costs unrelated to the effectuation of electronic debit transactions. That is consistent with the overarching mandate that interchange fees be reasonable and proportional to costs that *are* transaction-related. By analogy, if Congress had directed an agency to establish standards for "a healthy diet," and then required consideration of lean proteins while forbidding consideration of sweets, the agency could—and indeed would likely have to— include vegetables to satisfy the overarching requirement to define a healthy diet, even though Congress did not single out vegetables as something that must (or must not) be considered.

Congress's directive is clear: the Board must establish standards for interchange fees that account for (1) all transaction-related costs, plus (2) a reasonable return. The Board has never fully embraced this interpretation, excluding some transaction-related costs that should have been included and declining to factor in a reasonable return. But whatever the defects of the Board's approach, they pale in comparison to Plaintiff's. Reprising the position taken by merchant trade groups and rejected in court more than a decade ago, Plaintiff demands that interchange fees be slashed to cover even *fewer* transaction-related costs and continue to exclude a reasonable return.

Corner Post's arguments are plainly wrong. *First*, as described above, the statutory text explicitly refutes the assertion that the Board must limit interchange fees to only incremental ACS costs. The statute requires interchange fees to be reasonable and proportional to all transaction-related costs—not equal to a limited subset of those costs. *Second*, Plaintiff is wrong that the

statute prohibits the Board from allowing four particular transaction-related costs. The statute plainly permits (and indeed *requires*) the Board to consider all four specific costs. *Third*, the Board did not exceed its statutory authority by setting a single Interchange Fee Cap applicable to all covered issuers. Rather, the Board's interpretation is the only one that is consistent across the relevant statutory language, understanding Congress's use of the phrases "the transaction" and "the issuer" to refer to *representative* transactions and issuers. *Finally*, though Plaintiff rehashes each of its arguments under the guise of a challenge to arbitrary-and-capricious conduct, Plaintiff offers nothing new or different in support of this purportedly distinct basis for relief.

The result of Plaintiff's challenge, if successful, would be a financial windfall for merchants, while debit card issuers would be forced to recover those costs elsewhere, resulting in increased costs for other consumer banking products. Meanwhile, no benefit would flow to merchants' customers, as evidenced by the history of merchants pocketing their savings from Regulation II's reductions in interchange fees rather than lowering prices for goods and services. Plaintiff's arguments in support of this transparent financial ploy contravene the statute and are deficient as a matter of law. The Court should enter judgment against Plaintiff.

## BACKGROUND

### A.    The Electronic Debit Card Payment System

Debit cards are one of the most widely used payment types in the United States and are relied upon by millions of American consumers as their primary form of payment. In 2009, two years before the Board promulgated Regulation II, 37.9 billion debit card transactions were performed in the United States. Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,394, 43,395 (July 20, 2011) ("2011 Final Rule"). By 2021, that increased to 106 billion debit card transactions, totaling $4.55 trillion in transaction value. *See* Board of Governors of the Federal

Reserve System, *Federal Reserve Payment Study: 2022 Triennial Initial Data Release* tbl. 1, https://tinyurl.com/yckd3f6j (last updated Nov. 13, 2024).

The Associations' members are debit card issuers—the banks that hold cardholders' accounts, issue debit cards, and authorize the cardholders' transactions. The growth and efficacy of the debit card payment system is largely attributable to significant investments by issuers like the Associations' members. These institutions have expended substantial resources to innovate and maintain the debit card payment system, including to enhance functionality, increase security, and provide new products to consumers. Issuers incur significant costs in effecting electronic debit transactions, including from necessary software, hardware, and labor; network processing fees; transaction monitoring; billing and collection; data processing; consumer data protection; dispute resolution; and fraud prevention. These costs support a system providing (1) inexpensive, effective electronic payment options to consumers; (2) immediate, assured payments to merchants; and (3) an efficient, prompt, convenient, secure, and widely accepted method of payment.

Merchants like Plaintiff benefit tremendously from debit cards. They can accept a customer's preferred method of payment—which, unlike cash, can be used effectively online and at unattended locations (like gas pumps)—and, in turn, attract more customers and increase sales and profits. Debit cards also alleviate merchant expenses associated with cash and checks, including daily deposits; services necessary for hard currency purchases; and employee hours spent handling cash and check payments. As of 2014, "U.S. retail business los[t] about $40 billion annually because of the theft of cash alone"—a cost "disproportionately borne by mom-and-pops" based in part on their inability to "afford sophisticated security and cash transportation services."[2]

---

[2] Chakravorti, *The Hidden Costs of Cash*, Harv. Bus. Rev. (June 26, 2014), https://tinyurl.com/2s3w5x48.

Checks also require merchants to bear the significant risk of insufficient customer funds or fraudulent checks resulting in nonpayment; "[i]n both 2018 and 2021, average and median values of returned checks consistently exceeded those of checks collected" and the value of returned checks processed through the Federal Reserve equaled $62 billion.[3]

The debit card payments system thus brings substantial benefits to its users. Issuers' costs incurred for their role in this vital system, along with a reasonable return, have traditionally been recovered through interchange fees paid by merchants.

### B.    The Durbin Amendment

The Durbin Amendment was enacted as section 1075 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376, 2068-74. The Amendment was "crafted in conference committee at the eleventh hour," *NACS v. Bd. of Governors of the Fed. Rsrv. Sys.* ("*NACS II*"), 746 F.3d 474, 483 (D.C. Cir. 2014), was not subject to any hearings, and received mere minutes of total debate in Congress. The statute contains one overarching mandate: "The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693*o*-2(a)(2). Congress directed the Board—in paragraph (3)—to "prescribe regulations" to implement that same mandate, *i.e.*, "to establish standards for assessing whether the amount of any interchange fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* § 1693*o*-2(a)(3)(A).

Having established this overarching rule, Congress then required the Board in paragraph (4) to "consider" (or not) a few specific matters "[in] prescribing regulations under paragraph

---

[3] *Checks Processed by the Federal Reserve in 2021: Report of the Check Sample Surve*y at 12-13, Federal Reserve Bank of Atlanta (Apr. 25, 2023), https://tinyurl.com/4r9snkd2.

(3)(A)." 15 U.S.C. § 1693*o*-2(a)(4). First, the Board must "consider the functional similarity between" "electronic debit transactions" and "checking transactions that are required … to clear at par." *Id.* § 1693*o*-2(a)(4)(A). Second, "[i]n prescribing [these] regulations," *id.* § 1693*o*-2(a)(4), the Board must "distinguish between" (1) "the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2)," and (2) "other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2)," *id.* § 1693*o*-2(a)(4)(B)(i)-(ii). The statute does not forbid consideration of any other costs—*i.e.*, costs that *are* specific to particular debit transactions but that are *not* "incremental … authorization, clearance, [and] settlement" costs ("ACS costs").

## C.    Regulation II

The Board issued a Notice of Proposed Rulemaking on December 28, 2010. Debit Card Interchange Fees and Routing, 75 Fed. Reg. 81,722 (Dec. 28, 2010) ("2010 NPRM"). The proposal limited "allowable" costs to only certain costs issuers incur for authorizing, clearing, and settling transactions. 2010 NPRM, 75 Fed. Reg. at 81,734. The Board acknowledged that its proposed definition excluded many transaction-related issuer costs. *See id.* at 81,734-81,735.

The Board received over 11,500 comments—from consumers and consumer groups, government agencies, merchants and their trade groups, and financial institutions and their trade groups. *See* 2011 Final Rule, 76 Fed. Reg. at 43,402. That included the comment letter from TCH, which argued that the Board's proposed rule was "legally defective," inconsistent with the text of the Durbin Amendment, and "would have profound adverse consequences on consumers (particularly low-income Americans), the banking system …, and the United States payments system and economy as a whole." The Clearing House et al., Comment Letter Regarding Proposed

Rule on Debit Card Interchange Fees, Docket No. R-1404 at 1 (Feb. 22, 2011), https://tinyurl.com/ydd8n2pp ("2011 Comment Letter").

After considering comments, the Board issued its Final Rule—Regulation II—in July 2011. *See* 2011 Final Rule, 76 Fed. Reg. 43,394. That rule imposed a cap on interchange fees consisting of a base component of no more than 21 cents; an *ad valorem* component of 5 basis points, multiplied by the value of the transaction; and a fraud-prevention adjustment of no more than 1 cent. *See id.* at 43,404; Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,478, 43,480 (July 20, 2011).

In setting this cap, the Board did not limit allowable costs to only incremental ACS costs, as it had proposed. Instead, it included several additional costs that it found were specific to particular electronic debit transactions and that, in the Board's view, should be accounted for. 2011 Final Rule, 76 Fed. Reg. at 43,429-43,431. But the Board also refused to allow many other costs specific to particular electronic debit transactions. These included costs for non-sufficient funds handling, rewards and other incentives, cardholder inquiries, card production and delivery, and compliance costs. *Id.* at 43,428-43,429. The Board found that, together, the median per transaction cost of these excluded costs was 8.5 cents. *Id.* at 43,398.[4] Finally, the Board disagreed that the statute required it to account for a reasonable return for issuers and, as a result, stated that it "did not include a level of profit or a rate of return" in setting the cap. 2011 Final Rule, 76 Fed. Reg. at 43,427 n.119.

As to a third category of costs that fall within neither paragraph (4)(B)(i) nor (4)(B)(ii), the

---

[4] These excluded costs provide one reason, among many, why the merchant trade groups' amicus brief is both incomplete and inaccurate regarding allocation of costs and profits in the debit card payments system. *See* Dkt. 53 at 9-16. Moreover, the arguments—which are based primarily on post-2011 statistics—are irrelevant, because they could not have played any role in the Board's considerations at the time it promulgated Regulation II in 2011.

Board reasoned that if Congress had intended to limit the Board's consideration to the incremental ACS costs in paragraph 4(B)(i), it "would have prohibited consideration of *all* costs other than those required to be considered, rather than simply prohibiting consideration of *a particular set of* costs." 2011 Final Rule, 76 Fed. Reg. at 43,426 (emphasis added). The statutory text thus "le[ft] no doubt that costs that are not within the category of prohibited costs"—*i.e.*, not within paragraph (4)(B)(ii)—"may still be considered in establishing [interchange fee] standards." *Id.*

The Board also rejected an expansive reading of the set of costs prohibited by paragraph (4)(B)(ii). As the Board explained, interpreting paragraph (4)(B)(ii) to "prohibit[] consideration of all costs that are not able to be specifically identified to a given transaction would appear to exclude almost all costs related to electronic debit transactions because very few costs could be specifically assigned to a given transaction." 2011 Final Rule, 76 Fed. Reg. at 43,426. Indeed, "nearly all commenters" recognized that the statute did not require the interchange fee standard to "require computing the actual allowable costs of each specific transaction"; any such reading "would result in a statutory requirement that is virtually impossible to implement." *Id.* at 43,422. Accordingly, the Board understood paragraph (4)(B)(ii)'s reference to "costs that 'are not specific to a particular electronic debit transaction' … to mean those costs that are not incurred in the course of effecting any electronic debit transaction." *Id.* But the Board could consider "any cost that is incurred in the course of effecting any electronic debit transaction." *Id.* The Board found that this "straightforward interpretation … is workable and gives important meaning to this section" without "creating … tremendous burdens and practical absurdities." *Id.*

Ultimately, the Board established an Interchange Fee Cap based on "the per-transaction allowable costs of the issuer at the 80th percentile as reported on the Board's survey." 2011 Final Rule, 76 Fed. Reg. at 43,422. The Board noted that "this approach"—*i.e.*, a single cap applicable

9

to all issuers—was "consistent with" the relevant statutory language, which "refer[red] to '*an* issuer' and '*an* electronic debit transaction'" (*i.e.*, "a representative issuer and transaction"). *Id.* (emphasis added). Later references to "'*the* issuer' and '*the* transaction'" in the statute therefore "refer[ed] back to the original representative use of the term." *Id.* (emphasis added). The Board further explained that a contrary reading requiring an issuer-specific cap was untenable and "virtually impossible to implement," including because (1) an issuer's full costs related to each transaction are computed after the interchange fee is paid and (2) calculating the specific costs for each of the "tens of billions of electronic debit transactions" that the "growing number of covered issuers" carry out would require "an exceedingly complex matrix of interchange fees." *Id.* The Board concluded that Congress did not intend such an "absurd result." *Id.*

The Board also explained that a hybrid view—one that "focuse[d] on the costs incurred by a *specific* issuer in connection with a *representative* … transaction"—would require reading parallel instances of the words "issuer" and "transaction" inconsistently, while once again "lead[ing] to an extraordinarily complex and burdensome result." 2011 Final Rule, 76 Fed. Reg. at 43,423 (emphasis added).

The Board also explained the statutory basis for its consideration of each category of costs Plaintiff challenges here.

***ACS Costs.*** The Board declined to limit "incremental" ACS costs by reference to either "fixed" or "variable" ACS costs, given the artificiality of such concepts to the debit card system. 2011 Final Rule, 76 Fed. Reg. at 43,427. Though it initially had proposed distinguishing between "fixed" and "variable" ACS costs, the Board determined that describing these costs as "fixed" was a misnomer. "[T]he meanings of fixed costs and variable costs depend on a variety of factors" and the distinction "depends on the relevant time horizon and volume range," among other

considerations.  *Id.*  Not only could "the same type of cost … appear variable in one year but fixed in a different year" for a single issuer, but distinctions could vary widely between issuers based on accounting and use of third-party processors.  *Id.*  Thus, "enforcement of a distinction between fixed and variable costs [would be] very difficult and potentially uneven."  *Id.*

The Board considered several issuer costs that the Board deemed necessary for the issuer "to effect each transaction."  For example, "an issuer must maintain and use network connectivity" to receive and send all relevant ACS messages; must "maintain and use computer equipment that can process each authorization request"; and "must … employ staff to operate and maintain the computer equipment involved in transaction processing."  2011 Final Rule, 76 Fed. Reg. at 43,429-43,430.  Because "[e]ach transaction uses the equipment, hardware, software and associated labor, and [because] no particular transaction can occur without incurring these costs," such processing costs (*e.g.*, network connectivity costs and the associated hardware, software, and labor costs) are "'specific to a particular transaction.'"  *Id.*

***Transaction-Monitoring Costs.***  The Board also considered transaction-monitoring costs.  "Transactions monitoring systems assist in the authorization process by providing information to the issuer before the issuer decides to approve or decline the transaction."  2011 Final Rule, 76 Fed. Reg. at 43,430.  Therefore, "[t]ransactions monitoring is as integral to the authorization decision as confirming that a card is valid and authenticating the cardholder."  *Id.* at 43,431.

The Board further clarified its reasoning in August 2015 in response to the D.C. Circuit's decision in *NACS II*.  *See* Debit Card Interchange Fees and Routing, 80 Fed. Reg. 48,684 (Aug. 14, 2015) ("2015 Clarification").  The Board reiterated that "[t]ransactions-monitoring systems … assist in the authorization process by providing information needed by the issuer in deciding whether the issuer should authorize the transaction."  *Id.* at 48,685.  Therefore, transaction

11

monitoring, "[l]ike other authorization steps … is integral to an issuer's decision to authorize a specific transaction." *Id.* The Board rejected the notion that the purported "dual [fraud-prevention] purpose" of transaction monitoring provided a basis for excluding these costs from consideration, given that "most costs of the authorization process"—the "costs Congress *required* to be considered"—"assist in preventing some type of fraud." *Id.* (emphasis added).

The Board thus determined that transaction-monitoring costs "are part of the authorization costs that the Board *is required by the statute* to consider when establishing the interchange fee standard" based on the "integral" relationship between transaction monitoring and authorization. 2015 Clarification, 80 Fed. Reg. at 48,686 (emphasis added).

*Fraud Losses.* Regulation II also "include[d] an allowance for fraud losses in determining the interchange fee standard." 2011 Final Rule, 76 Fed. Reg. at 43,431. The Board explained that an "issuer's fraud losses are generally the result of the authorization, clearance, and settlement of an apparently valid transaction … later identifie[d] as fraudulent" and often cannot otherwise be recouped by an issuer through charge backs or other methods. *Id.* The Board determined both that fraud losses "are costs specific to a particular transaction" and that it was "reasonable" to "[p]ermit[] issuers to recover at least some fraud losses through interchange fees." *Id.*

*Network-Processing Fees.* The Board also "included network processing fees in determining the standard for interchange fees." 2011 Final Rule, 76 Fed. Reg. at 43,430. The Board noted that "[n]etwork processing fees are incurred by issuers in the course of effecting electronic debit transactions," are "determined by the amount of electronic debit transactions processed for the issuer," and are thus based on the number of specific transactions an issuer processes. *Id.* Thus, the Board found "that network processing fees are both specific to a particular transaction and incurred for the issuer's role in authorization, clearance, and settlement." *Id.*

### D.    Litigation Challenging The 2011 Final Rule

Shortly after the Board promulgated the 2011 Final Rule, several merchants and merchant trade groups challenged the rule under the Administrative Procedure Act ("APA").  *See NACS v. Bd. of Governors of Fed. Rsrv. Sys* ("*NACS I*"), 958 F. Supp. 2d 85, 96 (D.D.C. 2013).  The district court sided with the merchants and held that the Durbin Amendment allowed the Board to consider only "[i]ncremental ACS costs of individual transactions incurred by issuers."  *Id.* at 105.

The D.C. Circuit reversed.  *NACS II*, 746 F.3d at 477.  It held that the Board was statutorily permitted to consider costs beyond merely incremental ACS costs, upholding the "reasonable determination that the statute splits costs into three categories: (1) incremental ACS costs, which the Board must allow issuers to recover; (2) costs specific to a particular transaction, other than incremental ACS costs, which the Board may, but need not, allow issuers to recover; and (3) costs not specific to a particular transaction, which the Board may not allow issuers to recover."  *Id.* at 488.[5]  The D.C. Circuit tied its interpretation to paragraph (3)(A)'s mandate that "clearly grants the Board authority to promulgate regulations ensuring that interchange fees are reasonable and proportional to the costs issuers incur," which meant paragraph (4)(B)'s "consider and not consider" provisions should be read as a "limit[] to the Board's discretion"—not the sole "affirmative[] grant [of] the Board's authority."  *Id.*

While the D.C. Circuit at times relied on *Chevron* deference, it also independently and robustly analyzed the statutory text, upholding the Final Rule only after the court itself "[a]ppl[ied] traditional tools of statutory interpretation."  *NACS II*, 746 F.3d at 477.  The court rejected the merchants' narrow reading of the statute because, "[f]or several reasons," paragraph (4)(B)(i)'s description of incremental ACS costs "could just as easily, *if not more easily*, be read to qualify

---

[5] The D.C. Circuit "remand[ed] one minor issue—the Board's treatment of so-called transactions-monitoring costs—to the Board for further explanation."  *NACS II*, 746 F.3d at 477.

[the subsection's] language … such that it encompasses a subset of costs specific to a particular transaction, leaving other costs specific to a particular transaction unmentioned." *Id.* at 484 (emphasis added). In the D.C. Circuit's words, "had Congress wanted to allow issuers to recover only incremental ACS costs, it could have done so directly." *Id.* at 485.

The court also closely analyzed the grammatical implications of the statutory text. The merchants had argued that Congress intended paragraph (4)(B)(ii)—i.e., the prohibited costs category—to refer to (and exclude from consideration) *all* costs other than incremental ACS costs. In support of this position, the merchants argued that the phrase "which are not specific to a particular electronic debit transaction" following "other costs" in paragraph (4)(B)(ii) was merely *descriptive*. But Congress did not separate the phrases "other costs" and "which are not specific…" with a comma, which as the D.C. Circuit explained, meant that Congress intended to *restrict* the meaning of "other costs" to only *some* "other costs," and not *all* non-incremental ACS costs. *See NACS II*, 746 F.3d at 486-87. Interpreting the statute itself, the D.C. Circuit rejected the *NACS* plaintiffs' attempt to "stuff[] punctuation to the bottom of the interpretation tool box." *Id.* at 486.[6]

On January 20, 2015 the Supreme Court denied the *NACS* plaintiffs' petition for certiorari. *NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 574 U.S. 1121 (2015) (mem.).[7]

---

[6] Plaintiff urges the Court to ignore *NACS II*, but the Supreme Court was clear that "the opportunity to challenge agency action" provided by its interpretation of the statute of limitations in this case "does not mean that new plaintiffs will always win or that courts … need to expend significant resources to address each new suit," including because "courts entertaining later challenges," can "look to other circuits for persuasive authority." *Corner Post, Inc. v. Board of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 823-824 (2024); *cf. Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024) ("[P]rior cases that relied on the *Chevron* framework … are still subject to statutory *stare decisis* despite our change in interpretive methodology.").

[7] The Durbin Amendment itself—*i.e.*, the statute—was challenged shortly after its enactment (before the Board promulgated Regulation II). *See TCF Nat'l Bank v. Bernanke*, 643 F.3d 1158, 1161 (8th Cir. 2011). The Eighth Circuit affirmed the district court's denial of a preliminary injunction against the Amendment, holding that the statute (1) did not establish an

## ARGUMENT

The Durbin Amendment has one overarching mandate:  "The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  15 U.S.C. § 1693*o*-2(a)(2).  Congress repeated this language when directing the Board to prescribe regulations establishing standards for assessing whether interchange fees are reasonable and proportional to an issuer's transaction-related costs.  *Id.* § 1693*o*-2(a)(3)(A).  This text and the statutory structure require regulations that allow interchange fees through which issuers can recover their transaction-related costs plus a reasonable, proportional rate of return.

Plaintiff ignores these and other sections of the Durbin Amendment to focus instead on the Board's obligation to "consider" (or not) a few discrete categories of information in effecting the statute's overarching command.  But even there, Congress forbade the Board from considering only one category of costs—those not specific to particular transactions.  Plaintiff's attempt to elevate that instruction over Congress's primary directive contravenes the statute and raises significant constitutional concerns.  Plaintiff's arguments that the Board cannot consider four specific cost categories fare no better because the statute either expressly or effectively requires the Board to consider each type of cost.  Plaintiff's insistence on an issuer-specific fee standard repeats many of the interpretive errors underlying its contentions about which costs may be included.  Finally, Plaintiff's arguments that the Board acted arbitrarily and capriciously offer nothing beyond the same deficient arguments about the Board's statutory authority.  For these reasons, Plaintiff's challenge should be rejected.

---

unconstitutionally confiscatory rate and (2) did not violate the Equal Protection Clause.  *See id.* at 1163-65.  The Eighth Circuit considered only the "facial validity of the Durbin Amendment" and did not consider any arguments (constitutional or otherwise) related to Regulation II.  *Id.* at 1163.

## I.    The Statute Requires The Board To Prescribe Regulations For An Interchange Fee That Is Reasonable And Proportional To An Issuer's Transaction-Related Costs

Plaintiff's argument that the Board exceeded its statutory authority by considering more than just incremental ACS costs ignores Congress's prevailing mandate that the Board "establish standards for assessing whether the amount of any interchange transaction fee … is reasonable and proportional to *the cost incurred by the issuer with respect to the transaction*."  15 U.S.C. § 1693*o*-2(a)(3)(A) (emphasis added).  This paragraph does not refer to incremental ACS costs, let alone direct the Board to limit interchange fees to be equal to that subset of transaction-related costs.  The clear import of this statutory language is that issuers are entitled to recover transaction-related costs they incur in effecting debit transactions plus a reasonable, proportional return on their investments enabling such transactions.  Plaintiff largely ignores paragraphs (2) and (3)(A), and instead zeroes in on paragraph (4)'s "Considerations."  But even Plaintiff acknowledges, Dkt. 62 at 2, that courts should "use every tool at their disposal to determine the best reading of the statute." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).  That includes reading the "considerations" provisions in paragraph (4) consistent with the statute's overarching command in paragraphs (2) and (3) that interchange fees be "reasonable and proportional" to an issuers' costs.  Plaintiff consistently fails to account for the full statute, instead relying exclusively on subsidiary statutory "considerations."  Because Plaintiff's position would deny issuers the opportunity to recover many of their transaction-related costs, let alone a reasonable rate of return, it is foreclosed by both the statutory text and the canon of constitutional avoidance.

### A.    Interchange Fees Must Allow Issuers To Recover Costs Beyond Incremental ACS Costs Plus A Reasonable Rate Of Return

Congress required that the "amount of any interchange transaction fee" an issuer receives "shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  15 U.S.C. § 1693*o*-2(a)(2).  And it was this statutory aim that Congress explicitly

directed the Board to achieve, mandating in substantively identical language that the Board promulgate regulations "to establish standards for assessing whether the amount of any interchange transaction fee … is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." *Id.* § 1693*o*-2(a)(3)(A).   These directives contain the Durbin Amendment's overarching statutory command, and it is this text—not the "considerations" in paragraph (4)—that must prevail in determining the Board's statutory authority.  These paragraphs show that Congress intended for interchange fees to allow issuers to recover their transaction-related costs—not limited to incremental ACS costs—plus a reasonable return.

This conclusion is evident from the Durbin Amendment's text.  First, paragraphs (2) and (3)(A) contain no language limiting the phrase "cost incurred by the issuer with respect to the transaction" to a particular set of costs, and certainly not to incremental ACS costs.  Congress's use of the phrase "with respect to" likewise indicates that the costs to which interchange fees must be reasonable and proportional are broader than a single subcategory.  The phrase "with respect to" is straightforward in ordinary usage, meaning "in relation to."  *Webster's Third New International Dictionary* 1934 (2002); *see also Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128 (2d Cir. 2001) (Sotomayor, J.) (equating "related to" and "with respect to").  It does not require "a metaphysical discussion" to reach the conclusion that inclusive phrases like these are "broad." *Moshea v. NTSB*, 570 F.3d 349, 352 (D.C. Cir. 2009) (Kavanaugh, J.).  Congress's use of this broad, inclusive language evinces its intent that interchange fees account for costs beyond a single subcategory of costs related to debit transactions.

If, as Plaintiff argues, Congress had intended to "exclude[] all other costs that are not the incremental ACS cost from the fee standard," Dkt. 51 at 15, Congress "could have done so directly," *NACS II*, 746 F.3d at 485.  For example, Congress could have written the mandate in

17

paragraph (2) to say that interchange fees "shall be *equal to the incremental cost incurred by an issuer for the role of the issuer in authorization, clearance, or settlement of the transaction.*" Likewise, as the D.C. Circuit reasoned, "in [paragraph (3)(A)] Congress could have instructed the Board to 'promulgate regulations ensuring that interchange fees are reasonable and proportional to'"—or even *equal to*—"'the *incremental costs of authorization, clearance, and settlement that an issuer incurs with respect to a particular electronic debit transaction.*'" *Id.* (emphasis added). Indeed, that would have been the most natural, direct way to carry out the restriction Plaintiff seeks to read into the statute. But Congress did neither, instead relegating language about incremental ACS costs to paragraph (4) as something the Board must "consider" in prescribing regulations consistent with paragraphs (2) and (3). 15 U.S.C. § 1693*o*-2(a)(4)(B)(i). It would be strange for Congress to take this convoluted route when more straightforward language was readily available. *Cf. Gallardo ex rel. Vassallo v. Marstiller*, 596 U.S. 420, 429 (2022) (Thomas, J.) ("If Congress had intended to draw such a distinction, it easily could have drafted language to that effect.").

Plaintiff's contrary interpretation requires reading entire paragraphs—(2), (3)(A), and almost all of (4)—as meaningless surplusage. Though not an "absolute rule," the canon against surplusage directs courts to prefer an "interpretation [that] gives effect to every clause and word of a statute." *Marx v. General Revenue Corp.*, 568 U.S. 371, 385 (2013). And "[w]hen a statutory construction … 'render[s] an entire subparagraph meaningless,' … the canon against surplusage applies with special force," and "still more when the subparagraph is so evidently designed to serve a concrete function." *Pulsifer v. United States*, 601 U.S. 124, 143 (2024). If paragraph (4)(B)(i) means that interchange fees must be limited to incremental ACS costs, then there would be no need for paragraphs (2) or (3)(A) to require reasonability or proportionality to the issuers' transaction-related costs. Plaintiff's interpretation also would nullify even the other

"considerations" in paragraph (4) from which Plaintiff draws its focus on incremental ACS costs. Why bother directing the Board to "consider the functional similarity between … electronic debit transactions … and … checking transactions," 15 U.S.C. § 1693o-2(a)(4)(A), or not to consider "other costs incurred by an issuer which are not specific to a particular electronic debit transaction," *id.* § 1693o-2(a)(4)(B)(ii), if incremental ACS costs are all that matter?

Moreover, by skipping over the foundational provisions in paragraphs (2) and (3)(A), Plaintiff ignores Congress' use of the phrase "reasonable and proportional" to describe the *relationship* of interchange fees to issuers' transaction-related costs. The use of that phrase makes clear that Congress did not *limit* interchange fees to mere cost recovery. Instead, the phrase "reasonable and proportional" demonstrates that Congress intended to allow issuers to charge fees that cover transaction costs *plus* a reasonable and proportional rate of return above those costs.

This interpretation is clear from the text's ordinary meaning and consistent interpretations of similar text in other federal statutes. A "reasonable" fee is one that is "moderate" or "that allows a fair profit." *Webster's Third New International Dictionary* 1892 (2002). An interchange fee would not be reasonable if the government compelled firms to set the fee at a level that fails to account for any return or, worse, the recovery of even the costs of providing a service. Congress's pairing of "reasonable" with the words "and proportional to" confirms this reading of the statute. "Proportional" in this context means "corresponding in size, degree, or intensity" to, or "regulated or determined in size or degree with reference to," *id.* at 1819, the costs of the issuer. Notably, Congress did not require that interchange fees be, for example, "limited to," or "equal to" the costs issuers incur—language that it employs to place a cost-based cap on fees. *See, e.g.*, 7 U.S.C. § 940f(c)(2) ("amount of the fee … shall be equal to the modification cost").

Instead, the use of the phrase "reasonable and proportional" is akin to Congress's use of

the phrase "just[ and] reasonable" in federal ratemaking statutes.  7 U.S.C. § 211(a); 15 U.S.C.
§ 717c(a).  For decades courts have understood Congress's use of the term "reasonable," paired
with "just" or "fair," in ratemaking statutes, to require that the rates in question "yield[] sufficient
revenue to cover all proper costs … plus a specified return on invested capital." *ExxonMobil Oil
Corp. v. FERC*, 487 F.3d 945, 951 (D.C. Cir. 2007) (per curiam); *see also, e.g.*, *In re Permian
Basin Area Rate Cases*, 390 U.S. 747, 770 (1968).  Because only the Associations' interpretation
gives effect to each subsection of the statute, Plaintiff's contrary interpretation should be rejected.

### B.    Plaintiff Misconstrues Statutory Language Directing The Board To Consider Certain Factors

Across two briefs, Plaintiff fails to meaningfully analyze paragraphs (2) or (3)(A), instead
proceeding directly to paragraph (4) to support its artificially narrow reading.  Courts interpreting
statutes read "the relevant words not in a vacuum, but with reference to the statutory context,
'structure, history, and purpose.'"  *Abramski v. United States*, 573 U.S. 169, 179 (2014).  Even
interpreting paragraph (4) in a vacuum cannot support Plaintiff's position that the statute
"bifurcates the entire universe of interchange-fee cost into two categories." Dkt. 51 at 13.  Instead,
paragraph (4) specifies things the Board must consider, a subset of costs it cannot, and leaves all
other costs to be assessed under the overarching statutory mandate in paragraphs (2) and (3)(A).

Paragraph (4) lists things the Board "shall" or "shall not" "consider" "[i]n prescribing
regulations *under paragraph (3)(A)*."  15 U.S.C. § 1693*o*-2(a)(4) (emphasis added).  That is, even
paragraph (4) is clear that its considerations are subordinate to the overarching command to
establish regulations for interchange fees that are "reasonable and proportional to the cost incurred
by the issuer with respect to the transaction."  *Id.* § 1693*o*-2(a)(3)(A).  And the paragraph (4)
considerations themselves make clear they do not span the "entire universe" of issuers' transaction-
related costs.  Far from "specifically tell[ing] the Board how to calculate a 'reasonable' and

'proportional' interchange transaction fee," as Plaintiff claims, Dkt. 62 at 3, Congress instead issued a broad mandate—that interchange fees be "reasonable and proportional" to issuers' costs—and then set forth considerations to guide the Board in carrying out that task.

*First*, paragraph 4(A) directs the Board to "consider the functional similarity between … electronic debit transactions" and "checking transactions that are required … to clear at par."  15 U.S.C. § 1693*o*-2(a)(4)(A).  The Board complied with this demand, expressly considering over multiple Federal Register pages the similarities between these transactions, as well as their significant differences—which result in increased costs to issuers.  2011 Final Rule, 76 Fed. Reg. at 43,399-43,401.  Contrary to Plaintiff's uncited assertions, the statute says nothing suggesting Congress "wanted the costs to use debit cards to be as close to checks as possible," Dkt. 51 at 6, 18, 30, much less required the Board to ensure that outcome.  Instead, Congress set a rule— "reasonable and proportional to the cost incurred by the issuer with respect to the transaction"— and required that the Board merely "consider" this "functional similarity" issue before prescribing regulations.  It is not unusual for Congress to direct agencies to consider enumerated factors or circumstances before promulgating rules without "dictat[ing] particular decisional outcomes."  *Cf. Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015).  Indeed, Plaintiff's own authorities demonstrate that when "Congress orders a decisionmaker to 'consider' a list of factors," that instruction is satisfied if "'each factor [is] given genuine consideration and 'some weight' in the final determination.'"  Dkt. 62 at 21 (quoting *Tex. Med. Ass'n v. HHS*, 110 F.4th 762, 778 (5th Cir. 2024)).  The statute's direction to the Board about what it may or must "consider" does not, and cannot, supersede the statutory mandate of paragraphs (2) and (3)(A).

*Second*, paragraph (4)(B) requires the Board to "distinguish between … the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of

a particular electronic debit transaction, which cost shall be considered under paragraph (2)" and "other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2)."  15 U.S.C. § 1693o-2(a)(4)(B).  As described above, the statutory structure makes clear that the first of these "considerations"—which addresses a specific subset of costs related to debit transactions—is plainly a subcategory of the broader, unqualified "cost incurred by the issuer with respect to the transaction" to which fees must be "reasonable and proportional."  *Supra* 17-19.  A contrary reading would render the statutory command in paragraphs (2) and (3)(A) meaningless.  *Id.*

As for the costs that "shall not be considered," the text makes clear that these too are a subcategory of costs that does not cover *every* cost other than incremental ACS costs.  Again, had Congress intended to prohibit the Board from considering *all* "other costs," as Plaintiff argues (*e.g.*, Dkt. 51 at 15), it could have done so directly without any paragraph (4)(B)(ii) at all.  But it instead specified a subset of "other costs" that the Board shall not consider with the restrictive phrase "not specific to a particular electronic debit transaction."  15 U.S.C. § 1693o-2(a)(4)(B).  Congress's use of this phrase—instead of, for example, saying simply "other costs incurred by an issuer, which costs shall not be considered"—would be meaningless surplusage under Plaintiff's reading.  And interpreting this phrase to restrict—rather than describe—the category of "other costs" excluded from consideration follows from basic principles of grammar, which "require that commas set off descriptive" clauses.  *NACS II*, 746 F.3d at 487.

The result of this statutory scheme is thus, as the Board recognized, that the Board *must* consider incremental ACS costs and *must not* consider costs that are not specific to a particular electronic debit transaction.  But paragraph (4) says nothing about the third category of costs that *are not* incremental ACS costs but *are* specific to a particular electronic debit transaction.  Contrary

to Plaintiff's suggestion, this does not mean that the statute is "silent" as to this category, Dkt. 51 at 17-18, nor that the Board "ignore[d] the Durbin Amendment's bifurcation of costs" and thus "subvert[ed]" the statute's general mandate, Dkt. 62 at 7; far from it.  The statute speaks to this third category with the overarching statutory directive that interchange fees be reasonable and proportional to "the cost incurred by the issuer with respect to" an electronic debit transaction.

That statutory scheme does not give the Board "discretion" whether to consider this third category of costs, but rather *requires* that the Board consider *all* costs that the Board finds issuers incur "with respect to" debit transactions, 15 U.S.C. § 1693*o*-2(a)(2), (a)(3)(A), including incremental ACS costs, *id.* § 1693*o*-2(a)(4)(B)(i), and except for costs that are not specific to particular debit transactions, *id.* § 1693*o*-2(a)(4)(B)(ii).  To use an analogy, suppose Congress had instructed an agency to set rules for "a healthy diet," and, in so doing, to distinguish between lean proteins and sweets, requiring consideration of the former and prohibiting consideration of the latter.  No one would think that Congress had intended the agency only to include lean proteins in its healthy-diet rules.  What about grains, fruits, and vegetables?  For any category of food not specifically addressed by Congress, the agency would look to the general command and ask whether it is a component of a heathy diet.  In this example, the agency could of course include vegetables, and would likely *have to* include vegetables to satisfy the overarching statutory mandate, because a healthy diet might require nutrients not obtainable from lean proteins alone.

Nor does Congress's directive that the Board "distinguish between" the subcategories of costs described in paragraph (4) suggest there can be only two categories.  Not even Plaintiff's own citations support this reading, standing for, at most, the principle that "[t]o 'distinguish' means to 'separate into different categories' or 'to make a distinction.'"  Dkt. 51 at 14.  Nothing about these definitions suggest that one can "distinguish between" *only* two things.  If one has a red

marble, a green marble, and a blue marble, one can "distinguish between" the red and green marbles without pretending the blue marble does not exist. Or, as put by the D.C. Circuit, if "you make a deal to hand over part of your baseball card collection and to distinguish between rookie cards, which you must hand over, and other cards less than five years old, which you must not[,] … you could certainly hand over a 1960 Harmon Killebrew Topps card"—neither a rookie card nor less than five years old—"without violating the terms of the deal." *NACS II*, 746 F.3d at 488.

Plaintiff's appeal to "legislative history"—a single quote from a single floor speech of a single Senator—cannot trump the statute's text and structure. *See* Dkt. 51 at 18-19. Whatever Senator Durbin may have meant to convey in the quoted statement—which was not subject to debate, not joined by any other member of Congress, and ultimately misstates paragraph (4)(B)—his floor statement cannot trump the statutory text. As the Supreme Court has warned, courts are to "give no weight to a single reference by a single Senator during floor debate." *Bath Iron Works Corp. v. Director, Office of Workers' Comp. Programs*, 506 U.S. 153, 166 (1993); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979). Or, as another court has observed, "[c]herry-picking statements made by a handful of legislators does not represent legislative intent unless the statements reflect general agreement among the body." *United States v. Sorto-Munoz*, 2023 WL 4424126, at *20 (D.S.D. Jan. 13, 2023). Even setting aside its textually suspect interpretation, Plaintiff fails to identify any probative "legislative history."

Finally, Plaintiff's invocation of the major questions doctrine is a red herring. The doctrine does not apply merely because a suit involves some important policy issue (or else, the doctrine would swallow virtually every challenge to an agency rule). While the question of interchange-fee regulations is no doubt important, this dispute bears none of the indicia of cases in which the major questions doctrine applies. The Board has not made a "'vast assertion of newfound power,'"

24

Dkt. 51 at 19 (quoting *Missouri v. Biden*, 112 F.4th 531, 547 (8th Cir. 2024) (per curiam)), but instead promulgated exactly the sort of regulation that Congress directed, *i.e.*, one that regulates debit card interchange fees. Nor, as described above, *supra* 22-23, is the Board's authority to regulate based on statutory silence; the Board's authority instead derives from paragraph (3)(A)'s explicit mandate, in which Congress *did* "speak clearly," *cf. Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021), by requiring regulations that permit interchange fees reasonable and proportional to issuers' transaction-related costs. Indeed, if the major questions doctrine had any purchase here—it does not—it would favor *raising* the Interchange Fee Cap, as the only novel aspect of the Board's interpretation is that its price regulation fails to take into account a reasonable rate of return, much less all transaction-related costs incurred by issuers.

### C. Capping Interchange Fees Below Issuers' Costs Would Raise Serious Constitutional Concerns

If there were any doubt about the statutory interpretation set forth above, the doctrine of constitutional avoidance counsels strongly against Plaintiff's approach, which would require the Board to cap interchange fees at a level that would prevent many issuers from recouping even their costs—let alone a reasonable rate of return. This interpretation would "raise[] 'a serious doubt as to [the statute's] constitutionality," *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001), and should be rejected. *See also Sackett v. EPA*, 598 U.S. 651, 679 (2023) (requiring "exceedingly clear language … to significantly alter … the power of the Government over private property").

Specifically, the Constitution forbids the government from dictating a price at an amount that has a "confiscatory" effect—a price so low as to be "inadequate to compensate current equity holders for the risk associated with their investments." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307, 312 (1989). Although the government may limit returns, it is "plain that the 'power to regulate is not a power to destroy.'" *Permian Basin*, 390 U.S. at 769. Thus, where the government

regulates prices, it must at minimum "enable [a] company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed." *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 605 (1944). Courts have repeatedly held that price-control regulations that fail to allow a reasonable rate of return are unconstitutional. *See, e.g.*, *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 595-596 (6th Cir. 2001); *Guaranty Nat'l Ins. Co. v. Gates*, 916 F.2d 508, 515 (9th Cir. 1990); *Calfarm Ins. Co. v. Deukmejian*, 771 P.2d 1247, 1255-1256 (Cal. 1989); *Aetna Cas. & Sur. Co. v. Comm'r of Ins.*, 263 N.E.2d 698, 703 (Mass. 1970).

Plaintiff's interpretation would repeat the Board's earlier error and "clearly" not guarantee "the constitutionally-required fair and reasonable rate of return." *Michigan Bell*, 257 F.3d at 595. Indeed, the Board deliberately set the Interchange Fee Cap at the 80th percentile of surveyed issuers' "allowable" costs, with no provision for a reasonable return. *See* 2011 Final Rule, 76 Fed. Reg. at 43,422. And the Board's 2023 proposal to amend Regulation II acknowledged that the current cap covers this subset of costs of only 77 percent of covered issuers based on 2021 debit card issuer survey data. Debit Card Interchange Fees and Routing, 88 Fed. Reg. 78,100, 78,113 (Nov. 14, 2023) ("2023 NPRM"). Plaintiff's interpretation would slash the existing fee cap even further, denying not merely the opportunity for a reasonable rate of return, but even recoupment of the subset of transaction-related costs considered by the Board. This provides an independent reason to reject Plaintiff's atextual interpretation.[8]

---

[8] This Court need not resolve the constitutionality of the Durbin Amendment or Regulation II to reject Plaintiff's challenge, because the issue is whether the statute can and must be interpreted to avoid a serious constitutional issue. As noted *supra* 14 n.7, *TCF National Bank* was decided before the promulgation of Regulation II, and accordingly considered only the "facial viability of the Durbin Amendment" itself, as opposed to the constitutionality of the Board's Regulation II. The decision accordingly does not undermine the constitutional avoidance argument asserted here. For the purposes of preservation, however, the Associations respectfully submit that *TCF National Bank*, which rejected a constitutional challenge because issuers could pass on un-recouped costs

## II.    The Durbin Amendment Authorizes The Board To Consider Each Of The Costs Plaintiff Challenges

Plaintiff challenges the Board's consideration of four specific costs in setting the Interchange Fee Cap, including, as categorized by Plaintiff: "fixed ACS costs," "transaction-monitoring costs," "fraud losses," and "network processing fees." The Durbin Amendment plainly allows consideration of each of these costs—and indeed requires consideration of such costs to ensure that interchange fees are "reasonable and proportional" to issuers' transaction-related costs.

### A.    The Board Correctly Considered What Plaintiff Calls "Fixed" ACS Costs

Plaintiff first argues that the Board should not have considered what Plaintiff calls "fixed" ACS costs—"costs associated with 'network connectivity; software, hardware, equipment, and associated labor.'" Dkt. 51 at 21 (quoting 2011 Final Rule, 76 Fed. Reg. at 43,404). Not only does Plaintiff fail to demonstrate that these costs are properly characterized as "fixed," it also fails to demonstrate why that would make a difference as a statutory matter. For either of these reasons, Plaintiff's challenge to the Board's consideration of "fixed" ACS costs should be rejected.

To start, the terms "fixed" and "variable" appear nowhere in the statute, and Plaintiff offers no statutory basis for using these terms to categorize certain issuer costs. That makes sense, given the economic reality that there is not, as Plaintiff contends, a bright line between "fixed" and "variable" costs. As the Board explained, these costs (network connectivity, hardware, software, equipment, and associated labor) are not categorically "fixed" or "variable"—either as a matter of economic principles or the Board's findings about the workings of the debit card payments system. *See* 2011 Final Rule, 76 Fed. Reg. at 43,426-43,427. Therefore, Plaintiff is wrong to assert that its purported "plain-text understanding of 'fixed costs'" applies in this situation. Dkt. 62 at 13.

---

to consumers, 643 F.3d at 1164, was wrongly decided. Firms are "not required to subsidize their regulated services … with revenues generated from unregulated services." *Michigan Bell*, 257 F.3d at 594 (citing *Brooks-Scanlon Co. v. Railroad Comm'n*, 251 U.S. 396 (1920)).

Instead, as the Board correctly explained when it rejected incorporating these terms into Regulation II, "the meanings of fixed costs and variable costs depend on a variety of factors," including "the relevant time horizon and volume range," an issuer's accounting practices, and whether an issuer performs transaction processing in-house or outsources that functionality to a third party (*i.e.*, the cost might be characterized as "fixed" for those issuers who process transactions in-house but "variable" for those issuers who rely on a third party processor to carry out the same functions and who charges on a per-transaction basis). 2011 Final Rule, 76 Fed. Reg. at 43,427.  Indeed, even "the same type of cost may appear variable in one year, but fixed in a different year." *Id.*  "For example, in any given year one issuer might classify labor as an includable [variable] cost because labor costs happened to vary based on transaction volume over that year, while another issuer might classify labor as a non-includable [fixed] cost because such costs happened to remain fixed over that year." *NACS II*, 746 F.3d at 490.  The Board found that the bright line between "fixed" and "variable" costs that Plaintiff attempts to draw has no basis in reality, a point Plaintiff does not challenge in either of its briefs.  The distinction accordingly provides no help in determining the bounds of the Board's authority.

For the same reason, the Board correctly rejected the proposal to equate "incremental" ACS costs with what Plaintiff describes as "variable" ACS costs.  This is not, as Plaintiff argues, a mere "'practical consideration[],'" Dkt. 51 at 22, nor is it a result of any purported attempt by the Board to shirk a purportedly "difficult" "delineat[ion] between incremental ACS costs and" so-called "fixed ACS costs," Dkt. 62 at 13.  It is instead a question of how best to interpret the word "incremental" in the broader statutory context.  Given the absurdity that would result from equating "incremental" with "variable," the better interpretation of the term "incremental cost" is, as the Board considered but did not expressly adopt, "the difference between the cost incurred by a firm

if it produces a particular quantity of a good and the cost incurred by the firm if it does not produce the good at all." 2011 Final Rule, 76 Fed. Reg. at 43,426. A cost therefore is an "incremental" ACS cost if it is incurred because of an issuer's role in the ACS process; it is not an "incremental" ACS cost if it would be incurred regardless of whether the issuer authorizes, clears, and settles electronic debit transactions. The costs of network connectivity; software, hardware, equipment, and associated labor to authorize, clear, and settle transactions are precisely the sort of costs that the Board is not merely permitted, but *affirmatively required*, to consider under paragraph (4)(B)(i). Plaintiff does not even suggest what "incremental ACS costs" could mean such that it would include *some* costs but exclude the principal costs incurred to facilitate the ACS process.

Moreover, even if these costs were not "incremental" ACS costs, the Board must still consider them in setting an interchange fee that is "reasonable and proportional" to issuers' transaction-related costs under paragraphs (2) and (3)(A). These costs (network connectivity, hardware, software, equipment, and associated labor) are "specific to each and every electronic debit transaction," and therefore *not* among the costs prohibited by paragraph (4)(B)(ii). 2011 Final Rule, 76 Fed. Reg. at 43,427. That is not because of some purported "difficult[y]" that "could be obviated if the banks simply cleaned up their accounting." Dkt. 62 at 13. It is the reality of how debit transactions are processed. The effect of any one of the billions of debit transactions on these costs may be small, but the costs are specific to each particular transaction, as "[n]o electronic debit transaction can occur without incurring these costs." 2011 Final Rule, 76 Fed. Reg. at 43,427.

### B.    The Board Correctly Considered Transaction-Monitoring Costs

"Transactions monitoring is as integral to the authorization decision as confirming that a card is valid and authenticating the cardholder." 2011 Final Rule, 76 Fed. Reg. at 43,430. That is because "[t]ransactions-monitoring systems … assist in the authorization process by providing information needed by the issuer in deciding whether the issuer should authorize the transaction

before the issuer decides to approve or decline the transaction."  2015 Clarification, 80 Fed. Reg. at 48,685.  Accordingly, transaction monitoring, "[l]ike other authorization steps … is integral to an issuer's decision to authorize a specific transaction."  *Id.*  Because of the central role of transaction monitoring in the ACS process, the Board correctly recognized transaction-monitoring costs not as a cost it was merely *permitted* to consider, but one that "Congress *required* to be considered," under paragraph (4)(B)(i).  *Id.* at 48,685-48,686 (emphasis added).

Plaintiff does not dispute the integral role of transaction monitoring to the ACS process, but instead contends that the Board should nevertheless ignore these costs because transaction monitoring also helps prevent fraud.  That argument depends on Plaintiff's contention that any and all fraud-related costs must be included, if at all, under paragraph (5)(A), which provides that the Board "may allow for an adjustment to the fee amount received or charged by an issuer" if it "is reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions" and the issuer complies with fraud-related standards separately promulgated by the Board.  15 U.S.C. § 1693*o*-2(a)(5)(A).  Plaintiff is wrong, both on the statutory text and as a matter of avoiding absurd results.

Start with the text.  Despite elsewhere placing a great deal of weight on Congress's reference to "a particular" or "the transaction" in other statutory subsections, Plaintiff ignores the absence of any article, the absence of the word "particular," and the use of the plural "transactions" in paragraph (5)(A).  But courts must, when possible, "give[] effect to every clause and word of a statute."  *Marx*, 568 U.S. at 385.  Thus, while Congress's references to "a particular transaction" in paragraph (4)(B) are best understood as referring to costs incurred each time a transaction goes through the ACS process—like transaction monitoring—the unqualified plural "transactions" and broad categorical phrase "in relation to" in paragraph (5)(A) are best understood as encompassing

"fraud prevention costs over a broad spectrum of transactions," 2015 Clarification, 80 Fed. Reg. at 48,686. This is consistent with the structure and scheme of the Durbin Amendment, which provides for a fraud-prevention adjustment contingent on compliance with fraud prevention requirements that incentivize "programmatic improvements to address fraud outside of the context of particular transactions[.]" *Id.* Plaintiff's handwaving about whether such costs "assist" in authorization, are "integral to" authorization, or are "related to" authorization, Dkt. 62 at 13-14, serves only to obscure the reality the Board recognized—issuers cannot authorize a *particular* electronic debit transaction without transaction monitoring. Plaintiff fails to demonstrate why this cost—which Congress expressly required the Board to consider under paragraph (4)(B)—is forbidden because Congress also wanted to incentivize programmatic steps to reduce fraud.

Nor could Plaintiff, because its reading would collapse—rather than adhere to—the Durbin Amendment's statutory scheme. "[M]ost costs of the authorization process"—*i.e.*, the "costs Congress *required* to be considered"—"assist in preventing some type of fraud." 2015 Clarification, 80 Fed. Reg. at 48,685 (emphases added). Indeed, fraud prevention inheres in the authorization process, ensuring that a customer has sufficient funds and confirming her identity by, for example, requiring her to enter a personal identification number (PIN)—advantages for both issuers and merchants over checking transactions which fail to provide such assurances. It is absurd to conclude that Congress intended to excise any activity with some capacity to prevent fraud from the costs underlying interchange fees when it expressly *required* consideration of authorization costs, the majority of which have the "dual purpose" of preventing fraud and facilitating authorization of debit transactions. 2015 Clarification, 80 Fed. Reg. at 48,685.

## C.    The Board Correctly Considered The Costs Of Fraud Losses

Plaintiff nowhere disputes that "fraud losses"—which the Board limited to those related to nonsufficient funds and not recovered through chargebacks to merchants or customers, 2011 Final

Rule, 76 Fed. Reg. at 43,431—are costs incurred specific to particular electronic debit transactions. On that basis alone, the Board was required to consider (or at least not prohibited from considering) such transaction-specific costs.

Instead, Plaintiff first disputes the inclusion of this limited category of fraud losses in the Interchange Fee Cap because they are incurred by issuers as the "result" or "consequence" of the ACS process, and thus do not constitute a "cost." Dkt. 51 at 24-25. Plaintiff offers little beyond dictionary definitions in support of its distinction between costs incurred before, during, or after the ACS process, and nothing to demonstrate why the timing of expenses an issuer incurs in that process makes any statutory difference. To take a simple example, few would dispute that salaries are a central "cost" of many businesses; they do not transform into something other than "costs" merely because employees are paid only after working the hours covered by a particular paycheck.

Plaintiff similarly challenges the inclusion of fraud losses because they are incorporated into the Interchange Fee Cap "regardless of whether a fraud loss occurred," and are thus "anticipatory." Dkt. 51 at 25. But that argument would defeat the entire undertaking of the Durbin Amendment and Regulation II. Despite significant disputes over how to interpret Regulation II, all parties agree the Board should have considered *some* costs, which necessarily required it to consider data *from the past* to establish standards ensuring reasonable and proportional interchange fees *for the future*. Any cost factored into such regulations is necessarily "anticipatory." That is how time works. Objecting to inclusion of a cost in Regulation II because it is "anticipatory" does not take the Durbin Amendment's text, structure, or scheme seriously.

### D.    The Board Correctly Considered The Costs Of Network Processing Fees

Per the D.C. Circuit, "this is easy." *NACS II*, 746 F.3d at 490. "Network processing fees, which issuers pay on a per-transaction basis, are obviously specific to particular transactions." *Id.*

Plaintiff's arguments to the contrary make no sense. First it asserts that the Durbin Amendment prohibits the inclusion of the amount of a network fee in setting an interchange fee because the Amendment defines "network fee" as fees charged by networks "other than an interchange transaction fee." Dkt. 51 at 26. But there is of course no provision in the Durbin Amendment that prohibits consideration of per-transaction fees charged by networks to issuers when setting a standard based on costs the *issuer* incurs. Instead, Plaintiff draws its conclusion from its logically suspect assertion that "[a] 'network fee' cannot be both *different from* an 'interchange transaction fee' and simultaneously be *a component of* an 'interchange transaction fee.'" *Id.* That assertion collapses under the mildest scrutiny. Components of things are, of course, different than the things themselves. Incremental ACS costs are also not "interchange transaction fees," but even Plaintiff concedes that incremental ACS costs must be a component of interchange fees. A gear is not an engine but is a component of one. Two plus two is four, but two is not four.

Second, Plaintiff contends network processing fees charged to issuers cannot be considered in setting interchange fees because the statute prohibits network fees from being "used to directly or indirectly compensate an issuer with respect to an electronic debit transaction." Dkt. 51 at 26. The *NACS* plaintiffs tried this argument too, and the D.C. Circuit did not need *Chevron* to conclude that they "should have left it out entirely." *NACS II*, 746 F.3d at 491. Subsection (a)(8)(B)(i) "is designed to prevent issuers and networks from circumventing the Board's interchange fee rules, not to prevent issuers from recovering reasonable network processing fees through the interchange fee." *Id.* Indeed, the statute separately "authorizes the Board to prescribe rules to prevent circumvention or evasion of the interchange transaction fee standards" under the subsection Plaintiff relies on for this argument. 2011 Final Rule, 76 Fed. Reg. at 43,442.

Finally, Plaintiff argues that network fees are not incurred by issuers for their role in

processing electronic debit transactions, apparently because those fees are "charged by the networks for their role in the transaction." Dkt. 51 at 26. This argument misses the mark. To effect an electronic debit transaction, issuers must use the networks and pay the network fee for that use; *charging* the fee may be the network's role, but *paying* the fee is the issuer's role, and accordingly, an "eas[ily]" identifiable per-transaction issuer cost. *NACS II*, 746 F.3d at 490.

## III.    The Durbin Amendment Does Not Require The Board To Tailor Interchange Fee Caps To Specific Costs Of Specific Issuers

None of Plaintiff's arguments refute the Durbin Amendment's authorization to establish standards applicable to all issuers. Plaintiff's principal argument appears to be that the word "the"—in the phrase "*the* cost incurred by *the* issuer with respect to *the* transaction" in paragraph (2)—is a definite article that always means a single, specific entity—including, "*the* issuer." Dkt. 51 at 27. But even Plaintiff's own citations rebut that argument. In *Rumsfeld v. Padilla*, it was only "[t]he *consistent* use of the definite article" that indicated a reference to a single entity. 542 U.S. 426, 434 (2004) (emphasis added). Here, however, "the" is not used consistently, but instead, refers back to the phrases "*an* issuer" and "*a* transaction." *See supra* 9-10. Thus, *Nielsen v. Preap* provides an interpretation of "the" that fits this statute, *i.e.*, "that 'the' is 'a function word … indicat[ing] that a following noun or noun equivalent is definite *or has been previously specified by context*.'" 586 U.S. 392, 408 (2019) (emphasis added); *see also NLRB v. Noel Canning*, 573 U.S. 513, 527 (2014) ("[T]he word 'the' … can also refer 'to a term used generically or universally.'"). In the Durbin Amendment, the use of "the issuer" is previously specified by context, namely, the statute's reference to "*an* issuer." 15 U.S.C. § 1693*o*-2(a)(2).

Moreover, Plaintiff concedes that "a" or "an" has a "generalizing force." Dkt. 51 at 27 (quoting *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4-5 (D.C. Cir. 2000)). And it is the "generalizing force" of the statute's reference to "an issuer" that supports the Board's determination that later

references to "'the issuer' and 'the transaction'" therefore "refer[red] back to the original representative"—that is, *generalized*—"use of the term." 2011 Final Rule, 76 Fed. Reg. at 43,422. The Board's reference to the phrases "an issuer" and "a transaction" as "representative" accordingly does not, as Plaintiff contends, read the word "representative" into the statute, but instead merely describes the grammatical usage of the "generaliz[ed]" articles "a" and "an."

Plaintiff also ignores the Board's reasoning that only its interpretation ensures consistency throughout paragraph (2). As the Board explained, when it came to the term "the cost," "*[n]early all commenters* appear to believe the language did not require computing the actual allowable cost of each specific transaction; *none argued for such a calculation*." 2011 Final Rule, 76 Fed. Reg. at 43,422 (emphasis added). Thus, all agreed "the cost" referred "to the cost of an average electronic debit transaction"—*i.e.*, of a representative transaction. *Id.* There is no reason to believe that Congress would use "the" differently across the same phrase. Rather, "the issuer," in much the same manner as "the cost," most naturally refers to a representative issuer. *See id.* at 43,423.

Plaintiff's remaining arguments insisting on an issuer-specific Interchange Fee Cap do not hold water. For example, Plaintiff rehashes its erroneous interpretation of the requirement in paragraph (4)(B) that the Board consider costs specific to "particular" transactions. Not only is that argument deficient for the reasons discussed in detail above, *supra* 30-31, but Plaintiff offers no explanation why a requirement that the Board consider only costs specific to particular debit card transactions requires the Board to establish an issuer-specific rule for interchange fees. Nor is Plaintiff correct that the Board's interchange fee standard rests on mere "practical considerations." Dkt. 51 at 28. Contrary to Plaintiff's later assertion, it is indeed "unthinkable that Congress had an issuer-specific and transaction-specific approach in mind." Dkt. 62 at 19. The "tremendous complexity" of the issuer-specific regulations Plaintiff demands is relevant not

as a policy matter, but because it demonstrates the absurdity that would result from Plaintiff's interpretation, which the "Board d[id] not believe Congress intended." 2011 Final Rule, 76 Fed. Reg. at 43,422; *see also, e.g.*, *United States v. E.T.H.*, 833 F.3d 931, 938 (8th Cir. 2016) (declining to interpret statute to produce "absurd results"). Plaintiff's interpretation would result in absurdity because it would be "virtually impossible to implement," including because: (1) interchange fees are computed at the time of transactions, and an issuer's specific costs cannot be ascertained before the interchange fee is received; (2) issuer-specific fees would "result in an exceedingly complex matrix of interchange fees" with different calculations and issuer-specific costs for each of "tens of billions of electronic transactions"; and (3) such a regime would result in significant "difficulty in monitoring and enforcing compliance." 2011 Final Rule, 76 Fed. Reg. at 43,422.

That absurdity is stretched even further because Plaintiff acknowledges—despite widespread agreement at the time of Regulation II's promulgation to the contrary, *supra* 9, 35—that its interpretation would require "that the fee standard be transaction-specific." Dkt. 62 at 19. That is, Plaintiff's approach would require the instant calculation of issuer-specific costs, and the related interchange fees, for each of the more than 100 *billion* debit card transactions each year. That conclusion cannot be reconciled with the statutory text or the administrative record, and would present significant tension with the Durbin Amendment's requirement that issuers disclose "aggregate or summary information concerning the costs incurred." 15 U.S.C. § 1693*o*-2(a)(3)(B). It is difficult to see the value of "aggregate" or "summary" cost information if the Board's obligation were to set interchange fees based on the cost of each individual transaction. Plaintiff's suggestion that the Board could collect more "granular" information, Dkt. 62 at 20, provides no response to the statutory text indicating that the interchange fee standard should be premised on a *representative* transaction. *Supra* 34-35. Congress should not be presumed to have intended such

an unworkable, unenforceable regulatory morass.  After all, statutes should not be construed to impute to Congress "a purpose to paralyze with one hand what it sought to promote with the other." *Am. Paper Inst. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 421 (1983).

Instead, the Board's interchange fee standard applicable to all issuers was required—or at least permitted—by the statute's use of the concededly generalizing articles "a" and "an," and by the foundational principle that Congress does not intend to enact absurdity.  Plaintiff's challenge to Regulation II on this basis should be rejected.[9]

## IV.    Plaintiff's Challenge, If Successful, Would Harm Issuers And Consumers, While Providing Merchants A Financial Windfall

Regulation II has been the law of the land since 2011.  It has never been perfect.  Indeed, the Board itself recently acknowledged that Regulation II fails to permit nearly 23 percent of issuers even to recover the "allowable" *costs* that the Board considered in setting the Interchange Fee Cap.  *See* 2023 NPRM, 88 Fed. Reg. at 78,105.  And Regulation II fails to account for many additional costs issuers incur related to particular debit card transactions.  For example, it does not account for the costs of (1) non-fraud-related cardholder inquires (3 cents per transaction in 2021); (2) non-sufficient funds handling (.5 cents per transaction in 2021); (3) non-sufficient fund losses (1.05 cents per transaction in 2021); (4) transaction-specific compliance (1.15 cents per transaction); and (5) card production (2 cents per transaction in 2011, which are likely to be higher now given the changes in card production materials and other factors).  *See* The Clearing House, *et al.*, Comment Letter Regarding Docket No. R-1818, RIN 7100-AG67, Debit Card Interchange Fees and Routing at 37-41 (May 10, 2024), https://tinyurl.com/8fwkfvhr ("2024 Comment Letter").  Plaintiff's challenge would exacerbate this state of affairs, removing from consideration

---

[9] Despite purporting to separately challenge Regulation II as arbitrary and capricious, Plaintiff fails to raise any new arguments in support of that position.  The arbitrary-and-capricious framework does not save Plaintiff's arguments from their deficiencies set out at length above.

even more costs that issuers incur in facilitating debit card transactions, and preventing even more issuers from recovering their costs—let alone a reasonable return on their significant investments.

Further reducing interchange fees as Plaintiff urges would harm banking customers (particularly low-income customers) and consumers.  A below-cost Interchange Fee Cap like the one Plaintiff demands would force issuers to seek to fund their debit card programs by reducing their offerings of other services, including free banking products and services (like free checking) by charging or increasing fees on these and other consumer banking products.  This is not a merely theoretical point; empirical proof since Regulation II's promulgation confirms it.  As the Associations and others explained in a comment letter related to the Board's recent proposal to amend Regulation II, "[e]mpirical data … over the past 12 years demonstrates that the interchange fee cap has resulted in significant and widespread increases in the costs of basic deposit accounts[.]"  2024 Comment Letter at 18.  Under Regulation II, the number of large financial institutions who offered free deposit accounts fell from nearly 60 percent to below 20 percent.  *Id.* at 20.  In addition, shortly after Regulation II was enacted, "average deposit account fees for consumers nearly doubled, from roughly $4 per month to more than $7 per month" and average monthly fees associated with non-interest bearing and interest-bearing deposit accounts at covered institutions rose by 25 percent and almost 13 percent, respectively.  *Id.*

Those necessary changes in banking products have disproportionately affected low-income consumers.  A 2017 FDIC survey reported nearly 30 percent of respondents who previously had access to a bank account became unbanked because of account fees.[10]  As of 2019, growth in recently unbanked customers was highest in states with the most financial institutions subject to

---

[10] Federal Deposit Insurance Corporation, *2017 FDIC National Survey of Unbanked and Underbanked Households* at 23 (Oct. 2018), https://tinyurl.com/3jxdeneb.

the Interchange Fee Cap.[11]    Further reducing interchange fees would also endanger products specifically designed to benefit low-income banking consumers, such as the "Bank On" initiative that promotes accounts with limited monthly fees, low opening deposit amounts, and no overdraft and insufficient fund fees.  *See* 2024 Comment Letter at 21-23.  The Cities for Financial Empowerment Fund, which spearheads the "Bank On" initiative, and 38 Members of Congress expressed concerns that the Board's recent proposal to further reduce interchange fees would endanger the viability of Bank-On certified accounts.  *See id.* at 22-23.

Meanwhile, there is no evidence that lower interchange fees result in lower retail costs for consumers.  Some estimates suggest that around 75 percent of the $6.50 billion in annual savings that merchants received following the promulgation of Regulation II have gone straight to merchants' bottom line.[12]  As one example, at a 2010 Q4 Home Depot Inc. Earnings Conference, Home Depot's then-CFO anticipated a $35 million a year benefit specifically based on the Durbin Amendment and the Board's proposed rule.  2024 Comment Letter at 26.  That is emblematic of research demonstrating "conclusively … that consumers experience immediate Durbin losses through higher bank fees" with correspondingly "limited evidence [] for across-the-board consumer gains through significantly lower merchant prices."[13]   The same is likely to be true should interchange fees be further reduced based on Plaintiff's challenge.

## CONCLUSION

For the foregoing reasons, the Court should issue judgment against Plaintiff.

---

[11] Mukharlyamov & Sarin, *The Impact of the Durbin Amendment on Banks, Merchants, and Consumers*, 2046 All Faculty Scholarship 1, 36 (2019), https://tinyurl.com/4k2avkcn.

[12] Sarin, *Making Consumer Finance Work*, 119 Colum. L. Rev. 1519, 1542 (2019), https://tinyurl.com/4neyjaep.

[13] Mukharlyamov & Sarin, 2046 All Faculty Scholarship at 5.

Dated:   February 21, 2025

Respectfully submitted,

By: /s/  Noah A. Levine

**WILMER CUTLER PICKERING HALE AND DORR LLP**
Seth P. Waxman
seth.waxman@wilmerhale.com
2100 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
Tel: (202) 663-6000
Fax: (202) 663-6363

Noah A. Levine
noah.levine@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Tel: (212) 230-8800
Fax: (212) 230-8888

**SULLIVAN & CROMWELL LLP**
Jeffrey B. Wall
Judson O. Littleton
wallj@sullcrom.com
littletonj@sullcrom.com
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
Tel: (202) 956-7500
Fax: (202) 293-6330

*Attorneys for Amici Curiae The Bank Policy Institute and The Clearing House Association L.L.C.*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 21, 2025, I filed the foregoing using the Court's

CM/ECF system, which will send a notice of the filing to counsel for all parties.


*/s/ Noah A. Levine*
Noah A. Levine