**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| Corner Post, Inc., | |
| Plaintiff, | |
| vs. | Case No. 1:21-cv-00095 |
| Board of Governors of the Federal Reserve System, | |
| Defendant. | |

**ORDER GRANTING CORNER POST, INC.'S MOTION FOR SUMMARY JUDGMENT, AND DENYING BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## <u>INTRODUCTION</u>

[¶ 1]   THIS MATTER comes before the Court on the Motion for Summary Judgment filed by Plaintiff Corner Post, Inc.[1] ("Corner Post"), on November 15, 2024, and the Cross-Motion for Summary Judgment filed by Defendant Board of Governors of the Federal Reserve System (the "Board'"), on January 10, 2025. Doc. Nos. 50, 57. The Board filed its Response on January 10, 2025 (Doc. No. 59), and Corner Post filed its Response on February 7, 2025 (Doc. No. 63). Corner Post filed its Reply on February 7, 2025 (Doc. No. 62[2]), and the Board filed its respective Reply on February 28, 2025 (Doc. No. 70). In addition, several briefs have been filed by the following amici curiae: Retail Litigation Center, Inc., National Federation of Independent Business Small

---

[1] Plaintiffs North Dakota Retail Association and North Dakota Petroleum Marketers Association have been terminated from this action. Doc. No. 39.

[2] Corner Post filed a Combined Response in Opposition to the Board's Cross-Motion for Summary Judgment and Reply in Support of Plaintiff's Motion for Summary Judgment, which appears twice on the docket as Docket Numbers 62 and 63. For ease of reference, the Court will refer to both Corner Post's Reply and Response at Docket Number 62.

Business Legal Center, Inc., Merchant Advisory Group, The Bank Policy Institute, and The Clearing House Association L.L.C. Doc. Nos. 53, 65.[3] A hearing on the Parties' Motions was held on July 23, 2025, during which amici The Bank Policy Institute and The Clearing House Association L.L.C. were permitted to present their arguments alongside the Parties. See Doc. Nos. 73, 76. For the reasons set forth below, Corner Post's Motion for Summary Judgment is **GRANTED**, and the Board's Cross-Motion for Summary Judgment is **DENIED**.

## BACKGROUND

[¶ 2]    When one wonders if studying grammar and English's oddities is worthwhile, this case answers with a resounding "yes." It exemplifies how precise grammar and syntax might have avoided over a decade of legal battles (or, perhaps not, given lawyers' love for litigation). Now that the United States Supreme Court has remanded this case after addressing a procedural question, this Court is tasked with deciding whether the Board's regulation limiting debit card interchange transaction fees properly followed Congress's directions. See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799 (2024). In short, it did not.

[¶ 3]    Americans swipe their debit cards billions of times each year. See Debit Card Interchange Fees and Routing, 76 Fed. Reg. 43,394, 43,397 (July 20, 2011) (codified at 12 C.F.R. §§ 235.1– 235.10) ("Regulation II") (reporting approximately 37.6 billion debit card transactions occurred in 2009). Behind the scenes of a simple swipe is a complex system of electronic networks over which

---

[3] The American Bankers Association ("ABA") also filed a brief as an amicus curiae in support of the then-proposed intervenors, The Bank Policy Institute ("BPI") and The Clearing House Association L.L.C. ("TCH") on January 17, 2025. Doc. No. 60. After their Motion to Intervene was denied (Doc. No. 64), BPI and TCH filed their own brief of amici curiae in support of the Board February 21, 2025 (Doc. No. 65). Shortly thereafter, the ABA sought leave of the Court to file an amended brief of amicus curiae (Doc. No. 66), which the Court granted (Doc. No. 67). Since the Court's order, however, the ABA has not refiled its proposed amended brief. Therefore, the Court did not consider the ABA's brief.

debit transactions are transmitted and approved, fraud is monitored, and money and fees change hands. Those fees grabbed Congress's attention—particularly, the interchange transaction fee (the "interchange fee") that transferred $16.2 billion to debit card issuers (i.e., big banks) in 2009 alone. See id.

[¶ 4]    Four key actors are involved in a debit transaction triggering an interchange fee: the consumer, merchant, the bank that issued the debit card, and the merchant's bank. See NACS v. Bd. of Governors of Fed. Rsrv. Sys., 746 F.3d 474, 477 (D.C. Cir. 2014) ("NACS II"). Although the debit transaction occurs in this so-called "four party system," there is also a relevant fifth party: the network over whose pathways the debit transaction information is transmitted. Id.

[¶ 5]    Once the consumer gives her debit card information to the merchant, it's off to the races to authorize, clear, and settle the transaction (the "ACS" process). Put simply, in the electronic background, the merchant's bank—known as the "acquirer" because it acquires the consumer's money and deposits the funds in the merchant's bank account—receives an "authorization request" including the cardholder's information and the transaction's amount. Regulation II, 76 Fed. Reg. at 43,396. The acquirer passes along this information through the debit card "network" (most commonly, Visa or Mastercard) to the cardholder's bank—known as the "issuer" because it issued the debit card to the consumer. Id. The issuer evaluates whether the transaction appears fraudulent and whether the cardholder's account has sufficient funds, and sends its approval or denial via the network to the merchant. Id. Assuming the issuer has authorized the transcation, the clearance stage ensues. Clearance is the merchant's "formal request of payment" sent to the issuer over the network. NACS II, 746 F.3d at 478. Finally, the debit transaction is settled when the funds are actually transferred from the issuer to the acquirer—debiting the consumer's account and crediting the merchant's account. Regulation II, 76 Fed. Reg. at 43,396.

[¶ 6]    Parties involved in the ACS process obviously do not participate for free. Among other fees, the issuer (consumer's bank) requires the acquirer (merchant's bank) to pay an interchange fee to the issuer for the issuer's role in the transaction. See id. The issuer does not set its own fee, however. Id. Rather, a network—the entity passing the information between the paying and receiving sides of the debit transaction, such as Visa or Mastercard—sets the issuer's interchange fee. Id. Networks' role in setting interchange fees has been a boon to issuers at times, but not so much to merchants or consumers.

[¶ 7]    "Interchange fees have long been a sore point for merchants." Corner Post, Inc., 603 U.S. at 805. Merchants often end up bearing the brunt of most costs incurred along the ACS process, which they generally pass along to consumers. See NACS II, 746 F.3d at 479. The burden of interchange fees has become a necessary evil for most merchants given the plastic's popularity among American consumers. See id.

[¶ 8]    Before interchange fees became regulated in 2011, their price tags skyrotcketed. See Doc. No. 58, p. 9. More debit cards circulating in the market meant more revenue for networks, so networks set higher and higher interchange fees to entice issuers to push out more cards. Doc. No. 51, p. 8. See also NACS II, 746 F.3d at 479–80. This "race to the top" resulted in the average interchange fee reaching 44 cents per debit card swipe in 2009, which equated to 1.15% of the average debit transaction. See Regulation II, 76 Fed. Reg. at 43,397. As one would expect, issuing banks benefitted while merchants and consumers suffered as profits tightened and prices increased.

## I.    The Durbin Amendment

[¶ 9]    Congress took action. Spurred on by Senator Richard Durbin of Illinois, Congress passed the Durbin Amendment to the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010, which is codfied at 15 U.S.C. § 1693o-2, mandating that interchange fees "be reasonable

and proportional to the cost incurred by the issuer with respect to the transaction." 15 U.S.C. § 1693o-2(a)(2). This law targeted interchange fees paid to large issuing banks, i.e., those with $10 billion or more in assets. Id. § 1693o-2(a)(6)(A). To carry out the Durbin Amendment's directive, Congress mandated that the Board issue regulations and set standards for assessing whether an interchange fee met Congress's rubric:

(4) **Considerations; consultation**

In prescribing regulations under paragraph (3)(A), the Board shall—

(A) consider the functional similarity between—

(i) electronic debit transactions; and

(ii) checking transactions that are required within the Federal Reserve bank system to clear at par;

(B) distinguish between—

(i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under [§ 1693o-2(a)(2)]; and

(ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under [§ 1693o-2(a)(2).]

Id. §§ 1693o-2(a)(4)(A)–(B).

[¶ 10]   On top of the interchange fee, Congress enabled the Board to include an additional benefit to issuers if they complied with the Board's standards for fraud prevention:

(5) **Adjustment to interchange transaction fees for fraud prevention costs**

(A) **Adjustments**.

The Board may allow for an adjustment to the fee amount received or charged by an issuer under [§ 1693o-2(a)(2)], if—

> (i) such adjustment is reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions involving that issuer; and
>
> (ii) the issuer complies with the fraud-related standards established by the Board under [§ 1693o-2(a)(5)(B)], which standards shall—
>
> > (I) be designed to ensure that any fraud-related adjustment of the issuer is limited to the amount described in clause (i) and takes into account any fraud-related reimbursements (including amounts from charge-backs) received from consumers, merchants, or payment card networks in relation to electronic debit transactions involving the issuer; and
> >
> > (II) require issuers to take effective steps to reduce the occurrence of, and costs from, fraud in relation to electronic debit transactions, including through the development and implementation of cost-effective fraud prevention technology.

Id. § 1693o-2(a)(5)(A). See also id. § 1693o-2(a)(5)(B)(ii) (listing mandatory factors for the Board's consideration when issuing the fraud adjustment regulations).

## II.    The Board's 2010 Notice of Proposed Rulemaking

[¶ 11] Armed with its congressional directives, the Board issued a Notice of Proposed Rulemaking in 2010 setting forth (1) the type of costs the Board would allow issuers to recoup via the interchange fee; and (2) two alternative methods for calculating whether any interchange fee complies with the statute's general goal of ensuring the fee "is reasonable and proportional to the cost incurred by the issuer with respect to the transaction." Id. § 1693o-2(a)(3)(A). See Debit Card Interchange Fees and Routing, Proposed Rules, 75 Fed. Reg. 81,722 (Dec. 28, 2010) (the "Proposed Rule").

[¶ 12]  The cost categories the Board selected to be covered in the interchange fee caused—and continue to provoke—quite the hullabaloo. In the Proposed Rule, the Board explained it interpreted the Durbin Amendment as only permitting interchange fees to cover costs "specifically mentioned for consideration in the statute:" those "average variable cost[s]" associated with the ACS process

of a particular transaction. 75 Fed. Reg. at 81,734–35. <u>See also</u> 15 U.S.C. § 1693o-2(a)(4)(B)(i)

("[T]he incremental cost incurred by an issuer for the role of the issuer in the [ACS] of a particular

electronic debit transaction[] . . . shall be considered . . . .")." That said, the Board requested

comment on whether it should broaden its interpretation and allow the interchange fee to cover a

"third category" of costs—those costs specific to a particular transaction but not incremental ACS

costs. Proposed Rule, 75 Fed. Reg. at 81,734–35. Having the interchange fee cover this "third

category" of costs and increase issuers' interchange fee, the Board supposed, was neither explicitly

permitted nor excluded by the Durbin Amendment. <u>Id.</u> Accordingly, public debate was welcome.

<u>Id.</u>

[¶ 13]  The Proposed Rule presented two alternative methods for how networks could determine

issuers' interchange fees. Alternative 1 tethered each issuer's interchange fee to its average and

individualized ACS-related costs, subject to a safe harbor and fee cap. <u>Id.</u> at 81,726, 81,736–38

(explaining that calculating an issuer's actual cost per transaction would be "highly impracticable,"

so the better approach is to use the average per-transaction cost). Per Alternative 1, issuers with

average allowable ACS costs of 7 cents or less could automatically receive the 7-cents-per-

transaction safe harbor. <u>Id.</u> at 81,736. If an issuer's permissible costs were higher, those costs had

to be proven and could only be recovered up to the fee cap of 12 cents per transaction (roughly a

32-cent decrease when compared to the pre-regulation era). <u>Id.</u> at 81,726, 81,736–38. Alternative

2 proposed a streamlined approach: each issuer would receive the same interchange fee per

transaction (subject to the cap of 12 cents per transaction) regardless of the issuer's average cost

per transaction. Proposed Rule, 75 Fed. Reg. at 81,726.

[¶ 14]  The 12-cent cap and 7-cent safe harbor did not appear out of thin air. The Durbin

Amendment empowered the Board to require issuers and networks to "provide the Board with

such information as may be necessary to carry out" the Board's statutory directive. 15 U.S.C. § 1693o-2(a)(3)(B). Accordingly, the Board had (and still has) mountains of data at its disposal. After conducting surveys and reviewing data, the Board concluded roughly 80% of covered issuers would recoup their "per-transaction variable costs" if the fee were set at the 12-cent cap, while 50% of issuers' allowable costs would be accounted for by the 7-cent safe harbor. Proposed Rule, 75 Fed. Reg. at 81,737. As for those covered issuers with "substantially higher per-transaction costs than others" that were among the 20% not fully recouping their allowable costs from the 12-cent cap, the Board suggested their deficit was due to having "small programs targeted at high-net-worth customers or newer start-up programs that have not yet achieve economies of scale." Id. The Board further opined such high-rolling issuers were "unlikely" to be "recovering their per-transaction costs through interchange transaction fees" anyways. Id.

[¶ 15]  The Board received over 11,500 comments regarding its Proposed Rule. See Regulation II, 76 Fed. Reg. at 43,394. Merchants heavily favored the issuer-specific method of Alternative 1, contending issuers had "per-transaction [ACS] costs significantly below the proposed 12-cent cap" and suggesting the Board should lower the cap to 4 cents. Id. at 43,402. Issuers and networks, on the other hand, asked the Board to scrap the cap and "adopt a more flexible approach to the standard by prescribing guidelines." Id. These large banks and networks tended to favor Alternative 2's across-the-board cap and wanted to expand "the allowable cost base to include . . . payment guarantee costs, fraud losses, network processing fees, customer service costs, the costs of rewards, fixed costs, and a return on investment." Id.

### III.    Regulation II

[¶ 16]  Approximately seven months after the Proposed Rule was published, on July 20, 2011, the Board issued its final rule, titled "Regulation II" (pronounced "eye-eye"). Id. at 43,394. Regulation

- 8 -

II adopted the methodology of Alternative 2 but with a twist: networks could set a flat interchange fee with a cap of 21 cents per transaction plus an 0.05% *ad valorem* adjustment. Id. at 43,433–34.

[¶ 17]  The cap increased from the proposed 12 cents to the final 21 cents per transaction because the Board newly concluded, after reviewing thousands of comments, that § 1693o-2(a)(4)(B) was "ambiguous" and could be interpreted as allowing the Board to consider "any cost that is incurred in the course of effecting an electronic debit transaction." Regulation II, 76 Fed. Reg. at 43,426–27 (italics omitted). Although the statute explicitly mandates including only "incremental" ACS costs in the fee standard, see 15 U.S.C. § 1693o-2(a)(4)(B)(i), the Board explained what actually mattered was including costs that "related to a particular transaction," Regulation II, 76 Fed. Reg. at 43,427. In fact, the Board concluded it was unnecessary to define or categorize costs as "'incremental,' fixed or variable, or incurred in connection with authorization, clearance, and settlement" under this new rubric, particularly given that issuers use different cost-accounting systems and subjectively treat costs as fixed or variable. Id. Pursuant to its new statutory interpretation, the Board included the following four cost categories in its interchange fee standard: (1) transactions processing costs, whether fixed or variable, such as "equipment, hardware, software and associated labor" that enable the issuer to "maintain and use network connectivity to effect each transaction;" (2) network processing fees; (3) transaction-monitoring costs that seek to prevent fraud during the authorization process; and (4) fraud losses incurred by the issuer. Id. at 43,429–31.

[¶ 18]  In short, Regulation II expanded the world of allowable costs from a limited set explicitly mandated in the Durbin Amendment to "any cost that is not prohibited." Id. at 43,426.

**IV.    Initial Legal Challenges to Regulation II in the D.C. Circuit**

[¶ 19]  As expected, Regulation II found its way into court. See NACS v. Bd. of Governors of the Fed. Rsrv. Sys., 958 F. Supp. 2d 85 (D.D.C. 2013) ("NACS I"), rev'd, 746 F.3d 474. Retail industry trade associations and various businesses argued Regulation II's interchange fee was arbitrary, capricious, an abuse of discretion, and otherwise contrary to law. Id. Although operating under the then-required Chevron legal framework, the District Court for the District of Columbia generally agreed with the plaintiffs and concluded "the Board's interpretation is utterly indefensible" because "the statute is *not* silent or ambiguous" and the Durbin Amendment clearly forecloses Regulation II's fee standard. Id. at 106, 109.

[¶ 20]  That decision was reversed on appeal by the United States Court of Appeals for the District of Columbia Circuit. NACS II, 746 F.3d at 477. The court held "the Board's rules generally rest on reasonable constructions of the statute" pursuant to Chevron analysis. Id. at 477, 483. The circuit court, however, remanded "one minor issue" and told the Board to clarify how it chose to include transactions-monitoring costs in Regulation II's allowable costs given that the Durbin Amendment seemed to foreclose its inclusion in the fee standard. Id. at 477, 493 (explaining the Board needed to "articulate a reasonable justification for determining that transactions-monitoring costs properly fall outside the fraud-prevention adjustment").

[¶ 21]  Approximately one year later, the Board published its "Clarification" regarding transaction-monitoring costs. Debit Card Interchange Fees and Routing, Clarification, 80 Fed. Reg. 48,684 (Aug. 14, 2015) (the "Clarification"). The Board acknowledged transaction-monitoring costs are essentially fraud prevention costs already covered in the Durbin Amendment's fraud adjustment provision in § 1693o-2(a)(5). See id. at 48,685. That said, the Board justified its inclusion of certain transaction-monitoring costs in the interchange fee standard

because fraud prevention "is integral" to authorizing each transaction. <u>Id.</u> Per the Board's interpretation, the fraud adjustment provision would cover general fraud expenses because it references expenditures made "*in relation* to electronic debit transactions" while the interchange fee standard would include discrete fraud expenses tethered to a specific transaction. <u>Id.</u> at 48,686 (emphasis added) (quoting 15 U.S.C. § 16930-2(a)(5)(i)).

## V.    Corner Post's Litigation: Round I

[¶ 22]  Corner Post opened for business in 2018 as a truck stop and convenience store in Watford City, North Dakota. It accepts debit card payments from customers, including debit cards issued by big banks subject to Regulation II. As a small business, Corner Post quickly became disgruntled by interchange fees squeezing its profit margins.

[¶ 23]  The North Dakota Retail Association ("NDRA") and North Dakota Petroleum Marketers Association ("NDPMA") sought to challenge Regulation II on behalf of their members and chose Corner Post as their representative. They initiated the lawsuit in April 2021 and filed an amended complaint in July of that same year, naming Corner Post as the lead plaintiff and asserting two counts as grounds for relief. Doc. Nos. 1, 19. <u>See also</u> Doc. No. 24 (finding the Amended Complaint was properly filed at Doc. No. 19).

[¶ 24]  Count I alleged Regulation II violates Section 706 of the Administrative Procedure Act (the "APA") (5 U.S.C. § 706) because Regulation II is contrary to law and exceeds the Board's statutory authority given: (1) the Board included costs other than incremental ACS costs in the fee standard; (2) the Board included prohibited costs of "fixed ACS costs, fraud losses, transaction-monitoring costs, and network-processing fees" in the fee standard; and (3) the Board issued a universal fee cap rather than fee standards specific to each issuer and transaction. Doc. No. 19, pp. 32–34. Count II alleges Regulation II is arbitrary and capricious (and therefore, violates § 706 of

the APA) because: (1) the Board failed to properly consider or explain how the additional cost considerations related to the Durbin Amendment's mandate to "consider the functional similarity between" debit transactions and the traditional checking system, see 15 U.S.C. § 1693o-2(a)(4)(A); (2) the Board arbitrarily included four prohibited costs in the fee standard: "fixed ACS costs, fraud losses, transaction-monitoring costs, and network processing fees"; and (3) the Board failed to properly explain why it set the fee cap at a rate "significantly greater than issuers' actual incremental costs" given issuers' average processing costs were at or below 8 cents while the cap remained at 21 cents plus the *ad valorem* component. Doc. No. 19, pp. 34–37.

[¶ 25]  Next came the saga resulting in this case going to the United States Supreme Court. The Board moved to dismiss Corner Post's lawsuit because the applicable six-year statute of limitations had expired. See Doc. No. 20 (citing 28 U.S.C. § 2404(a)). Regulation II had been published as a final rule on July 20, 2011—almost ten years before NDRA and NDPMA initiated this lawsuit and more than six years before Corner Post opened its doors for business. Seeing how the statute of limitations had passed, this Court granted the Board's motion and the Court of Appeals for the Eighth Circuit affirmed. See Doc. Nos. 28, 32.

[¶ 26]  Corner Post successfully appealed to the Supreme Court. Corner Post, Inc., 603 U.S. at 804. The Supreme Court held the statute of limitations did not bar Corner Post's suit because Corner Post's claim accrued when it was injured by Regulation II, not when the rule became final long before Corner Post existed. Id. at 813 ("[I]njury, not just finality, is required to sue under the APA . . . ."). With the lawsuit revived, the Supreme Court reversed the Eighth Circuit's judgment and remanded the case to this Court. Id. at 825.

## VI.    Updates to Regulation II

[¶ 27]  While this case ricocheted between the Supreme Court and this Court, the Board made a few updates to Regulation II. Those updates do not affect the merits of this litigation, but they are nonetheless interesting.

[¶ 28]  In 2023, the Board issued a Notice of Proposed Rulemaking proposing to lower the interchange fee cap because issuers' data showed their costs had "declined significantly." Debit Card Interchange Fees and Routing, Notice of Proposed Rulemaking, 88 Fed. Reg. 78,100, 78,100 (Nov. 14, 2023) (the "2023 NPRM"). The Board steadfastly asserted its considerations and methodology "remain[ed] sound," so the update would simply lower the fee base component to 14.4 cents, the *ad valorem* component to 4.0 basis points, and the fraud prevention adjustment to 1.3 cents. Id. at 78,101. See also Debit Card Interchange Fees and Routing; Extension of Comment Period, 89 Fed. Reg. 5,438, 5,438 (Jan. 29, 2024) (extending the comment period until May 2024).

## VII.    Corner Post's Litigation: Round II

[¶ 29]  Corner Post's lawsuit marched on with Corner Post as the sole plaintiff while the associational plaintiffs—NDPMA and NDRA—were terminated as parties in September 2024. Doc. No. 39. On November 15, 2024, Corner Post filed its present Motion for Summary Judgment.[4] Doc. No. 50. Not long thereafter, the Board filed its cross-Motion for Summary Judgment. Doc. No. 57.

---

[4] Corner Post is not the only plaintiff seeking to vacate Regulation II. In the United States District Court for the Eastern District of Kentucky, a separate plaintiff—Linney's Pizza, LLC—seeks the same relief and shares legal counsel with Corner Post. See Linney's Pizza, LLC v. Bd. of Governors of the Fed. Rsrv. Sys., No. 3:22-cv-00071 (E.D. Ky. Feb. 19, 2025). The Kentucky litigation has similar pending cross-motions for summary judgment, but that court has not yet set a date for oral argument as of the filing of this order.

## **DISCUSSION**

[¶ 30]  Corner Post presents two main challenges to Regulation II pursuant to the APA. Doc. No. 51. First, Corner Post contends Regulation II is contrary to law because: (1) the Board improperly interpreted the Durbin Amendment's language to include the "third category" of costs in the fee standard; (2) the Board included four prohibited costs in the fee standard: fixed ACS costs, network processing fees, transaction-monitoring costs, and fraud losses; and (3) the Board established a universal fee cap instead of tailoring the fee to each issuer and transaction (an approach Corner Post labels as "issuer-specific and transaction-specific"). Second, Corner Post asserts Regulation II is arbitrary and capricious for similar reasons: (1) the Board did not properly consider the functional similarity between traditional checking systems and electronic debit transactions because checks clear essentially with no fees while debit transactions generate billions in interchange fees; (2) the Board refused to determine whether costs were incremental, fixed, variable, or incurred in the ACS process and cherry-picked certain costs to include in the fee standard; and (3) the Board failed to establish the interchange fee standard based on actual costs incurred by each issuer in each transaction.

[¶ 31]  To remedy these alleged wrongs, Corner Post requests the Court vacate Regulation II's fee standard but stay the vacatur for six months so the Board has time to issue a valid interchange fee standard. The Board, in turn, argues it is entitled to summary judgment because Congress granted the Board significant discretion to draft the fee standard in Regulation II even following the Supreme Court's decision of Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024) ("Loper Bright"), which eliminated the deferential legal framework for agencies set forth in Chevron. Additionally, the Board contends, it has fully complied with Congress's directives in the Durbin Amendment and appropriately exercised its discretion in accordance with the statute's text and

- 14 -

purpose. If, however, Corner Post prevails on procedural grounds, the Board requests the Court remand the case to the Board without vacatur so the Board may issue an additional clarification. Alternatively, if Corner Post prevails on substantive matters, then the Board asks for the vacatur to be stayed pending appeal. See Doc. No. 78, pp. 51:24–52:1.

## I.    Summary Judgment Standard

[¶ 32]  Summary judgment is appropriate when the movant demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If there is sufficient debate regarding relevant facts that could persuade a reasonable jury to find in favor of the nonmoving party, summary judgment is improper. See Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). Where a federal agency's actions are challenged pursuant to the APA, summary judgment is often used to resolve the dispute because the case generally hinges on questions of law rather than fact. See United Food & Com. Workers Union, Local No. 663 v. U.S. Dep't of Agric., 532 F. Supp. 3d 741, 768 (D. Minn. 2021).

[¶ 33]  Here, the Parties agree this case rests on matters of law and have not presented any disputes of material fact. Accordingly, this case is appropriate for summary judgment.

## II.    The Board's Statutory Interpretation Is Not Subject to Deferential Review

[¶ 34]  When this litigation began roughly fourteen years ago, the Parties were subject to the mire of Chevron deference. See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984), overruled by, Loper Bright, 603 U.S. at 412. That judicially-created framework directed courts to take a backseat to an agency's interpretation of law if there was a supposed statutory ambiguity. See id. Last year, however, the Supreme Court finally discarded Chevron deference and reinstituted courts' proper role in statutory interpretation when it issued its opinion in Loper

Bright. Now, even under Loper Bright's restored power to the judiciary, the Board argues Congress drafted the Durbin Amendment with the intention that the Board's statutory interpretation would be reviewed deferentially. Corner Post disagrees, contending the Board is improperly repackaging the defunct Chevron deference under a different name. The Court agrees with Corner Post.

[¶ 35]  Courts—not agencies—emphatically and completely fill the role of saying "what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803). Congress may delegate to an agency some discretionary authority for carrying out a statute's purpose, but the reviewing court still determines in the first instance if that delegation exists and, if so, the boundaries of that delegation. Loper Bright, 603 U.S. at 395 (tasking courts reviewing agency action under the APA "to independently interpret the statute and effectuate the will of Congress subject to constitutional limits"). An agency's claim of having expertise in the statute's subject area or holding the same statutory interpretation for a period of time "may" be helpful to the court's analysis, but the court is by no means bound to give deference to that interpretation. Id. at 394. After all, Congress said "the reviewing court shall decide all relevant questions of law" in APA actions. 5 U.S.C. § 706. Once a court concludes Congress properly granted an agency some particular discretion, then the court is tasked with evaluating whether the agency's action "was reasonable and reasonably explained." Seven Cnty. Infrastructure Coal. v. Eagle Cnty., 605 U.S. ____, 145 S. Ct. 1497, 1511 (2025) (explaining "when an agency exercises discretion granted by a statute, judicial review is typically conducted under the [APA's] deferential arbitrary-and-capricious standard").

[¶ 36]  Purported statutory ambiguities no longer change the legal calculus for how courts ought to review agency action. Loper Bright, 603 U.S. at 399–400 (stating the previous "presumption" that statutory ambiguity is an implicit delegation to the agency is undeniably improper). "[M]any or perhaps most statutory ambiguities may be unintentional" because Congress may not—or

sometimes cannot—"squarely answer the question at hand" or anticipate how clever parties will complicate a rather straight-forward phrase. Id. Regardless of whether intentionality or lapse of mind created the supposed ambiguity, only courts hold the expertise and constitutional permission to resolve it. Id. at 400. Accordingly, this Court—and not the Board—will determine the "best" interpretation of the Durbin Amendment because courts hold the monopoly "[i]n the business of statutory interpretation" and delineate the boundaries of an agency's authority. Id. at 395, 400.

[¶ 37]  Having established the roles of the Court and the Board, the Court must now decide whether the Durbin Amendment directs the Court to take the Board's suggested "hands-off" approach. The Court finds it does not. This is not to say the Board has zero discretion in regulating interchange fees, but Congress certainly did not hand the Board a blank check of discretion that it claims to have.

[¶ 38]  The Durbin Amendment is akin to a funnel—it starts with a broad purpose and narrows to particular boundaries for the Board's actions. Problematically, the Board wants to use the purpose to override the congressionally-constructed narrow boundaries. But just as a person cannot lop off the restrictive half of a funnel and expect it to function as originally designed, the Board cannot overlook or discard Congress's mandates and still implement the Durbin Amendment as Congress intended.

[¶ 39]  The Durbin Amendment opens by enabling the Board to "prescribe regulations[] . . . regarding any interchange transaction fee," to "implement this subsection," and to "prevent" affected parties from circumventing or evading the statute's oversight. 15 U.S.C. § 1693o-2(a)(1). If that were the statute's extent, then the Board might very well have the broad discretion it claims. But there is more. The following one-sentence subsection semi-narrows the Board's ability to prescribe regulations by instructing the interchange fee must also be "reasonable and proportional

to the cost incurred by the issuer with respect to the transaction." <u>Id.</u> § 1693o-2(a)(2). That sentence is also full of terms seeming to give the Board discretion, <u>see, e.g.,</u> <u>Reasonable</u>, <u>Black's Law Dictionary</u> (9th ed. 2009), but concluding discretion abounds without reading the statute's entirety is myopic and could render superfluous whole sections containing congressional mandates, <u>see</u> <u>Hibbs v. Winn</u>, 542 U.S. 88, 101 (2004) ("The rule against superfluities complements the principle that courts are to interpret the words of a statute in context.").

[¶ 40]  Indeed, the phrase "reasonable and proportional" does not exist in a vacuum—the Durbin Amendment details how the Board must assess whether an interchange fee is "reasonable" and "proportional." <u>See, e.g.,</u> 15 U.S.C. § 1693o-2(a)(4)(B). <u>But see</u> <u>Batterton v. Francis</u>, 432 U.S. 416, 425 (1977) (reviewing agency actions pursuant to a statute delegating an agency head express power to draft definitions of "unemployment" without any noted limitations on his discretion). Congress told the Board what it "shall" and "shall not" consider, what it "shall" "distinguish between," and with whom it "shall" consult to ensure fees meet the reasonable and proportional requirement. 15 U.S.C. § 1693o-2(a)(4). These "shall" and "shall nots" obliterate discretion. <u>See</u> <u>Bufkin v. Collins</u>, 604 U.S. ____, 145 S. Ct. 728, 737 (2025). Even more instructions, directions, and considerations for the Board's rulemaking follow in additional subparagraphs, resulting in clear boundaries for its regulations. <u>See, e.g.,</u> 15 U.S.C. § 1693o-2(a)(5).

[¶ 41]  Taking a step back to appreciate the Durbin Amendment's entirety, the best reading of §§ 1693o-2(a)(1) through (a)(3)(A)(1) is that they include generalized purpose statements or introductory paragraphs that are then narrowed and made precise. <u>See</u> <u>Loper Bright</u>, 603 U.S. at 408–09 ("The statute still has a best meaning, necessarily discernible by a court deploying its full interpretive toolkit."). They are not the Board's permission slip to draft regulations with presumed deferential review.

[¶ 42]  The Board's cited Interstate Commerce Commission rate-making cases where Congress delegated substantial discretion to that agency are inapposite and even cut against the Board's request for deference. See Doc. No. 58, pp. 21-22 (citing, for instance, 49 U.S.C. § 10701 and Alldredge Grain & Storage Co. v. ICC, 720 F.2d 480 (8th Cir. 1983)). Ironically, in both the Proposed Rule and Regulation II, the Board explained it would not rely on these now-cited statutes and cases involving public utility rate-making:

> Public utility rate-setting involves unique circumstances, none of which are present in the case of setting standards for interchange transaction fees. Issuers are unlike public utilities, which, in general, are required to make their services regularly available to the public. In addition, unlike in the case of public utilities where the utility's only source of revenue is the fees charged for the service or commodity, issuers have other sources, besides interchange fees, from which they can receive revenue to cover their costs of operations and earn a profit.

Proposed Rule, 75 Fed. Reg. at 81,733, n.44. See also Regulation II, 76 Fed. Reg. at 43,434 (noting terms like "just and reasonable" typically used in public utility rate cases are "term[s] of art" that Congress could have used if "it intended the Board to consider other ratemaking jurisprudence"). The Board now backtracks, perhaps because it is attracted to the deferential treatment given to those agencies. See, e.g., Iowa Pub. Serv. Co. v. ICC, 643 F.2d 542, 546 (8th Cir. 1981) ("Courts traditionally have applied a deferential standard in reviewing rate determinations by an agency[] . . . ."). The Board was correct in the first instance—those cases cannot grant the Board the discretion it desires.

[¶ 43]  Rate-making cases are inapplicable and disanalogous for multiple reasons already discussed by the Board. See Proposed Rule, 75 Fed. Reg. at 81,733, n.44. Not to mention the language and structure of rate-making statutes are distinct from the Durbin Amendment. Compare 49 U.S.C. § 10701, with 15 U.S.C. § 1693o-2. Even so, it is worth mentioning the Board is incorrect in suggesting courts traditionally gave wholesale discretion to rate-setting agencies. In

Iowa Public Service Company v. ICC, the Eighth Circuit acknowledged "[c]ourts traditionally have applied a deferential standard in reviewing rate determinations by an agency," but the court did not end its sentence there. 643 F.2d at 546. The Eighth Circuit continued: "[B]ut the courts have an obligation to determine whether the Commission's decision comports with applicable law, whether there is evidence in the record to support the Commission's findings, and whether the agency's rationale is both discernible and defensible." Id. That "obligation" the Eighth Circuit recognized shares numerous similarities to the Court's present and non-deferential review duties under Loper Bright. See 603 U.S. at 394–95. Accordingly, the Board's sudden reversal and reliance on rate-making cases do not further the Board's quest for deference writ large.

[¶ 44]  Finally, the Board contends Regulation II is subject to deferential review because Congress said so in 15 U.S.C. § 1693b(e)(2). That subsection states: "No provision of this subchapter may be construed as altering, limiting, or otherwise affecting the deference that a court affords to . . . the Board in making determinations regarding the meaning or interpretation of section 1693o-2 of this title." 15 U.S.C. § 1693b(e)(2). The Board has not identified any case interpreting this provision as it desires and neither has this Court. Section 1693b(e)(2)'s plain language does not require courts to give any particular deference to the Board. Congress does require, however, that courts decide all questions of law where agency action is involved. See 5 U.S.C. § 706. The Supreme Court has further instructed courts how to do that job: to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." Loper Bright, 603 U.S. at 412.

[¶ 45]  None of the reasons cited by the Board—either collectively or individually—indicate the Durbin Amendment requires the Court to comply with the Board's request for deference. This

does not mean Congress gave the Board zero discretion in its rulemaking, but Congress certainly did not hand over the statute to the Board's whims. See id. at 412–13.

### III.    The Board's Inclusion of the "Third Category" of Costs in Regulation II Contradicts the Durbin Amendment

[¶ 46]    The Board promulgated Regulation II contrary to Congress's express mandate by including the "third category" of allowable costs in the interchange fee standard. To justify its expansive interpretation, the Board argues the Durbin Amendment's purpose and portions of its text make the inclusion of certain non-ACS-but-still-transaction-specific costs the best way to set a reasonable and proportional interchange fee. See Doc. No. 58, pp. 23–24 (abandoning the statutory ambiguity argument since the Supreme Court's decision in Loper Bright). On the other hand, Corner Post contends Congress drafted a strictly bifurcated system: the Board must include incremental ACS costs in the fee standard and exclude all others. After exhausting "every tool at [the Court's] disposal to determine the best reading of the statute and resolve any ambiguity," Union Pac. R.R. Co. v. Surface Transp. Bd., 113 F.4th 823, 833 (8th Cir. 2024) (alteration omitted) (quoting Loper Bright, 603 U.S. at 400), the Court concludes the Durbin Amendment prohibits the inclusion of any cost in the interchange fee standard other than the incremental ACS cost of a transaction, 15 U.S.C. § 1693o-2(a)(4)(B)(i).

### A.    The Restrictive Versus Descriptive Grammar Debate Is Unhelpful

[¶ 47]    "When interpreting a statute, [the Court must] begin with the text." Lackey v. Stinnie, 604 U.S. _____, 145 S. Ct. 659, 666 (2025). The Parties rightly begin their textual battle in the statute's key subsection where Congress told the Board what it "shall" and "shall not" do. 15 U.S.C. § 1693o-2(a)(4)(B). Ultimately, however, this restrictive versus descriptive debate goes by the wayside because Congress inconsistently used "which," "that," and commas throughout the Durbin Amendment.

[¶ 48]  The operative subsection with Congress's key mandates says:

> **(4) Considerations; consultation**
>
> In prescribing regulations under [§ 1693o-2(a)(3)(A)], the Board shall--
>
> * * *
>
>> (B) distinguish between--
>>
>>> (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and
>>>
>>> (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2)[.]

Id. Here is where careful attention in English class regarding the use of "which" versus "that" and comma versus no comma might have been particularly useful. Notice in § 1693o-2(a)(4)(B)(ii) how Congress excluded those costs "which are not specific to a particular electronic debit transaction." Id. § 1693o-2(a)(4)(B)(ii). This phrase is "restrictive" in the Board's perspective—it defines the narrow category of costs Congress excluded from the fee standard and opens the doors to others' inclusion. See NACS II, 746 F.3d at 485 ("As their labels suggest, descriptive clauses explain, while restrictive clauses define."). In Corner Post's interpretation, that phrase is descriptive—it merely describes a non-exhaustive example of excluded costs. See id. Corner Post essentially contends Congress excluded "[*all*] other costs incurred by an issuer [*including those*] not specific to a particular electronic debt transaction." 15 U.S.C. § 1693o-2(a)(4)(B)(ii).

[¶ 49]  Grammatically-conscious writers typically begin a descriptive clause with the word "which" and set it apart with commas. See NACS II, 746 F.3d at 485–86, 487–88 (noting there may be exceptions where "which" may be restrictive, but the word is predominately used in descriptive clauses). Restrictive clauses, on the other hand, start with a "that" and are not

sandwiched by commas. See <u>Mumid v. Abraham Lincoln High School</u>, 618 F.3d 789, 798–99 (8th Cir. 2010) (citing various grammar sources describing the differences between "that" and "which"). For instance, the Smith's picnic, *which* included ham, had a wider variety of delicacies than the Johnson's picnic *that* had ham (and probably left the Johnson family members wishing they had joined forces with the Smiths so they could enjoy foods other than ham). The unfortunate reality is substituting "*which* for *that* is perhaps the most common blunder with these words," <u>United States v. Transocean Deepwater Drilling, Inc</u>., 767 F.3d 485, 494 (5th Cir. 2014) (alteration omitted) (quoting Bryan A. Garner, <u>Garner's Dictionary of Legal Usage</u> 889 (3d ed. 2011)), and Congress made its fair share of such blunders in the Durbin Amendment.

[¶ 50] The debated cost clause has the unorthodox mixture of starting with "which" (a "descriptive" feature) but lacks commas on its either side (a "restrictive" feature). See 15 U.S.C. § 1693o-2(a)(4)(B)(ii). <u>See also</u> <u>Mumid</u>, 618 F.3d at 798–99 (discussing "descriptive" versus "restrictive" grammar). When the D.C. Circuit reviewed the same clause in <u>NACS II</u>, that court ultimately determined it was restrictive for two reasons: (1) Congress introduced another "clearly restrictive" clause in the Durbin Amendment with a "which"; and (2) it seemed elsewhere "Congress set aside every clearly descriptive clause with commas." 746 F.3d at 487. In other words, the D.C. Circuit believed Congress's blunders were sufficiently consistent such that it could confidently determine a clause's restrictive or descriptive nature. See <u>id.</u> This Court disagrees.

[¶ 51]  Congress's consistency in inconsistently using proper restrictive and descriptive grammar makes it an unreliable tool of interpretation. Where Congress obviously meant to draft a restrictive clause to ensure issuers and networks could not create a pseudo-monopoly on debit cards, it unfortunately used the descriptive "which." See 15 U.S.C. § 1693o-2(b)(1)(A)(ii) (prohibiting issuers and networks from programming debit cards exclusively for a network or "2 or more such

networks *which* are owned, controlled, or otherwise operated by" certain affiliates (emphasis added)). Congress knew, however, a restrictive clause starts with a "that" and has no commas because the Durbin Amendment excludes from regulation "any issuer *that*, together with its affiliates, has assets of less than [\$10 billion]." Id. § 1693o-2(a)(6)(A) (emphasis added). Congress drafted a few grammatically proper descriptive clauses, as the D.C. Circuit noted, see NACS II, 746 F.3d at 487 (highlighting Congress properly wrote the descriptive clause of "which costs shall not be considered" in § 1693o-2(a)(4)(B)(ii)), but counterexamples undercut any alleged grammatical consistency of "which" versus "that" in the Durbin Amendment, see, e.g., 15 U.S.C. § 1693o-2(a)(7)(A)(ii)(I) (using a descriptive "which" with no commas in a what should be a restrictive phrase). Ultimately, the Durbin Amendment's commas and articles are not reliable tools for chiseling away at the statute's meaning because Congress did not draft the statute with the attention to detail of a puritanical grammarian.

**B.  The Durbin Amendment's Structure and Plain Language Clearly Evidence a Bifurcated Cost System**

[¶ 52]  Setting aside the grammar debate, the Parties argue differing subsections hold the key to unlocking the Durbin Amendment. The Board contends the statute's purpose allows the Board to consider more than incremental ACS costs in the interchange fee standard. Corner Post, in turn, argues § 1693o-2(a)(4)(B)'s detailed instructions for including particular costs and excluding others means incremental ACS costs must be considered and everything else is off limits.

[¶ 53]  It bears repeating that context is key because "[i]nterpretation of a word or phrase depends upon reading the whole statutory text." Dolan v. U.S. Postal Serv., 546 U.S. 481, 486 (2006). After having considered each section in its context and the Durbin Amendment's language, the Court finds the best interpretation is Congress established a bifurcated system only permitting the Board

- 24 -

to include incremental ACS costs in the interchange fee standard. <u>See</u> 15 U.S.C. § 1693o-2(a)(4)(B).

### 1. The Durbin Amendment's Structure Indicates Only Incremental ACS Costs Are Allowable Costs

[¶ 54] Congress instructed "any interchange transaction fee . . . shall be reasonable and proportional to the cost incurred by the issuer," but that generic "cost" reference was not the final word. 15 U.S.C. § 1693o-2(a)(2). <u>See also</u> <u>id.</u> § 1693o-2(a)(3)(A) (using similar language under the subheading of "In [G]eneral"). After Congress mentioned the statute's purpose and set deadlines for when the Board must issue regulations—all within the statute's first three sentences where generic "cost" references appear—it noticeably narrowed the focus to incremental ACS costs. <u>See</u> <u>id.</u> §§ 1693o-2(a)(1)–(3)(A).

[¶ 55] Congress understood the Board needed access to issuer and network data in order to appropriately regulate the debit card industry. So, immediately after taking care of preliminary matters in the statute's first three sentences, Congress authorized the Board to retrieve "such information as may be necessary" from issuers and networks. <u>Id.</u> § 1693o-2(a)(3)(B). But here is where Congress pivoted from discussing costs in general terms to honing-in on incremental ACS costs. Despite the Board having access to immense data, Congress demanded the Board issue regular public reports only about "costs incurred" in relation to the ACS process. <u>Id.</u> Congress also insisted the Board issue ACS cost reports when it published the interchange transaction fee rules— similar to how a teacher requires his students to provide their sources when submitting a project. <u>Id.</u> Even in this information collection section that does not govern the Board's considerations for the interchange fee standard, Congress was making its intention clear. Congress plainly wanted the Board to establish interchange fees reasonable and proportional to one particular set of costs: ACS costs.

[¶ 56]  The fact the "Information collection" provision does not expressly command the Board to collect and publish data on "incremental" ACS costs is inconsequential. But see NACS II, 746 F.3d at 488 (brushing aside § 1693o-2(a)(3)(B) because "the word 'incremental' appears nowhere" in that particular subsection). First, the primary purpose of the "Information collection" provision is to inform the Board of market prices and practices of debit card issuers and networks before it regulates them. See 15 U.S.C. § 1693o-2(a)(3)(B). That subsection does not dictate which costs the Board must include or exclude when calculating an interchange fee—that comes later in the statute. See id. § 1693o-2(a)(4). Second, the "Information collection" provision requires public disclosure of competing companies' private information, so Congress understandably gave the Board leeway in publishing ACS-related cost data it "considers appropriate and in the public interest." Id. § 1693o-2(a)(3)(B). If "incremental" ACS costs are appropriate for publication, then so be it, but if not, then Congress gave the Board discretion in publishing "aggregate or summary information" relating to general ACS costs likely to protect competition. Id. In sum, the "Information collection" provision provides concrete evidence Congress wanted to tether interchange fees to ACS costs—not just any costs.

[¶ 57]  But that is not the end of the Durbin Amendment's cost-related instructions. The Durbin Amendment's paramount authority for determining which costs are included in the Board's interchange fee standard is found immediately below the "Information collection" and is aptly titled "Considerations; consultation." See id. § 1693o-2(a)(4). To put this subsection in structural perspective, Congress inserted these mandatory "[c]onsiderations" only after authorizing the Board to regulate interchange fees, ensuring the Board was market savvy, and telling the Board its public reports and rules needed to be supported by ACS cost data. Stated differently, Congress methodically prepared the Board to arrive at the "Considerations" subsection with the

understanding it could only include "incremental [ACS] cost[s]" in the fee standard. Id. § 1693o-2(a)(4)(B)(i). "Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 353 (2013).

[¶ 58]  The "Consideration" subsection has primary authority to determine included and excluded costs due to two primary reasons. First, it says so. 15 U.S.C. § 1693o-2(a)(4). Congress wrote that "[i]n prescribing regulations *under paragraph (3)(A)*, the Board shall" consider incremental ACS costs and "shall not" consider "other costs." Id. (emphasis added). Paragraph (3)(A) is a favorite of the Board's because it generically refers to "cost." Id. § 1693o-2(a)(3)(A) ("The Board shall prescribe regulations . . . to establish standards for assessing whether . . . any interchange transaction fee . . . is reasonable and proportional to the cost incurred by the issuer . . . ."). But the "Consideration" subsection forces paragraph (3)(A)'s generic "cost" reference to be sorted into either "incremental [ACS] cost[s]" that "shall be considered" or "other costs" that "shall not" be considered. Id. § 1693o-2(a)(4)(B). The Board's other favorite subsection with a generic cost reference—§ 1693o-2(a)(2)—is also subject to the same fate. This is because the "Considerations" subsection requires paragraph (3)(A) to withstand the cost sorting, and paragraph (3)(A) references paragraph (a)(2), so both of their "cost" references get roped into being either a required incremental ACS cost or a prohibited "other cost." Id. § 1693o-2(a)(4)(B). It is all connected. Congress cross-referenced the subsections to erase any doubt that all regulations had to funnel through the "shall" and "shall not" of the "Considerations" subsection. See Bufkin, 145 S. Ct. at 737 (explaining "shall" sets forth a "mandatory command").

[¶ 59]  The second reason for the "Considerations" subsection's authority originates from a general rule of statutory interpretation prohibiting a statute's "purpose—even purpose as most narrowly defined—[from being] used to contradict text or to supplement it." Antonin Scalia &

Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 57 (2012). The Board improperly argues the preliminary provisions with their generic cost references should be used to overlook the "Considerations" provision's specific references to incremental ACS cost because Congress wanted to arrive at a "reasonable and proportional" fee standard. See Doc. No. 58, pp. 23–24. But, as already explained, Congress told the Board how to achieve that "reasonable and proportional" goal: filter cost considerations through § 1693o-2(a)(4)(B) and only include incremental ACS costs. In sum, the Durbin Amendment's structure indisputably makes the "Considerations" subsection in § 1693o-2(a)(4) authoritative on which costs the Board shall and shall not include in the interchange fee standard.

[¶ 60]  The Board's argument, however, is not fully refuted by looking at the statutory structure.

### 2. The Durbin Amendment's Plain Language Forecloses the Board's Interpretation

[¶ 61]  The Board acknowledges incremental ACS costs must be included in the fee standard but argues other costs specific to a particular electronic debit transaction *may* also be included. It is undeniably creative how the Board found wiggle room in the statute's commands that certain costs "shall be considered" while others "shall not" to conclude a third category of costs *may* be considered. See 15 U.S.C. § 1693o-2(a)(4)(B). A creative response, however, is not always correct.

[¶ 62]  As Corner Post highlights, the "Considerations" subsection in § 1693o-2(a)(4) contains several textual red flags signaling it only allows consideration of one cost category and excludes all others. But see NACS II, 746 F.3d at 487–88 (brushing aside certain "textual support" undermining the Board's position, in significant part, due to the now-overruled Chevron framework). This is not a novel interpretation. See NACS I, 958 F. Supp. 2d at 100 (concluding the Durbin Amendment has a bifurcated cost system). For the reasons set forth below, this Court agrees the statutory language definitively "bifurcate[s] the entire universe of costs associated with

- 28 -

interchange fees" and permits the Board to only consider incremental ACS costs in its interchange fee standard. Id.

[¶ 63]  First, Congress began the subsection with a mandate: "the Board shall . . . distinguish between" two listed cost categories. 15 U.S.C. § 1693o-2(a)(4)(B). Three loaded words exist in that short command: shall, distinguish, and between. "It is undisputed that the word 'shall' imposes a mandatory command." Bufkin, 145 S. Ct. at 737. "Distinguish" requires the Board "[t]o make a distinction." Distinguish, Black's Law Dictionary, (9th ed. 2009). And finally, "between" typically refers to two options while "among" expands the list of choices. Compare Allen v. Milligan, 599 U.S. 1, 13 (2023) ("Seeking to navigate any tension *between* the two . . . .") (emphasis added), with, id. at 32 ("[E]xplaining that 'the use of an express racial target' was just one factor *among* others . . . ." (emphasis added) (quoting Bethune-Hill v. Virginia State Bd. of Elections, 580 U.S. 178, 192 (2017))). Accordingly, Congress said the Board must make a distinction between two— and only two—options because those are the complete list of choices following the command to "distinguish between." 15 U.S.C. § 1693o-2(a)(4)(B) (listing (i) and (ii) as the items to "distinguish between").

[¶ 64]  Second, Congress plainly told the Board one cost option "shall be considered" in the interchange fee standard while the other "shall not." 15 U.S.C. § 1693o-2(a)(4)(B). There is no elbowroom for an implied third discretionary cost consideration (a "may consider" option) where Congress listed two options and cabined those options with a mandatory "shall" and "shall not." See Bufkin, 145 S. Ct. at 737 (explaining "shall" evaporates the possibility of discretion).

[¶ 65]  Congress does not "hide elephants in mouseholes." Whitman v. Am. Trucking Ass'ns, Inc., 531 U.S. 457, 468 (2001). That is a playful way of saying Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions" or invisible clauses. Id. The

Durbin Amendment was enacted to rein-in big banks' ballooning interchange fees, so Congress was naturally cautious in detailing what "shall" and "shall not" be included when regulating said fees. See Corner Post, Inc., 603 U.S. at 805 (explaining the Durbin Amendment's origins); see also TCF Nat'l Bank v. Bernanke, 643 F.3d 1158, 1164–65 (8th Cir. 2011) (explaining the Durbin Amendment was enacted, in part, "to prevent retailers and consumers from having to bear a disproportionate amount of costs of the debit card system"). Congress did not hide an "easter egg" of a third cost category in the Durbin Amendment, particularly when those additional costs would benefit banks at the expense of merchants and consumers. The Board should not have been puzzled by the Durbin Amendment's "silence" about how to include this "third category" of costs because Congress expressly excluded them. See Regulation II, 76 Fed. Reg. at 43,426 (contending the Durbin Amendment was somehow "silent" about "how these [newfound] costs should be considered").

[¶ 66]  Congress certainly could have drafted the Durbin Amendment more precisely, but courts "do not demand (or in truth expect) that Congress draft in the most translucent way possible." Pulsifer v. United States, 601 U.S. 124, 137 (2024). The Board argues if Congress intended the Durbin Amendment to have a bifurcated cost system, it would have said so as plain as day. Congress would have written, for instance, "[all] other costs incurred by an issuer . . . shall not be considered" and omitted the phrase "which are not specific to a particular electronic debit transaction." 15 U.S.C. § 1693o-2(a)(4)(B)(ii). Instead, the Board contends, Corner Post's bifurcated interpretation makes Congress's restrictive phrase of "which are not specific to a particular electronic debit transaction" mere surplusage. Id. The Court disagrees.

[¶ 67]  As already explained, Congress's inconsistencies make restrictive and descriptive grammar an unreliable interpretive tool for the Durbin Amendment's interpretation. Even if Corner Post's

bifurcated interpretation makes those ten words surplusage, the "canon against surplusage is not an absolute rule." In re Simply Essentials, LLC, 78 F.4th 1006, 1009 (8th Cir. 2023) (quoting Marx v. Gen. Revenue Corp., 568 U.S. 371, 385 (2013)). Congress was obviously focused on tethering issuers' interchange fees to costs associated with "particular electronic debit transaction[s]," 15 U.S.C. § 1693o-2(a)(4)(B)(ii), so "[i]t is not unreasonable that Congress would repeat itself in order to ensure the results it intended were followed," In re Simply Essentials, LLC, 78 F.4th at 1009. The Court must "presume that the legislature says in a statute what it means and means in a statute what it says there." BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004) (alteration omitted) (quoting Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253–54 (1992)). That presumption—and the Durbin Amendment's express language—means Congress forbade the Board's newfound cost category.

### C. The Durbin Amendment's Legislative History Confirms the Statute's Bifurcation

[¶ 68]   Statements from the Durbin Amendment's principal author further confirm the Board may only consider incremental ACS costs when setting the interchange fee standard. Although Senator Richard Durbin's statements are unnecessary to prove this point, they put the cherry on top. See Scalia & Garner, supra, at 388 ("[L]egislative history can be consulted to . . . establish that it is indeed thinkable that a particular word or phrase should mean precisely what it says."). As part of the Durbin Amendment's congressional record, Senator Durbin stated:

> [Section 1693o-2(a)(4)] makes clear that *the cost* to be considered by the Board in conducting its reasonable and proportional analysis *is the incremental cost incurred by the issuer for its role in the authorization, clearance, or settlement of a particular electronic debit transaction*, as opposed to other costs incurred by an issuer which are not specific to the authorization, clearance, or settlement of a particular electronic debit transaction.

156 Cong. Rec. S5902, S5925 (daily ed. July 15, 2010) (statement of Sen. Richard Durbin) (emphases added). He later reiterated the "reasonable and proportional fee amount [for the interchange fee standard] is based" upon "the incremental issuer costs." Id. From the lips of the statute's principal sponsor to the law's words on paper (but most importantly, on paper), the Durbin Amendment clearly prohibits the consideration of any cost except for incremental ACS costs in the Board's reasonable and proportional fee analysis. See 15 U.S.C. § 1693o-2(a)(4)(B).

## IV. Regulation II's Four Additional Cost Considerations in the Interchange Transaction Fee Are Prohibited by the Durbin Amendment

[¶ 69] Even in so finding the Durbin Amendment bifurcates the cost considerations, the Court still needs to address whether the Board properly included four specific costs in Regulation II. This is because the Board considers portions of such costs to be "incremental ACS costs." Doc. No. 58, pp. 28–29 (describing transaction-monitoring costs as "part and parcel of the authorization process"). These costs are known as "fixed ACS costs, transaction-monitoring costs, issuer fraud losses, and network processing fees." Id. See also Regulation II, 76 Fed. Reg. at 43,429–31. For the reasons stated herein, the Board's inclusion of these four costs runs afoul of the Durbin Amendment. See 5 U.S.C. § 706(2).

### A. Fixed ACS Costs

[¶ 70] Fixed ACS costs are not, by definition, "incremental [ACS] cost[s]." 15 U.S.C. § 1693o-2(a)(4)(B)(i). See Regulation II, 76 Fed. Reg. at 43,429–30 (noting examples of such costs are "equipment, hardware, software and associated labor"). The Board does not outright argue the two are equivalent, but it implies as much by contending the definition of "fixed" and "incremental" do not matter. It explains setting universal definitions for "fixed," "incremental," or "variable" costs is unworkable because issuers have differing cost accounting systems. Ironically, the Board makes this argument all the while labeling certain costs as "fixed" in its brief and noting in

Regulation II that issuers have categorized certain costs as "fixed" and "variable" when responding to the Board's data requests. See, e.g., Doc. No. 58, p. 28; see also Regulation II, 76 Fed. Reg. at 43,429. Another reason the Board finds it unnecessary to define costs is, pursuant to its interpretation, the Durbin Amendment's requirements are satisfied so long as the "costs [are] related to a particular transaction" regardless of the cost's label. Regulation II, 76 Fed. Reg. at 43,426 (declining to define "'incremental,' fixed or variable, or incurred in connection with authorization, clearance, and settlement").

[¶ 71]  But definitions matter—especially when Congress mandates only a particular type of cost be considered and all others "shall not." See 15 U.S.C. § 1693o-2(a)(4)(B). Fixed ACS costs do not fit the bill here. They are not, by the Board's own admission, "incremental [ACS] cost[s]" associated with "a particular electronic debit transaction," id. § 1693o-2(a)(4)(B), so their inclusion is plainly contrary to the Durbin Amendment's mandate and must be set aside, see 5 U.S.C. § 706(2). See also Fixed Cost, Black's Law Dictionary (9th ed. 2009) (defining "fixed cost" as "A cost whose value does not fluctuate with changes in output or business activity; esp., overhead expenses such as rent, salaries, and depreciation.").

### B.  Transaction-Monitoring Costs

[¶ 72]  "[T]ransaction-monitoring costs" is essentially another name for fraud prevention costs. See Doc. No. 58, p. 29. These costs are associated, for example, with systems "providing information to the issuer before the issuer decides to approve or decline the transaction." Regulation II, 76 Fed. Reg. at 43,430. Congress dedicated several subsections to regulating interchange fees and then, in a separate provision, tacked on a bonus "adjustment to the [interchange] fee amount received or charged by an issuer" only if the issuer complied with certain fraud prevention measures. Compare 15 U.S.C. §§ 1693o-2(a)(1)–(4), with id. § 1693o-2(a)(5).

Congress aptly titled that bonus fraud adjustment provision, "Adjustments to interchange transaction fees for fraud prevention costs." Id. Despite Congress's clear directions, the Board contends transaction-monitoring costs (i.e., fraud prevention costs) should be accounted for in the interchange fee.

[¶ 73]  More specifically, the Board posits transaction-monitoring costs may be partially covered in the fraud adjustment provision and partially in the interchange fee standard because fraud prevention is "part and parcel of the authorization process." Doc. No. 58, p. 29. See also Regulation II, 76 Fed. Reg. at 43,430 (explaining transaction-monitoring systems provide information about whether "to approve or decline the transaction"). Some semantic gymnastics ensue as the Board attempts to justify its position. In the Board's view, the fraud adjustment subsection covers all general or overhead costs associated with transaction monitoring because that subsection refers to "costs incurred . . . *in relation to* electronic debit *transactions*"—a generic and plural description. 15 U.S.C. § 1693o-2(a)(5)(A)(i) (emphases added). The interchange fee standard, according to the Board, embraces the remaining variable transaction-monitoring costs because it narrows includable costs to only those associated with "a particular electronic debit transaction"—a specific and singular description. Id. § 1693o-2(a)(4)(B)(i). Corner Post obviously disagrees. It highlights transaction monitoring systems merely "assist" the authorization process, so they are at best "a fraud-prevention activity that occurs *during* authorization" and their costs may only be covered in the fraud prevention adjustment. Doc. No. 62, p. 22 (quoting Clarification, 80 Fed. Reg. at 48,685). The Court agrees with Corner Post and concludes the fraud adjustment provision subsumes all transaction-monitoring costs.

[¶ 74]  Congress did not split hairs when it came to fraud prevention costs. The fraud adjustment provision is intentionally nestled immediately below the interchange fee section because it is a

*possible* bonus to issuers only if they satisfy two conditions: (1) the adjustment is determined to be "reasonably necessary" for that particular issuer; and (2) "the issuer complies with the fraud-related standards established by the Board." 15 U.S.C. § 1693o-2(a)(5)(A). Issuers must earn the fraud adjustment bonus, not be handed it. See, e.g., 156 Cong. Rec. at S5925 ("[F]raud prevention costs would not be considered as part of the incremental issuer costs upon which the reasonable and proportional fee amount is based."). The reason is obvious from the text: Congress wanted a "carrot" to ensure issuers complied with certain fraud-related standards designed to effectively "reduce the occurrence of, and costs from, fraud." See 15 U.S.C. § 1693o-2(a)(5)(A)(ii). Why should issuers receive a bonus if their fraud prevention measures are sub-par? The Board lacks a compelling comeback. Instead, it reiterates transaction monitoring is essential in the authorization process so its related costs should be included in the interchange fee. Doc. No. 70, pp. 14–16.

[¶ 75] Congress, however, understood how fraud prevention functions in the authorization process and still restricted recouping fraud costs to the adjustment provision. For instance, among the factors the Board is required to consider when issuing regulations for implementing the fraud adjustment provision, it must evaluate how fraud occurs during the authorization process. 15 U.S.C. § 1693o-2(a)(5)(B)(ii)(II). The Board is also required to investigate if interchange fees' price tag has historically "reduced or increased incentives for parties involved in electronic debit transactions to reduce fraud." Id. § 1693o-2(a)(5)(B)(ii)(VI). Congress plainly knew fraud prevention is crucial in the authorization process and that an interchange fee with no strings attached might not incentivize issuers to invest in effective (but expensive) fraud prevention measures. Accordingly, it drafted the conditional and comprehensive fraud prevention adjustment.

[¶ 76]  The Board has now had three opportunities to justify its inclusion of transaction-monitoring costs in the interchange fee standard—once before the D.C. District Court, another time before the

D.C. Circuit, and now before this Court—and not one court has agreed with its interpretation because the fraud adjustment provision is comprehensive. <u>See NACS I</u>, 958 F. Supp. 2d at 107–08; <u>NACS II</u>, 746 F.3d at 492. Apparently, third time is not a charm.

### C. <u>Fraud Losses</u>

[¶ 77]   Fraud losses—separate from fraud prevention costs—also made their way into the interchange fee standard because the Board reasoned losses are necessarily specific to a particular transaction because no loss would have occurred "but for" the transaction's authorization, clearance, and settlement. Doc. No. 58, p. 31. <u>See also</u> Regulation II, 76 Fed. Reg. at 43,431 (explaining fraud losses were included as the *ad valorem* component in the interchange fee standard because their value "varies with the amount of the transaction"). Corner Post argues fraud *losses* are not *costs*, they are improperly included as an insurance policy in the interchange fee standard, and their inclusion undermines Congress's goal to incentivize issuers to prevent fraud. The Court concurs with Corner Post.

[¶ 78]   The Board's inclusion of fraud losses could pass muster "but for" the Durbin Amendment's language and structure. First, fraud losses are not "cost[s]." 15 U.S.C. § 1693o-2(a)(4)(B)(i). The Board and Corner Post engage in a battle of "cost" definitions, but even the Board's definition that a cost may be a "*loss* or penalty involved in gaining something" acknowledges "cost" is the *certain* or agreed-upon up-front loss you accept to gain something (e.g., if the child inserts the requisite quarter into the arcade game, then she gains the right to play)—"cost" is not an insurance policy to compensate for *potential* after-the-fact losses. Doc. No. 58, p. 32 (emphasis added) (quoting <u>The Merriam Webster Dictionary</u> 90 (2009)).

[¶ 79]   Second, fraud losses are not "cost[s] *incurred by an issuer* for the *role of the issuer* in the [ACS] of a particular electronic debit transaction." 15 U.S.C. § 1693o-2(a)(4)(B)(i) (emphases

added). This characteristic is required of all costs allowed in the interchange fee standard. Id. The Board conceded this reality when it explained "the exact source of fraud often is unknown" and "network rules allocate responsibility for fraudulent transactions." Regulation II, 76 Fed. Reg. at 43,431. As the Board states, the scenario is entirely possible that a fraud loss would not be the result of an issuer's actions and a network could determine the merchant (not the issuer) should bear the loss. Id. Accordingly, the Board's automatic fraud loss compensation to issuers directly contravenes the Durbin Amendment by paying issuers even for *potential* losses they did not cause and might not have to incur. See 15 U.S.C. § 1693o-2(a)(4)(B)(i).

[¶ 80]  Finally, including fraud losses in the interchange fee standard undermines the efficacy and purpose of the fraud prevention adjustment in § 1693o-2(a)(5). The Board brushes this point aside because the adjustment provision addresses "fraud *prevention* rather than *losses*," Doc. No. 58, p. 33, but a closer reading of the statute says otherwise. The fraud prevention adjustment explicitly anticipates issuers will experience fraud losses and commands the Board to take care of such losses via the adjustment. See, e.g., 15 U.S.C. § 1693o-2(a)(5)(A)(ii)(I). Indeed, the adjustment provision tells the Board its fraud-prevention standards for issuers must "take[] into account any fraud-related reimbursements" and consider "the costs of fraudulent transactions absorbed by each party involved in such transactions." Id. §§ 1693o-2(a)(5)(A)(i)(I), (a)(5)(B)(ii)(V). The precise word "loss" may not appear there, but reimbursement for fraud losses is certainly covered *and* contingent on issuers complying with particular fraud prevention measures. See Id. § 1693o-2(a)(5)(A)(ii). The Board's anticipatory payments to issuers for potential fraud losses without ensuring issuers comply with fraud prevention measures is an *ultra vires* act that cannot stand.

### D.  **Network Processing Fees**

[¶ 81]  Network processing fees are fairly self-explanatory: they are fees charged by networks for processing electronic debit transactions. See NACS II, 746 F.3d at 479; see also Regulation II, 76 Fed. Reg. at 43,430 (noting "network processing fees" include "switch fees"). Networks typically charge both acquirers (i.e., merchants' banks) and issuers these fees because both parties use the networks' pathways to send transactional information. See Proposed Rule, 75 Fed. Reg. at 81,725. The Board's Proposed Rule initially excluded network processing fees from the interchange fee standard because acquirers (and their clients, the merchants) would effectively be paying for their own use of the networks' pathways plus the issuers' use. Id. at 81,735. "That is, an acquirer would pay its own network processing fees directly to the network and," because issuers tend to pass-on their fees to merchants and consumers, the acquirer "would indirectly pay the issuer's network processing fees through the allowable costs included in the interchange fee standard." Id. This was an unacceptable outcome, but only for a time.

[¶ 82]  The Board reversed course when it issued Regulation II. Network processing fees became an allowable cost because the Board reasoned: (a) an issuer could not complete the ACS process for any transaction if it did not use networks' pathways to communicate; (b) using their pathways to process a transaction requires a particular payment; (c) therefore, issuers incur network processing fee costs for their own role in each transaction. See Regulation II, 76 Fed. Reg. at 43,430; see also Doc. No 58, pp. 33–34. In doing so, the Board violated several provisions of the Durbin Amendment.

[¶ 83]  First, network processing fees are not "incurred by an issuer *for the role of the issuer*" in the ACS process, as is required of any cost included in the fee standard. 15 U.S.C. § 1693o-2(a)(4)(B)(i) (emphasis added). Instead, network processing fees "compensate the network for its

role in processing the transaction." NACS II, 746 F.3d at 479. The Board protests that "but for being an issuer, the issuer would not incur these fees" and the transaction would not be processed, therefore, the issuer is incurring the fees because of its role. Doc. No. 70, p. 17. FedEx customers necessarily incur fees to send packages and they would not incur such fees but for being a customer of FedEx. Nobody, however, would realistically argue that the FedEx fee was incurred for the role of the *customer*. Likewise, network processing fees are not incurred for the role of the issuer— they are incurred by an issuer to ensure the network will fulfill its role. 15 U.S.C. § 1693o-2(a)(4)(B)(i).

[¶ 84]   Second, Congress excluded network fees from being part of the calculation of interchange fees by narrowly defining "network fee" and dedicating an entire section to regulating said fees. The statute defines "network fee" as "any fee charged and received by a [network] with respect to an electronic debit transaction, *other than an interchange transaction fee*." 15 U.S.C. § 1693o-2(c)(10) (emphasis added). Taking a philosophical stance, the Board argues that like a machine's component is not the same as the machine itself, a network fee may be included in the overall calculation of an interchange fee without becoming an interchange fee. See Doc. No. 78, pp. 49–50. Corner Post contends a network fee cannot be a component of, yet different from, an interchange fee. See Doc. No. 78, p. 32:3–8. The Court agrees with Corner Post.

[¶ 85]   Just as Congress instructed the Board to exclude fraud costs in the interchange fee standard, it also told the Board to exclude network fees. Congress dedicated an entire section to network fees, even titling it "Regulatory authority over network fees" and placing that section far below and separate from others that deal with interchange fees. 15 U.S.C. § 1693o-2(a)(8). The phrase "network fees" does not appear in the Durbin Amendment until Congress enabled the Board to regulate them. Id. And in so regulating, the Board was commanded to "ensure that" network fees

were "not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction." 15 U.S.C. § 1693o-2(a)(8)(B)(i). The Board, however, ignored that clear command and effectively reimbursed issuers for paying network fees by including that cost in interchange fees. See Regulation II, 76 Fed. Reg. at 43,430. Congress said what it meant and meant what it said: network fees may not be part of the interchange fee. See BedRoc Ltd., LLC, 541 U.S. at 183.

[¶ 86]  Having found each of the Board's four newly-included costs in Regulation II contravene the Durbin Amendment's commands, the Court concludes the Board's Regulation II is not in accordance with the law and the Board exceeded its statutory authority. See 5 U.S.C. § 706(2).

## V.    Regulation II's Use of the "Representative Issuer" Model Rather than an Issuer-Specific and Transaction-Specific Model Is Contrary to Law

[¶ 87]  Corner Post also asserts Regulation II is contrary to the Durbin Amendment because it set a "one-size-fits-all" interchange fee standard rather than tailoring interchange fees to be "issuer-specific and transaction-specific." Doc. No. 51, p. 34. The Board counters that the Durbin Amendment does not compel a per-transaction and per-issuer approach, but even if it did, the canon against absurdity instructs against that interpretation because it "would be virtually impossible to implement." Doc. No. 58, pp. 35–36.

[¶ 88]  A single fee standard for all—even with an adjustable *ad valorem* component—cannot be squared with the Durbin Amendment's text. Congress commanded the Board to "establish *standards* for assessing whether the amount of any interchange transaction fee . . . is reasonable and proportional to *the* cost incurred by *the* issuer with respect to *the* transaction." 15 U.S.C. § 1693o-2(a)(3)(A) (emphases added). The Parties squabble about whether "the issuer" and "the transaction" really mean a per-issuer and per-transaction standard given that Congress also discussed fees that "*an* issuer" may receive regarding "*an* electronic debit transaction." Compare id. § 1693o-2(a)(3)(A), with id. §§ 1693o-2(a)(1), (a)(2) (emphases added). Sometimes the article

"a" or "an" may be indefinite and mean more than one object, so the Board contends it has authority to formulate one standard applicable to all covered issuers and transactions. Compare Sports v. Top Rank, Inc., 954 F.3d 1142, 1147–48 (8th Cir. 2020) (noting the article "a" is sometimes indefinite and may mean "any"), with Cochise Consultancy, Inc. v. United States ex rel. Hunt, 587 U.S. 262, 272 (2019) (explaining the article "the" is considered definite and generally indicates a singular object). But here, the text and logic say otherwise.

[¶ 89]  Congress directed the Board to issue "standards"—not just one. 15 U.S.C. § 1693o-2(a)(3)(A). It also instructed the Board to include an issuer's "incremental [ACS] cost" for "a *particular*" transaction in its standards' cost considerations. Id. § 1693o-2(a)(4)(B)(i) (emphasis added). Not just any transaction or a conglomerate of transactions, but a "particular" transaction. Id. Why? Because "any interchange transaction fee" must be "reasonable and proportional." Id. § 1693o-2(a)(3)(A). If something is to be "reasonable and proportional," it begs the question: in relation to what? Congress answered that question: "to the cost incurred by the issuer with respect to the transaction." Id. The Board's Proposed Rule explained certain covered issuers had "substantially higher per-transaction costs than others." 75 Fed. Reg. at 81,737. A single standard cannot be reasonable and proportional to issuers with extremely high per-transaction costs and those with substantially lower costs. Accordingly, the Durbin Amendment necessitates tailored "standards" because not all issuers' costs will be reasonable and proportional in relation to one fee standard. See 15 U.S.C. § 1693o-2(a)(3)(A).

[¶ 90]  The Board is correct that issuing such particularized standards will be challenging, but it incorrectly argues the canon against absurdity prohibits that statutory interpretation. The canon only applies when a statute is ambiguous and the proposed interpretation is so irrational and "would be so monstrous that all mankind would, without hesitation, unite in rejecting the

application." United States Dep't of State v. Picur, No. 1:18-cv-00041, 2024 WL 4502250, slip op. at *13 (D.D.C Oct. 16, 2024) (quoting United States v. Long, 997 F.3d 342, 356 (D.C. Cir. 2021)). See also Small v. United States, 544 U.S. 385, 404 (2005) (Thomas, J., dissenting) ("We should employ that canon only where the result of applying the plain language would be, in a genuine sense, absurd, *i.e.*, where it is quite impossible that Congress could have intended the result and where the alleged absurdity is so clear as to be obvious to most anyone." (citation modified)). The Durbin Amendment is not ambiguous (and the Board's brief does not contend as much). But even if it were, requiring the Board to ensure interchange fees were reasonable and proportional to each individual issuer's cost would likely get a round of applause (from everyone except issuers and the Board) rather a united uprising.

[¶ 91]  The daunting task is not impossible or even borderline absurd given the statute's clear language and the fact that Congress empowered the Board to access "such information as may be necessary to carry out the [Durbin Amendment's] provisions." 15 U.S.C. § 1693o-2(a)(3)(B) (authorizing the Board to "require any issuer [or network] to provide the Board with" needed information). For instance, Corner Post suggested during oral argument the Board might find certain issuers' data are sufficiently similar, such that issuers and types of transactions could be effectively categorized and subjected to tailored fee safe harbors that satisfy the statutory "reasonable and proportional" requirement. See Doc. No. 78, pp. 20:16–21:6 ("[I]f the Board has the data to show that both within an issuer and then across issuers all of that data is . . . relatively the same, roughly within the same . . . band, then in that set of circumstances I could conceive that a safe harbor cap might be appropriate."). That scenario may be an instance where a court might find Congress statutorily granted the agency some discretion to treat similarly-situated issuers and transactions as "an issuer" and a "particular" transaction, see Seven Cnty. Infrastructure Coal., 145

- 42 -

S. Ct. at 1511 ("[W]hen an agency exercises discretion granted by a statute, judicial review is typically conducted under the . . . deferential arbitrary-and-capricious standard."), but the Court declines to make such a finding given this issue is currently speculative, U.S. Const. art. III, § 2, cl. 1 (extending judicial power only to "[c]ases" or "[c]ontroversies"). What is certain, however, is Regulation II's one-size-fits-all standard does not comport with the Durbin Amendment's text or logic.

### VI.    The Court Will Not Address the Major Questions Doctrine or the Amici's Particularized Concerns

[¶ 92]  Having found Regulation II contravenes the Durbin Amendment and must be set aside, see 5 U.S.C. § 706(2), there are a few loose ends to tie up. The Court need not consider whether Regulation II is arbitrary and capricious or whether the major questions doctrine is an additional basis for finding Regulation II is contrary to law because the Durbin Amendment's text already causes the regulation's demise. See, e.g., Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs., 594 U.S. 758 (2021) (per curiam) (applying the major questions doctrine).

[¶ 93]  Neither is it necessary to delve into certain amici's concerns—particularly those of the big banks—that (1) existing interchange transaction fees are problematic because they do not provide a reasonable rate of return, and (2) any further cuts to Regulation II's cost considerations could result in unconstitutional confiscatory action. See Doc. No. 65, p. 30. The Eighth Circuit already rejected national banking associations' facial challenge to the Durbin Amendment (a case in which one of the amici appeared) when they argued the then-proposed Alternative 1's fees of "twelve cents or less per transaction" would be unconstitutionally confiscatory. TCF Nat'l Bank, 643 F.3d at 1162. Regulation II set a fee much higher than twelve cents, so the confiscatory concerns are outsized. Also, the Board explicitly excluded from Regulation II "a level of profit or a rate of return as an allowable cost" because to any "extent profit is a 'cost,' it is not one that is specific to a

particular transaction." 76 Fed. Reg. at 43,427 n.119. Here, neither the Board nor Corner Post share the amici's concerns. Accordingly, the Court "decline[s] to consider this issue because it was raised to this court by the amici and not by the parties." Solis v. Summit Contractors, Inc., 558 F.3d 815, 826 n.6 (8th Cir. 2009).

## **CONCLUSION**

[¶ 94] For the foregoing reasons, the Court **GRANTS** Corner Post's Motion for Summary Judgment (Doc. No. 50) and **DENIES** the Board's Cross-Motion for Summary Judgment (Doc. No. 57). Accordingly, the Court will vacate Regulation II, 76 Fed. Reg. 43,394 (July 20, 2011), because it is contrary to law and was promulgated in excess of the Board's authority. See 5 U.S.C. § 706(2). The Court will stay such vacatur pending the resolution of any appeal to the United States Circuit Court for the Eighth Circuit in order to prevent interchange transaction fees from becoming a completely unregulated market. See NACS II, 746 F.3d at 493 (noting a vacatur of the rule "would lead to an entirely unregulated market"). This Order does not prevent the Board's pending updates to Regulation II from taking effect, which serve to lower the "interchange fee cap based on the latest data reported to the Board by large debit card issuers." 2023 NPRM, 88 Fed. Reg. at 78,100.

[¶ 95] **IT IS SO ORDERED**.

DATED August 6, 2025.

Daniel M. Traynor, District Judge
United States District Court